# EXHIBIT 1

# TRUE AND CORRECT COPY OF ORIGINAL

<div style="border:1px solid black">

### CORTE INTERNACIONAL DE ARBITRAJE
### DE LA
### CÁMARA DE COMERCIO INTERNACIONAL

</div>

**Caso CCI 24306/JPA/AJP**

**ÁLYA CONSTRUTORA S.A.**

**(antes CONSTRUTORA QUEIROZ GALVÃO S.A.) (Brasil)**

*(Demandante)*

**c.**

**1. PDVSA PETROLEO S.A. (Venezuela)**

**2. PETROLEOS DE VENEZUELA S.A. (Venezuela)**

*(Demandadas)*

_____

### LAUDO FINAL
_____

*Tribunal Arbitral*
Prof. Diego P. Fernández Arroyo (Árbitro Presidente)
Sr. Cristián Conejero Roos
Prof. Franco Ferrari

*Secretario del Tribunal*
Dr. Bruno Sousa Rodrigues

**Sede del Arbitraje: Paris, Francia**

Arbitraje CCI 24306/JPA/AJP, Laudo Final

*Esta página se dejó en blanco intencionalmente*

# ÍNDICE

**I.  INTRODUCCIÓN** ................................................................................. **10**

**1.  Las partes** ............................................................................................. **10**
  A)  La Demandante .................................................................................. 10
  B)  Las Demandadas ................................................................................ 10

**2.  Los apoderados de las Partes** ........................................................... **10**
  A)  Los apoderados de la Demandante ..................................................... 10
  B)  Los apoderados de las Demandadas ................................................... 11

**3.  El Tribunal Arbitral** ........................................................................... **11**

**4.  Los Acuerdos de arbitraje** ................................................................. **12**

**II.  ANTENCEDENTES PROCESALES** ................................................. **15**

**III.  LA CONTROVERSIA** .......................................................................... **26**

**1.  Origen de la controversia** .................................................................. **27**

**2.  Los hechos relevantes respecto de la controversia** ........................ **27**

**IV.  RESUMEN DE LAS POSICIONES Y PRETENSIONES DE LAS PARTES** .... **28**

**1.  Posiciones y pretensiones de la Demandante** ................................. **28**

**2.  Posiciones y pretensiones de las Demandadas** ............................... **30**

**V.  ANALISIS** ............................................................................................. **33**

**1.  Introducción** ......................................................................................... **33**

**2.  La admisibilidad de la demanda y el antejuicio administrativo** ......... **35**
  A)  La posición de las Demandadas ......................................................... 35
  B)  La posición de la Demandante ........................................................... 36
  C)  El análisis del Tribunal ...................................................................... 37

**3.  La terminación de los Contratos** ...................................................... **39**
  A)  La posición de la Demandante ........................................................... 39
  B)  La posición de las Demandadas ......................................................... 42
  C)  El análisis del Tribunal ...................................................................... 45

**4.  El derecho a la indemnización bajo la LCP y el RLCP** ................. **62**
  A)  La posición de la Demandante ........................................................... 62
  B)  La posición de las Demandadas ......................................................... 63
  C)  El análisis del Tribunal ...................................................................... 64

*5.*   *El quantum de la indemnización bajo la LCP y el RLCP* ....................................................*66*
   A)   La posición de la Demandante.................................................................................66
   B)   La posición de las Demandadas...............................................................................68
   C)   El análisis del Tribunal ...........................................................................................69

**VI.**   **COSTAS** ...........................................................................................................**79**

**VII.**   **DISPOSITIVO**.............................................................................................**80**

## TÉRMINOS DEFINIDOS

| | |
|---|---|
| **Acta de Misión** | Acta de Misión, redactada en concordancia a lo previsto en el Artículo 23 del Reglamento de Arbitraje de la CCI en vigor desde el 1 de marzo de 2017, firmada el 6 de febrero de 2020 |
| **Acuerdos de arbitraje** | Referencia en conjunto a la cláusula SEXTA del Addendum n.º 1 – PIGAP, la cláusula 29 del Contrato PIGAP y el Artículo 29 del Contrato Carito-Pirital |
| **Addendum 1 - Carito-Pirital** | Contrato n.º 4600071245/1B-121-015-F-16-N-0151, IPC INCREMENTO DE LA CAPACIDAD DE COMPRESIÓN DE GAS DE BAJA (60 PSIG) Y MEDIA PRESIÓN (450 PSIG) CARITO-PIRITAL |
| **Addendum 1 - PIGAP** | Contrato n.º 4600057362 / 1B-121-015-A-14-N-5406, ADDENDUM n.º 1, CONTRATO DE INGENIERÍA, PROCURA Y CONSTRUCCIÓN IPC AMPLIACIÓN PIGAP II |
| **Addendum 2 - PIGAP** | Contrato n.º 4600057362 / 1B-121-015-A-14-N-5406, ADDENDUM n.º 2, CONTRATO DE INGENIERÍA, PROCURA Y CONSTRUCCIÓN IPC AMPLIACIÓN PIGAP II |
| **Audiencia** | Audiencia sobre el Mérito, celebrada entre los días 30 de enero y 1 de febrero de 2023 de forma híbrida, con formato presencial en la Oficina Dentons, ubicada en 5 Blv. Malasherbes, 75008, Paris, Francia |
| **Audiencia de Jurisdicción e Admisibilidad** | Audiencia sobre Jurisdicción y Admisibilidad, celebrada los días 8 y 9 de noviembre de 2021 de forma híbrida, con formato presencial en la |

| | |
|---|---|
| | Oficina Dentons, ubicada en 5 Blv. Malasherbes, 75008, Paris, Francia |
| **BSJI** | Banco San Juan Internacional Inc. |
| **CCI** | Cámara de Comercio Internacional |
| **Contestación** | Memorial de Contestación presentado conjuntamente por las Demandadas en 20 de septiembre de 2022 |
| **Contrato PIGAP** | Contrato n.º 4600057362 / 1B-121-015-A-14-N-5406, IPC AMPLIACIÓN PIGAP II |
| **Contrato Carito-Pirital** | Contrato n.º 4600071245/1B-121-015-F-16-N-0151, IPC INCREMENTO DE LA CAPACIDAD DE COMPRESIÓN DE GAS DE BAJA (60 PSIG) Y MEDIA PRESIÓN (450 PSIG) CARITO-PIRITAL |
| **Contratos** | Denominación conjunta del Contrato PIGAP y el Contrato Carito-Pirital |
| **Convención de Nueva York** | Convención de las Naciones Unidas sobre el reconocimiento y la ejecución de las sentencias arbitrales extranjeras, Nueva York, 10 de junio de 1958 |
| **Demandante** | Álya Construtora S.A. (antes Construtora Queiroz Galvão S.A.) |
| **Demandadas** | PDVSA Petróleo S.A y Petróleos de Venezuela S.A. |
| **Demanda** | Memorial de Demanda presentado por la Demandante en 17 de agosto de 2022 |
| **Dúplica** | Memorial de Dúplica presentado por las Demandadas en 9 de noviembre de 2022 |

| | |
|---|---|
| **EPA Demandante** | Escrito Post Audiencia presentado por la Demandante el 21 de febrero de 2023 |
| **EPA Demandadas** | Escrito Post Audiencia presentado por las Demandadas el 21 de febrero de 2023 |
| **Escrito Complementario a la Contestación** | Escrito Complementario al Memorial de Contestación presentado conjuntamente por las Demandadas el día 4 de octubre de 2023 |
| **Informe Badell** | Opinión de Experto sobre Asuntos de Derecho Venezolano del Professor Rafael Badell Madrid |
| **Informe Freitas** | Opinión del Experto Diego de Freitas sobre la Veracidad de la Información de Soporte Compartida por la Demandante (Anexos De-63, De-64 y De-65) |
| **Informe Mouriño** | Primer Dictamen Jurídico del Professor Carlos Enrique Mouriño Vaquero |
| **Laudo Parcial** | Laudo Parcial dictado el día 24 de mayo de 2022 |
| **LCP** | Decreto con Rango, Valor y Fuerza de Ley de Contrataciones Públicas, publicado en Gaceta Oficial Extraordinaria n.º 6.154 de fecha 19 de noviembre de 2014 |
| **LOPGR** | Ley Orgánica de la Procuraduría General de la República |
| **OP1** | Orden Procesal n.º 1, de fecha 10 de febrero de 2020 |
| **OP2** | Orden Procesal n.º 2, de fecha 10 de agosto de 2021 |
| **OP3** | Orden Procesal n.º 3, de fecha 1º de noviembre de 2021 |

| | |
|---|---|
| **OP4** | Orden Procesal n.º 4, de fecha 8 de noviembre de 2021 |
| **OP5** | Orden Procesal n.º 5, de fecha 2 de agosto de 2022 |
| **OP5 (modificada)** | Orden Procesal n.º 5 (modificada), de fecha de 6 de septiembre de 2022 |
| **OP6** | Orden Procesal n.º 6, de fecha 12 de octubre de 2022 |
| **OP7** | Orden Procesal n.º 7, de fecha 6 de enero de 2023 |
| **OP8** | Orden procesal n.º 8, de fecha 25 de enero de 2023 |
| **Partes** | Demandante y Demandadas conjuntamente |
| **PDVSA** | Petróleos de Venezuela S.A. |
| **PDVSA Petróleo** | PDVSA Petróleos S.A. |
| **Primera Demandada** | PDVSA Petróleos S.A. |
| **Providencias Administrativas de Terminación** | Providencia Administrativa n.º 001, de fecha 9 de octubre de 2018, relativa al Contrato PIGAP; y Providencia Administrativa n.º 002 de fecha 9 de octubre de 2018, respecto del Contrato Carito-Pirital, las cuales decidieron por rescindir los Contratos por causas imputables al contratista |
| **QG** | Álya Construtora S.A. (antes Construtora Queiroz Galvão S.A.) |
| **RLCP** | Reglamento de la Ley de Contrataciones Públicas, publicado en Gaeta Oficial n.º 39.181 de echa de mayo de 2009 |

| | |
|---|---|
| **Reglamento** | Reglamento de Arbitraje de la CCI en vigor el 1 de marzo de 2017 |
| **Réplica** | Memorial de Réplica presentado por la Demandante en 25 de octubre de 2022 |
| **Secretaría** | Secretaría de la Corte de la Cámara de Comercio Internacional |
| **Segunda Demandada** | Petróleos de Venezuela S.A. |
| **Segundo Informe Badell** | Segunda Opinión de Experto sobre Asuntos de Derecho Venezolano del Professor Rafael Badell Madrid |
| **Segundo Informe Freitas** | Opinión del Experto Diego de Freitas sobre la Veracidad de la Información de Soporte Compartida por la Demandante (Anexos De-65, De-66 y De-69) y Revisión del Segundo Testimonio de Gediel Deleo |
| **Segundo Informe Mouriño** | Segundo Dictamen Jurídico del Professor Carlos Enrique Mouriño Vaquero |
| **Solicitud** | Solicitud de Arbitraje presentada por la Demandante el 2 de marzo de 2019 ante la Secretaría |

# I. INTRODUCCIÓN

## 1. *Las partes*

### A) La Demandante

1. La demandante es Álya Construtora S.A., antes Construtora Queiroz Galvão S.A. ("**QG**" o la "**Demandante**"). Es una sociedad constituida de conformidad con las leyes de la República Federativa de Brasil e inscrita en el Registro Mercantil de la ciudad de Río de Janeiro, bajo el n.º CNPJ/MF 33.412.792/0001.60, cuya sucursal en la República Bolivariana de Venezuela fue inscrita en el Registro Mercantil Quinto de la Circunscripción Judicial del Distrito Capital y Estado Miranda el 15 de enero de 2010, bajo el n.º 5, Tomo 6-A. El domicilio social de la sucursal de QG en la República Bolivariana de Venezuela está ubicado en Av. Venezuela, Torre Mariana, Piso 7, Urbanización El Rosal, Caracas, Municipio Chacao, República Bolivariana de Venezuela.

### B) Las Demandadas

2. Las demandadas son: (i) PDVSA Petróleo S.A., una empresa estatal dedicada a la actividad petrolera, registrada de conformidad con las leyes de la República Bolivariana de Venezuela, cuya sede se encuentra en la Avenida Libertador, Urbanización la Campiña, Edificio Petróleos de Venezuela, Torre Este, Caracas, República Bolivariana de Venezuela ("**PDVSA Petróleo**" o "**Primera Demandada**"); (ii) Petróleos de Venezuela S.A., una empresa estatal dedicada a la actividad petrolera, registrada de conformidad con las leyes de la República Bolivariana de Venezuela, cuya sede se encuentra en la Avenida Libertador, Urbanización la Campiña, Edificio Petróleos de Venezuela, Torre Este, Caracas, República Bolivariana de Venezuela ("**PDVSA**" o "**Segunda Demandada**", conjuntamente las "**Demandadas" y, conjuntamente con la Demandante, las "Partes**").

## 2. *Los apoderados de las Partes*

### A) Los apoderados de la Demandante

3. La Demandante es representada por:

> **José Ignacio García Cueto**
> **Marie Isabelle Delleur**
> **Ignacio Díaz**
> **Florencia Bohl**
> **Hernán Chiriboga**
> **Nicolás De La Flor Puccinelli**
> CLIFFORD CHANCE US LLP
> 2001 K Street, N.W.
> Washington, DC, 20006
> ESTADOS UNIDOS DE AMÉRICA
> Emails: jose.garciacueto@cliffordchance.com;

mi.delleur@cliffordchance.com;
ignacio.diaz@cliffordchance.com;
florencia.bohl@cliffordchance.com;
hernan.Cchiriboganovillo@cliffordchance.com
nicolas.delaflorpuccinelli@cliffordchance.com

B)  Los apoderados de las Demandadas

4.      Las Demandadas son representadas por:

**Miguel Barráez**
**Annabella Rivas**
**Aldo Galindo**
PDVSA PETROLEOS, S.A.
PETROLEOS DE VENEZUELA, S.A.
Avenida Libertador, Urbanización la Campiña
Edificio Petróleos de Venezuela, Torre Este
Caracas
REPÚBLICA BOLIVARIANA DE VENEZUELA
E-mails: barraezms@gmail.com;
rivasaay@pdvsa.com;
galindoa@pdvsa.com;
cjlitigios@pdvsa.com.

**Roberto Antonio Leyba**
VENATT INTERNATIONAL ADVISORS KFT A.C.
Urbanización San Antonio, Sabana
Grande Sur, Prolongación Las Acacias,
entre Avenida Casanova y Abraham Lincoln
Torre Domus, Piso 7, oficina 7-C
Caracas
REPÚBLICA BOLIVARIANA DE VENEZUELA
E-mails: rleyba@venezuelanattorneys.com;

### 3.  *El Tribunal Arbitral*

5.      El Tribunal Arbitral se compone de los siguientes miembros:

**Presidente:**
Prof. Diego P. Fernández Arroyo
4 rue Rollin
75005 Paris
FRANCIA
E-mail: diego.fernandezarroyo@dpfa-arb.com

**Co-Árbitro designado por la Demandante:**

Sr. Cristián Conejero Roos
CUATRECASAS
Oficina de Santiago de Chile
Av. Nueva Costanera 3300, piso 4 Vitacura
7630413 Santiago de Chile
CHILE
E-mail: cristian.conejero@cuatrecasas.com

**Co-Árbitro designado por las Demandadas:**
Prof. Franco Ferrari
CENTER FOR TRANSNATIONAL LITIGATION,
ARBITRATION AND COMMERCIAL LAW
NYU School of Law 409B
40 Washington Square South
New York, 10012
ESTADOS UNIDOS DE AMERICA
E-mail: franco.ferrari@nyu.edu

### 4. *Los Acuerdos de arbitraje*

6.    El presente arbitraje está basado en la cláusula 6 del Contrato n.º 4600057362 / 1B-121-015-A-14-N-5406, ADDENDUM n.º 1, CONTRATO DE INGENIERÍA, PROCURA Y CONSTRUCCIÓN IPC AMPLIACIÓN ("**Addendum n.º 1 – PIGAP**"), en la cláusula 29 del Contrato n.º 4600057362 / 1B-121-015-A-14-N-5406, IPC AMPLIACIÓN PIGAP II ("**Contrato PIGAP**"), y en la cláusula 29 del Contrato n.º 4600071245/1B-121-015-F-16-N-0151, IPC INCREMENTO DE LA CAPACIDAD DE COMPRESIÓN DE GAS DE BAJA (60 PSIG) Y MEDIA PRESIÓN (450 PSIG) CARITO-PIRITAL ("**Contrato Carito-Pirital**" y, conjuntamente con el Contrato PIGAP, los "**Contratos**"). En conjunto, las tres cláusulas son mencionadas en este arbitraje como los "**Acuerdos de arbitraje**". Estos Acuerdos de arbitraje fueron firmados por PDVSA Petróleo y QG.

7.    La cláusula SEXTA del Addendum n.º 1 - PIGAP establece lo que sigue:

> "*Las PARTES acuerdan modificar la CLÁUSULA 29 – RESOLUCIÓN DE CONTROVERSIAS, con la finalidad de sustituir la Subcláusula 29.1, por la siguiente:*
> ***29.1*** *En caso de controversias que surjan de la ejecución o interpretación del presente CONTRATO, las PARTES harán sus mejores esfuerzos para lograr una solución amigable de sus diferencias. En caso de no lograrse acuerdo entre el REPRESENTANTE DE LA CONTRATISTA y el REPRESENTANTE DE LA COMPAÑÍA dentro de un lapso de treinta (30) DÍAS contados a partir de la notificación que haga una parte a la otra respecto a una controversia, la controversia será sometida por un Director de LA CONTRATISTA al máximo nivel de autoridad gerencial de la ORGANIZACIÓN CONTRATANTE de LA COMPAÑÍA, para su consideración y resolución.*
> *En caso de no solventarse la controversia a ese nivel dentro de un lapso de treinta (30) DÍAS contados a partir de la notificación que haga un director de LA CONTRATISTA al máximo nivel de autoridad gerencial de la ORGANIZACIÓN CONTRATANTE de LA COMPAÑÍA, el*

*Presidente de LA CONTRATISTA someterá la controversia al Director de Enlace de la ORGANIZACIÓN CONTRATANTE de LA COMPAÑÍA para resolverla en un lapso de treinta (30) DÍAS.*

*Vencido este último lapso y en caso que la disputa o diferencia no haya sido resuelta con aplicación del procedimiento anterior, cualquiera de las PARTES podrá someterla a arbitraje, de acuerdo con las siguientes reglas:*

> *1. El Arbitraje se celebrará de conformidad con el Reglamento de Arbitraje de la Cámara de Comercio Interanacional (CCI).*
>
> *2. El lugar para el arbitraje será en Paris, Francia.*
>
> *3. Los idiomas del procedimiento arbitral serán castellano e inglés.*
>
> *4. El arbitraje será un arbitraje de derecho.*
>
> *5. El tribunal arbitral estará integrado por tres (3) árbitros. Los árbitros serán nombrados de la siguiente manera: cada PARTE designará un árbitro. El nombramiento por la parte que ha iniciado el arbitraje deberá realizarse en el requerimiento de arbitraje o de cualquier otra manera, al momento en que inicie el arbitraje. Dentro de los diez (10) DÍAS siguientes a la confirmación del último árbitro nombrado por las PARTES, los árbitros nombrados por ambas PARTES deberán designar a un tercero, quien actuará como presidente del tribunal arbitral. Si los árbitros nombrados por ambas PARTES no designan al presidente del tribunal arbitral en el lapso aquí establecido, el presidente deberá ser nombrado por la Corte Internacional de Arbitraje de la CCI, de conformidad con las Reglas de la CCI. Ninguno de los árbitros podrá haber sido empleado o consultor de ninguna de las PARTES, o de sus filiales, o contratado por las PARTES o sus filiales como abogado, contador público, o similar, o haber sido miembro, funcionario, director o empleado de cualquier entidad relacionada con una de las PARTES o cualquiera de sus filiales, o tener un interés financiero en la disputa. Los árbitros deberán ser abogados, de cualquier nacionalidad distinta de la de todas las PARTES, y deberán hablar de forma fluida el idioma inglés y el idioma castellano.*
>
> *6. Los costos del proceso serán cubiertos por ambas PARTES, en partes idénticas, a menos que el tribunal arbitral decida en contrario en su laudo.*
>
> *7. Las PARTES harán su mejor esfuerzo para seguir cumpliendo sus obligaciones bajo el CONTRATO pese a cualquier controversia entre ellas, de modo que no se suspenda la ejecución del CONTRATO.*
>
> *8. Cualquier laudo arbitral será definitivo y vinculante para las PARTES.*

8. En consecuencia, la cláusula 29 del Contrato PIGAP debe ser leído como sigue:

> *29.1 En caso de controversias que surjan de la ejecución o interpretación del presente CONTRATO, las PARTES harán sus mejores esfuerzos para lograr una solución amigable de sus diferencias. En caso de no lograrse acuerdo entre el REPRESENTANTE DE LA CONTRATISTA y el REPRESENTANTE DE LA COMPAÑÍA dentro de un lapso de treinta (30) DÍAS contados a partir de la notificación que haga una parte a la otra respecto a una controversia, la controversia será sometida por un Director de LA CONTRATISTA al máximo nivel de autoridad gerencial de la ORGANIZACIÓN CONTRATANTE de LA COMPAÑÍA, para su consideración y resolución.*

*En caso de no solventarse la controversia a ese nivel dentro de un lapso de treinta (30) DÍAS contados a partir de la notificación que haga un director de LA CONTRATISTA al máximo nivel de autoridad gerencial de la ORGANIZACIÓN CONTRATANTE de LA COMPAÑÍA, el Presidente de LA CONTRATISTA someterá la controversia al Director de Enlace de la ORGANIZACIÓN CONTRATANTE de LA COMPAÑÍA para resolverla en un lapso de treinta (30) DÍAS.*

*Vencido este último lapso y en caso que la disputa o diferencia no haya sido resuelta con aplicación del procedimiento anterior, cualquiera de las PARTES podrá someterla a arbitraje, de acuerdo con las siguientes reglas:*

> ***1.*** *El Arbitraje se celebrará de conformidad con el Reglamento de Arbitraje de la Cámara de Comercio Internacional (CCI).*
> ***2.*** *El lugar para el arbitraje será en París, Francia.*
> ***3.*** *Los idiomas del procedimiento arbitral serán castellano e inglés.*
> ***4.*** *El arbitraje será un arbitraje de derecho.*
> ***5.*** *El tribunal arbitral estará integrado por tres (3) árbitros. Los árbitros serán nombrados de la siguiente manera: cada PARTE designará un árbitro. El nombramiento por la parte que ha iniciado el arbitraje deberá realizarse en el requerimiento de arbitraje o de cualquier otra manera, al momento en que inicie el arbitraje. Dentro de los diez (10) DÍAS siguientes a la confirmación del último árbitro nombrado por las PARTES, los árbitros nombrados por ambas PARTES deberán designar a un tercero, quien actuará como presidente del tribunal arbitral. Si los árbitros nombrados por ambas PARTES no designan al presidente del tribunal arbitral en el lapso aquí establecido, el presidente deberá ser nombrado por la Corte Internacional de Arbitraje de la CCI, de conformidad con las Reglas de la CCI. Ninguno de los árbitros podrá haber sido empleado o consultor de ninguna de las PARTES, o de sus filiales, o contratado por las PARTES o sus filiales como abogado, contador público, o similar, o haber sido miembro, funcionario, director o empleado de cualquier entidad relacionada con una de las PARTES o cualquiera de sus filiales, o tener un interés financiero en la disputa. Los árbitros deberán ser abogados, de cualquier nacionalidad distinta de la de todas las PARTES, y deberán hablar de forma fluida el idioma inglés y el idioma castellano.*
> ***6.*** *Los costos del proceso serán cubiertos por ambas PARTES, en partes idénticas, a menos que el tribunal arbitral decida en contrario en su laudo.*
> ***7.*** *Las PARTES harán su mejor esfuerzo para seguir cumpliendo sus obligaciones bajo el CONTRATO pese a cualquier controversia entre ellas, de modo que no se suspenda la ejecución del CONTRATO.*
> ***8.*** *Cualquier laudo arbitral será definitivo y vinculante para las PARTES.*

***29.2.*** *Así mismo, las PARTES convienen en que la información resultante o generada en el procedimiento descrito en el Numeral anterior, tendrá carácter confidencial y se tratará de conformidad con lo establecido en la Cláusula 24 (CONFIDENCIALIDAD) del presente CONTRATO."*

9.      La cláusula 29 del Contrato Carito-Pirital tiene el mismo texto.

## II. ANTENCEDENTES PROCESALES

10. El día 24 de mayo de 2022, el Tribunal emitió el Laudo Parcial decidiendo una serie de cuestiones relativas a su jurisdicción y a la admisibilidad de la demanda.

11. El día 25 de mayo de 2022, la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional prorrogó el plazo para dictar el laudo final hasta el 30 de junio de 2022.

12. El día 8 de junio de 2022, la Secretaría envió a las Partes una copia de cortesía del Laudo Parcial por correo electrónico.

13. El día 9 de junio de 2022, las Partes acusaron recibo de la copia de cortesía del Laudo Parcial.

14. El día 20 de junio de 2022, la Secretaría comunicó al Tribunal Arbitral que la Demandante había recibido el Laudo Parcial el día 13 de junio de 2022.

15. El día 23 de junio de 2022, la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional prorrogó el plazo para dictar el laudo final hasta el 29 de julio de 2022.

16. El día 29 de junio de 2022, el Tribunal envió una comunicación a las Partes señalándoles que el plazo para el inicio de la segunda fase de este Arbitraje comenzaría a computarse a partir de que todas las Partes hubieran recibido copia física del Laudo Parcial. En la misma comunicación, el Tribunal también se refirió a la provisión para honorarios y gastos, en los siguientes términos: "debido a la situación imperante durante la primera fase, no se depositó la provisión para honorarios y gastos (lo que es algo absolutamente anormal en el arbitraje internacional) sino que se pagó directamente a los árbitros al final de la primera etapa, después de realizada la Audiencia de Jurisdicción. Estamos esperando una respuesta de la CCI para ver si podemos normalizar esta cuestión con vistas a la segunda fase de este arbitraje. Es decir, que la provisión sea pagada antes de comenzar el trabajo concreto del Tribunal. El Tribunal también ha preguntado si la previsión de gastos inicial (EUR 580 000), continúa vigente o debe ser actualizada teniendo en cuenta lo realizado hasta ahora en este arbitraje".

17. El día 13 de julio de 2022, la Secretaría informó que la Corte había reconsiderado ese mismo día la provisión para gastos y decidió aumentarla de EUR 580 000 a EUR 615 000. En su notificación, la Secretaría informó que estaba a la espera de "ciertas verificaciones" por parte de su Departamento de Servicios Legales y de su institución bancaria con el fin de proporcionar información actualizada con respecto a la forma de proceder en cuanto al aspecto financiero de este arbitraje.

18. El día 20 de julio de 2022, el Tribunal recibió una comunicación del departamento de la CCI encargado de las cuestiones de *compliance* en el que se notificó que uno de los bancos con los que trabaja la CCI estaba dispuesto a recibir pagos en arbitrajes en los que participa una entidad venezolana sancionada siempre que esos pagos sean realizados por la entidad no sancionada y se cumplan una serie de requisitos.

19.     El día 21 de julio de 2022, la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional prorrogó el plazo para dictar el laudo final hasta 28 de febrero de 2023.

20.     El día 25 de julio de 2022, la Secretaría informó a las Partes lo indicado en el párrafo precedente, les envió la Tabla Financiera actualizada y solicitó a la Demandante una nueva provisión de fondos.

21.     El mismo día, la Demandante acusó recibo de la comunicación anterior y se comprometió a gestionar debidamente el pago.

22.     El día 28 de julio de 2022, la Secretaría informó que las Demandadas fueron notificadas del Laudo Parcial el día 14 de julio de 2022.

23.     El mismo día, ante una consulta de la Demandante, el Tribunal Arbitral anunció el envío inminente de un proyecto de calendario siguiendo los plazos establecidos en la Orden Procesal n.º 2 (la "**OP2**").

24.     El día 29 de julio de 2022, el Tribunal envió el proyecto de la Orden Procesal n.º 5 (la "**OP5**"), conteniendo dicho calendario y solicitó a las Partes que se pronuncien a la mayor brevedad acerca del mismo.

25.     Los días 1 y 2 de agosto de 2022, respectivamente, la Demandante y las Demandadas respondieron al llamado del Tribunal Arbitral.

26.     El día 2 de agosto de 2022, el Tribunal Arbitral emitió la OP5, en la cual se estableció el calendario procesal de la segunda fase del procedimiento.

27.     El día 17 de agosto de 2022, la Demandante presentó su Memorial de Demanda (la "**Demanda**"), acompañado de los índices de anexos de prueba documental y autoridades legales, las declaraciones de testigos con los índices de anexos, y el informe de experto con su índice de anexos. En la ocasión, la Demandante informó que, de conformidad con el párrafo 8 de la Orden Procesal n.º 1 (la "**OP1**"), la Demandante enviaría en los siguientes tres días hábiles (lunes 22 de agosto) un hipervínculo a un Portal de Transferencia de Datos con los índices de anexos de prueba documental y autoridades legales, las declaraciones de testigos con sus índices de anexos, los informes u opiniones de peritos pertinentes con los índices de anexos, los anexos de pruebas documentales y autoridades legales.

28.     El día 18 de agosto de 2022, el Tribunal Arbitral acusó recibo de la Demanda y sus anexos.

29.     El día 22 de agosto de 2022, la Demandante presentó el hipervínculo a un Portal de Transferencia de Datos que contenía los índices de anexos de prueba documental y autoridades legales; las declaraciones de testigos con sus índices de anexos, los informes u opiniones de peritos pertinentes con los índices de anexos, y los anexos de pruebas documentales y autoridades legales. En la misma oportunidad, la Demandante comunicó que, de conformidad con el párrafo 8 de la OP1, la Demandante presentaría las traducciones a documentos no redactados en lengua española o inglesa en 7 días hábiles desde la presentación del escrito (i.e. 26 de agosto de 2022).

30.    El día 23 de agosto de 2022, el Tribunal Arbitral acusó recibo del mensaje de la Demandante, confirmando que había podido acceder a los documentos a través del Portal de Transferencia de Datos.

31.    El día 26 de agosto de 2022, la Demandante presentó el hipervínculo al Portal de Transferencia de Datos donde se habían cargado las traducciones de los documentos no redactados en lengua española o inglesa.

32.    El día 27 de agosto de 2022, el Tribunal Arbitral acusó recibo de las traducciones. Sin embargo, el Tribunal Arbitral invitó la Demandante a enviar una lista de documentos traducidos para que pudiera confirmar que había podido acceder a todos las traducciones.

33.    El día 28 de agosto de 2022, la Demandante comunicó la lista de documentos traducidos.

34.    El mismo día, el Tribunal Arbitral acusó recibo de la lista de documentos traducidos, confirmando que había podido acceder a todas las traducciones enviadas.

35.    El día 5 de septiembre de 2022, las Demandadas informaron que "[d]ebido a las sanciones que pesan sobre nuestras representadas, a la fecha, ha sido imposible contratar a un testigo experto", solicitando al Tribunal Arbitral que se le otorgara "una prórroga de 15 días adicionales al lapso de presentar nuestro memorial de contestación".

36.    El día 6 de septiembre de 2022, el Tribunal Arbitral invitó a la Demandante a comentar la solicitud de las Demandadas no más tarde del jueves 8 de septiembre de 2022.

37.    El mismo día, la Demandante presentó sus comentarios, proponiendo que "[e]l 20 de septiembre de 2022 (fecha fijada en la OP5) las Demandadas presentarán su Memorial de Contestación, testimonios y prueba documental y legal e informes de experto (no afectados por la sanciones), que "[e]l 30 de septiembre de 2022 (+10 días calendario), de así estimarlo conveniente, las Demandadas tienen la posibilidad de presentar el peritaje que viene demorado por las sanciones, acompañado, de así quererlo las Demandadas, de un breve escrito limitado a resumir las conclusiones del informe", y que "[l]a Demandante presentará su Memorial de Réplica el 15 de octubre y las Demandadas su Dúplica el 30 de octubre".

38.    El mismo día, el Tribunal Arbitral acusó recibo de los comentarios y propuestas de la Demandante, informando que se pronunciaría a respecto a la brevedad.

39.    El mismo día, el Tribunal Arbitral decidió acceder a la solicitud de las Demandadas de retrasar 15 días el plazo previsto en el calendario para la presentación del Memorial (o Memoriales) de Contestación, pero solo respecto del informe pericial cuya elaboración se vería afectada por las sanciones. Así, la fecha límite para la presentación de dicho Memorial (exceptuando el mencionado informe pericial) siguió siendo el 20 de septiembre de 2022. En la misma oportunidad, el Tribunal Arbitral indicó que el resto de los plazos deberían ser modificados en consecuencia, razón por la cual emitió el mismo 6 de septiembre la OP5 modificada actualizando los plazos del procedimiento.

40. El día 17 de septiembre de 2022, las Demandadas presentaron una comunicación en que informaban que seguían teniendo dificultades para realizar el pago de sus expertos, solicitando una nueva prórroga de 15 días adicionales para presentación de su Memorial de Contestación.

41. El día 18 de septiembre de 2022, el Tribunal Arbitral acusó recibo de la comunicación de las Demandadas e invitó a la Demandante a que realizara sus comentarios no más tarde del 19 de septiembre de 2022.

42. El día 19 de septiembre de 2022, la Demandante presentó sus comentarios, observando que "si la contratación de expertos se está imposibilitando por las sanciones esta parte no se opone a que se extienda 15 días el plazo de presentación de ambas pericias y del breve escrito de acompañamiento que se limitará a los puntos de la pericial".

43. El mismo día, el Tribunal Arbitral autorizó a las Demandadas a presentar los informes legal y contable mencionados en el plazo de 15 días suplementarios antes concedido, en el entendimiento de que en ambos casos las Demandadas han tenido inconvenientes para contratar los expertos a raíz de las sanciones.

44. El día 20 de septiembre de 2022, las Demandadas escribieron al Tribunal Arbitral informando que uno de sus testigos había tenido problemas de conectividad "al punto que desde el día de ayer no lo hemos podido contactar para finiquitar el asunto de su declaración". Así, las Demandadas solicitaron al Tribunal Arbitral que "nos conceda dos (2) días más para presentar la declaración de ese testigo, y si tenemos a bien, algún escrito complementario al Memorial de Contestación", observando que "[d]e transcurrir ese plazo sin que logremos contactar al testigo desistiremos de su presentación".

45. El mismo día, dada la perentoriedad de la solicitud, que no brindó tiempo para solicitar comentarios a la Demandante, el Tribunal concedió excepcionalmente una prórroga de dos días (es decir, hasta el 22 de septiembre de 2022) para presentar la declaración escrita del mencionado testigo, indicando que este debía ser identificado claramente en el Memorial de Contestación o en la carta acompañando dicho memorial. Además, el Tribunal Arbitral observó que dicha prórroga excepcional se refería sólo a dicha declaración testimonial, pero a ningún otro documento a presentar por las Demandadas, subrayando que las Demandadas no podrían presentar ningún escrito complementario al Memorial de Contestación después del vencimiento del plazo que vencía aquel día.

46. El mismo día, las Demandadas presentaron su Memorial de Contestación (la "**Contestación**"), acompañado de los listados de anexos legales y fácticos.

47. En una serie de correos del mismo día, las Demandadas transmitieron los anexos a la Contestación e informaron que el nombre del testigo que tenía problemas de conectividad era Luis Vielma.

48. El mismo día, el Tribunal Arbitral acusó recibo de los documentos enviados y tomó nota del nombre del testigo cuya declaración podría ser presentada hasta el 22 de septiembre de 2022.

49.   El día 22 de septiembre de 2022, las Demandadas enviaron la Declaración del testigo Luis Vielma, así como el listado de sus anexos.

50.   El mismo día, el Tribunal Arbitral acusó recibo de la declaración testimonial del Sr. Luis Vielma con sus anexos.

51.   El día 4 de octubre de 2022, las Demandadas presentaron su Escrito Complementario al Memorial de Contestación (el "**Escrito Complementario a la Contestación**"), acompañado del Dictamen Legal y del Dictamen Contable.

52.   El mismo día, el Tribunal Arbitral acusó recibo de la manifestación de las Demandadas.

53.   El día 5 de octubre de 2022, las Demandadas presentaron anexos del Dictamen Contable.

54.   El día 7 de octubre de 2022, las Demandadas presentaron anexos del Dictamen Legal.

55.   El día 8 de octubre de 2022, el Tribunal Arbitral acusó recibo de los anexos del Dictamen Legal. Sin embargo, el Tribunal Arbitral solicitó información acerca de si las Demandadas habían colocado o colocarían toda la documentación en un Portal de Transferencia de Datos como señalado en el §7 de la OP1.

56.   El día 9 de octubre de 2022, las Demandadas comunicaron por correo electrónico que una versión previa del Dictamen Legal había sido involuntariamente transmitida, la cual contenía errores materiales. Así, las Demandadas solicitaron que se tomara como válida una nueva versión del Dictamen Legal. Igualmente, las Demandadas informaron que habían preparado una versión *redline* que evidenciaría las diferencias entre la versión originalmente presentada y la nueva versión. Por fin, las Demandadas comunicaron al Tribunal Arbitral que en razón de fallas técnicas no habían podido cargar la documentación en un Portal de Transferencia de Datos, pero garantizaron que la situación sería subsanada a la brevedad.

57.   El mismo día, las Demandadas transmitieron nuevos anexos del Dictamen Legal.

58.   El día 10 de octubre de 2022, el Tribunal Arbitral acusó recibo de correo de las Demandadas de fecha 9 de octubre de 2022, en el que se incluyeron 6 autoridades legales (anexos DaE-41 a DaE-46), previamente remitidas con diferente nomenclatura. Sin embargo, el Tribunal Arbitral observó que en su mensaje las Demandadas hablaban de una nueva versión del Dictamen y de 18 anexos. El Tribunal Arbitral subrayó que esto significaría que el mensaje recibido por el Tribunal Arbitral no contenía toda la documentación adjuntada. Asimismo, en aras de preservar el principio de igualdad procesal, el Tribunal Arbitral preguntó a la Demandante si tenía alguna consideración que hacer acerca de las últimas manifestaciones de las Demandadas.

59.   El mismo día, la Demandante formuló una serie de comentarios a la manifestación de las Demandadas. Asimismo, la Demandante solicitó al Tribunal Arbitral "que determine que el Informe Mouriño válido es el presentado en la fecha fijada en la OP5 (i.e. el presentado el 4 de octubre) o suspenda el plazo de la Demandante para la presentación del Memorial

de Réplica hasta que decida si admitirá, o no, el informe corregido y/o algún anexo adicional".

60. Siempre el día 10 de octubre de 2022, el Tribunal Arbitral acusó recibo de la comunicación de la Demandante y solicitó a las Demandadas que aclararan la situación planteada respecto del Dictamen Legal, sus versiones y sus anexos.

61. El día 11 de octubre de 2022, las Demandadas presentaron las aclaraciones solicitadas. Asimismo, para salvaguardar el derecho a la defensa de la Demandante, las Demandadas informaron que estarían de acuerdo con que se conceda 5 días adicionales a fin de que la Demandante pudiera preparar su réplica tomando en consideración la versión correcta del Dictamen Legal y sus anexos correspondientes.

62. El día 13 de octubre de 2022, el Tribunal Arbitral emitió la Orden Procesal n.º 6 ("**OP6**") en que ordenó a las Demandadas que, sin demora, envíen nuevamente las diferentes versiones del Dictamen Legal y todos los Anexos que lo acompañan, reiterando que las Demandadas deberán compartir esa documentación mediante un Portal de Transferencia de Datos a la mayor brevedad posible; concedió a la Demandante un plazo adicional de cinco días (es decir, hasta el 25 de octubre de 2022) para presentar su Memorial de Réplica; dispuso que el Memorial de Dúplica debería ser presentado el 9 de noviembre de 2022, que la Notificación de Testigos debería ser realizada a más tardar el 23 de noviembre de 2022, que evaluaría oportunamente la admisibilidad y la pertinencia de la prueba presentada por las Demandadas, y, finalmente, pospuso su decisión respecto a las costas provocadas por estas actuaciones procesales para un momento ulterior.

63. El día 14 de octubre de 2022, las Demandadas enviaron el hipervínculo para la descarga de los últimos archivos remitidos.

64. El día 15 de octubre de 2022, el Tribunal Arbitral acusó recibo del envío, vía *dropbox*, de las versiones "correcta" y "comparada" del Informe Legal del Prof. Mouriño, junto con los Anexos DaE-9 a DaE-46, así como la lista que los describe. En la misma ocasión, el Tribunal solicitó a la Demandante que confirme si había tenido acceso a la documentación referida.

65. El mismo día, la Demandante confirmó que había tenido acceso "a las versiones 'correcta' y 'comparada' del Informe Legal del Prof. Mouriño, junto con los Anexos DaE-9 a DaE-46, así como a la lista de anexos 'correcta' del Prof. Mouriño, a través del enlace compartido".

66. El día 17 de octubre de 2022, el Tribunal Arbitral acusó recibo de la confirmación de la Demandante.

67. El día 25 de octubre de 2022, la Demandante presentó su Memorial de Réplica (la "**Réplica**"), acompañado de los índices de anexos de prueba documental y autoridades legales, las declaraciones de testigos con los índices de anexos, y el informe de experto con su índice de anexos. En la misma oportunidad, la Demandante informó al Tribunal Arbitral y a la Secretaría que había cambiado su nombre, pasando a llamarse Álya Construtora S.A.

68. El día 26 de octubre de 2022, el Tribunal Arbitral acusó recibo de la Réplica de la Demandante, junto a tres declaraciones testimoniales y un informe pericial, todo acompañado de cuatro listados de anexos.

69. El día 28 de octubre de 2022, la Demandante transmitió el hipervínculo a un Portal de Transferencia de Datos conteniendo la documentación de la Réplica. En la misma oportunidad, la Demandante informó que "[e]n la recolección de los documentos de soporte del Segundo Reporte del Dr. Badell se identificó un anexo que se encontraba citado en ese reporte pero que no estaba mencionado en el listado de anexos remitido al Tribunal el 25 de octubre de 2022" y que "[p]or ello, se ha cargado una versión actualizada del listado de anexos del Dr. Badell al FTP que incluye este documento y lo identifica como 'Anexo 57'".

70. El día 29 de octubre de 2022, el Tribunal Arbitral informó que había tomado nota de la versión actualizada del listado de anexos del Dr. Badell, confirmando además que ha podido descargar toda la documentación de la Réplica transmitida en el Portal de Transferencia de Datos.

71. El día 9 de noviembre de 2022, las Demandadas transmitieron el Memorial de Dúplica (la "**Dúplica**"), acompañado de los listados de anexos legales y factuales, así como de los anexos que le corresponden a los Dictámenes correspondientes. En la misma oportunidad, las Demandadas señalaron que "la Demandante presentó cuatro (4) anexos a los cuales no hace referencia en su Memorial de Réplica, ni es posible relacionarlo con alguno de sus argumentos", solicitando "a ese Tribunal que niegue la incorporación de tales anexos al expediente" o subsidiariamente que "pida a la Demandante que exprese la relación de estos anexos con sus argumentos y nos permita realizar la respectiva contestación".

72. El día 10 de noviembre de 2022, el Tribunal Arbitral acusó recibo de la Dúplica de las Demandadas, acompañada de los listados de anexos legales y factuales, así como de los anexos que le corresponden a los Dictámenes correspondiente y tomó nota de la solicitación de las Demandadas. En la misma oportunidad, el Tribunal Arbitral invitó a la Demandante a presentar los comentarios que entendiera pertinentes no más tarde del 15 de noviembre de 2022.

73. El día 13 de noviembre de 2022, las Demandadas transmitieron el hipervínculo para la descarga de los anexos de la Dúplica.

74. El mismo día, el Tribunal Arbitral acusó recibo del enlace para acceder a la plataforma de datos donde se podría descargar los Anexos de la Dúplica. Sin embargo, el Tribunal Arbitral observó que la plataforma *dropbox* indicaba que los datos están protegidos y, por lo tanto, el tribunal no había podido tener acceso a los documentos transmitidos, invitando las Demandadas a que solucionaran el problema técnico a la mayor brevedad posible.

75. El mismo día, las Demandadas enviaron nuevo hipervínculo para la descarga de los anexos de la Dúplica.

76.     El día 14 de noviembre de 2022, el Tribunal Arbitral confirmó que había podido descargar los anexos de la Dúplica.

77.     El día 15 de noviembre de 2022, la Demandante presentó una serie de comentarios respecto de la solicitud de las Demandadas para que se negara la incorporación de los anexos De-71 a De-74 al expediente. En particular, la Demandante afirmó que el pedido era infundado y que "[d]e una simple lectura de los párrafos 13 y 14 del Segundo Testimonio del Sr. Nielsen y un cotejo de los mismos con el nombre de los documentos citados es evidente que estos anexos se refieren a lo indicado en dichos párrafos".

78.     El mismo día, la Demandante advirtió que las Demandadas no habían cargado el anexo Da-29 a la plataforma de transferencia de datos.

79.     El mismo día, el Tribunal Arbitral tomó nota de las explicaciones de la Demandante respecto de los anexos De-71 a De-74. Sin embargo, el Tribunal Arbitral invitó a las Demandadas a realizar los comentarios necesarios al respecto, a más tardar el 18 de noviembre de 2022. Asimismo, en relación con el anexo Da-29, el Tribunal ordenó su presentación a las Demandadas en el mismo plazo indicado, asumiendo que se trataría de un error de cargado.

80.     El día 18 de noviembre de 2022, las Demandadas remitieron sus comentarios a los Anexos De-071, De-072, De-073, De-074 presentados por la Demandante, así como adjuntó el anexo Da-29 referente a su Memorial de Dúplica.

81.     El mismo día, el Tribunal Arbitral acusó recibo de la comunicación de las Demandadas.

82.     El día 23 de noviembre de 2022, la Demandante informó que contrainterrogaría durante la Audiencia al testigo Sr. Luis Vielma, y a los expertos Lic. Diego de Freitas y Prof. Carlos Enrique Mouriño Vaquero.

83.     El mismo día, las Demandadas informaron que contrainterrogarían durante la Audiencia a los testigos Sres. Ariel Nielsen, Bruno Saber Alvim, Gediel Deleo, y al experto Prof. Rafael Badell.

84.     El día 24 de noviembre de 2022, el Tribunal Arbitral acusó recibo de los mensajes de las Partes que contenían las listas de testigos y expertos que cada Parte desea interrogar en la Audiencia.

85.     El día 25 de noviembre de 2022, la Secretaría envió correspondencia con la Tabla Financiera actualizada del caso. El Tribunal realizó algunos señalamientos a la Secretaría acerca de los cálculos establecidos, observando que la cuantificación de los reclamos había evolucionado en la segunda fase del procedimiento.

86.     El día 28 de noviembre de 2022, la Demandante envió una carta al Tribunal Arbitral formulando una serie de comentarios respecto de la Dúplica presentada por las Demandadas.

87.   El mismo día, las Demandadas enviaron un correo tomando nota de los argumentos de la Demandante y solicitando plazo para manifestarse.

88.   El día 29 de noviembre de 2022, el Tribunal Arbitral acusó recibo de la carta de la Demandante de fecha 28 de noviembre de 2022, invitando a las Demandadas a formular los comentarios que estimaran pertinentes no más tarde del día 2 de diciembre de 2022.

89.   El día 1 de diciembre 2022, la Secretaría señaló a las Partes que el monto en disputa había aumentado, transmitiendo la nueva Tabla Financiera del caso.

90.   El día 2 de diciembre de 2022, las Demandadas presentaron su respuesta a la carta de la Demandante de fecha 28 de noviembre de 2022.

91.   El mismo día 2 de diciembre de 2022, el Tribunal Arbitral envió a las Partes una carta en que las invitaba a dar inicio a conversaciones respecto de la organización de la Audiencia, estableciendo el 16 de diciembre de 2022 como plazo para comunicar al Tribunal Arbitral el resultado de sus tratativas.

92.   El día 5 de diciembre de 2022, el Tribunal Arbitral envió un mensaje a las Partes acusando recibo de la respuesta de las Demandadas y observando que las Partes tendrían la oportunidad de desarrollar sus argumentos respecto de las cuestiones suscitadas por la Demandante en la Audiencia. Además, el Tribunal Arbitral observó que, en el momento oportuno, analizaría con la atención debida la admisibilidad y relevancia de las pruebas presentadas por las Partes.

93.   El día 14 de diciembre de 2022, la Demandante envió un correo electrónico informando al Tribunal Arbitral que las Partes habían mantenido conversaciones respecto de la organización de la Audiencia y habían llegado a una serie de acuerdos, los cuales fueron comunicados en el mismo mensaje.

94.   El día 16 de diciembre de 2022, las Demandadas enviaron un correo electrónico confirmando "en todas y cada una de sus partes los acuerdos manifestados por la parte demandante".

95.   El mismo día, el Tribunal Arbitral acusó recibo del mensaje de la Demandante, confirmado por las Demandadas, informando de los acuerdos de las Partes para la organización de la Audiencia. El Tribunal Arbitral informó que elaboraría una orden procesal teniendo en cuenta dichos acuerdos, y que remitiría el correspondiente borrador para que las Partes formulen sus observaciones.

96.   El día 29 de diciembre de 2022, el Tribunal Arbitral circuló el proyecto de la Orden Procesal n.º 7 (la "**OP7**"), invitando a las Partes a formular los comentarios que estimaran oportunos respecto del mismo hasta el día 5 de enero de 2023.

97.   El día 5 de enero de 2023, las Demandadas presentaron sus comentarios al proyecto de la OP7.

98. El mismo día, la Demandante presentó sus comentarios al proyecto de OP7, sugiriendo ciertas modificaciones al orden de las declaraciones de los expertos.

99. El día 6 de enero de 2023, las Demandadas enviaron mensaje informando de su desacuerdo con las sugerencias de la Demandante.

100. El mismo día, el Tribunal Arbitral emitió la OP7, disponiendo sobre la Audiencia sobre el Fondo.

101. Siempre el mismo 6 de enero de 2023, la Demandante acusó recibo de la OP7.

102. El día 7 de enero de 2023, las Demandadas acusaron recibo de la OP7 e informaron respecto de detalles logísticos relativos a la organización de la Audiencia.

103. El mismo día, el Tribunal Arbitral tomó nota de las informaciones transmitidas por las Demandadas, solicitando informaciones adicionales respecto de la logística de la Audiencia.

104. El día 16 de febrero de 2023, la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional prorrogó el plazo para dictar el laudo final hasta el 31 de julio de 2023.

105. El día 16 de noviembre de 2023, la Demandante presentó su lista de asistentes a la Audiencia.

106. El día 17 de enero de 2023, las Demandadas presentaron su lista de asistentes a la Audiencia.

107. El mismo día, el Tribunal Arbitral acusó recibo de las listas de asistentes comunicadas.

108. El día 20 de enero de 2023, las Demandadas solicitaron al Tribunal Arbitral que emitiese "una carta por participante, que se menciona a continuación de donde se pueda desprender su participación en el proceso y por ende la justificación de su entrada a Francia-Paris".

109. El mismo día, el Tribunal Arbitral tomó nota de la solicitud de las Demandadas.

110. El día 23 de noviembre de 2023, el Tribunal Arbitral transmitió a las Demandadas las cartas solicitadas.

111. El mismo día, las Demandadas formularon una serie de pedidos respecto de la presentación de ciertos documentos y la utilización de soporte *Power Point* por el testigo Luis Vielma.

112. De conformidad con la invitación del Tribunal Arbitral, el día 24 de enero de 2023, la Demandante ofreció sus comentarios a las cuestiones planteadas por las Demandadas.

113. El mismo día, las Demandadas acusaron recibo de las cartas solicitadas en su comunicación de fecha 20 de enero de 2023.

114. El día 25 de enero de 2023, el Tribunal Arbitral emitió la Orden Procesal n.º 8 (la "**OP8**"), autorizando la presentación de ciertos documentos hasta el día 26 de enero de 2023 y rechazando la posibilidad de utilización de *Power Point* por el testigo Luis Vielma.

115. El día 26 de enero de 2023, las Demandadas enviaron una comunicación en respuesta a la OP8.

116. El mismo día, el Tribunal Arbitral acusó recibo de la comunicación de las Demandadas.

117. El día 27 de enero de 2023, el Tribunal Arbitral escribió a las Partes para comunicar la lista de asistentes a la Audiencia y otros detalles logísticos.

118. Del día 30 de enero al 1 de febrero de 2023, fue celebrada la Audiencia sobre el Fondo (la "**Audiencia**"), en la oficina de Dentons de París, ubicadas en 5 Boulevard Malesherbes, 75008 París, Francia. Inicialmente programada para ser realizada en formato híbrido, las Partes acordaron en el primer día de Audiencia que esta podría desarrollarse totalmente en formato presencial. La Audiencia contó con la participación de las personas mencionadas a continuación:

      Por el Tribunal, participaron las personas que siguen:
      Diego P. Fernández Arroyo, Presidente del Tribunal Arbitral
      Cristián Conejero Roos, Co-árbitro
      Franco Ferrari, Co-árbitro
      Bruno Sousa Rodrigues, Secretario del Tribunal Arbitral

      Por la Demandante, participaron las personas que siguen:
      Rafael Badell, Experto
      Ariel Nielsen, Testigo
      Bruno Alvim, Testigo
      Gediel Deleo, Testigo
      José Ignacio García Cueto, Abogado
      Ignacio Díaz, Abogado
      Florencia Bohl, Abogada
      Hernán A. Chiriboga Novillo, Abogado
      Nicolás De La Flor Puccinelli, Abogado

      Por las Demandadas, participaron las personas que siguen:
      Luis Alberto Vielma Peña, Testigo
      Carlos Enrique Mouriño Vaquero, Experto
      Diego Antonio De Freitas Assalona, Experto
      Fidel Alberto Castillo Gómez, Abogado
      Jorge Isaac González Carvajal, Abogado
      Carmen Teresa Oliveros Durán, Abogada
      Roberto Antonio Tadeo Leyba Morales, Abogado

119. Al final de la Audiencia, el Tribunal Arbitral invitó a las Partes a presentar Escritos Post Audiencia ("**EPA**") sobre la base de las preguntas formuladas por el Tribunal Arbitral. La fecha límite establecida para la presentación de los EPAs fue el 21 de febrero de 2023.

120. El día 16 de febrero de 2023, las Demandadas presentaron comunicación solicitando la incorporación de ciertos documentos al expediente.

121. El mismo día, el Tribunal Arbitral acusó recibo e invitó a la Demandante a que presentara comentario no más del 20 de febrero de 2023.

122. El mismo día, la Demandante presentó sus comentarios.

123. El día 18 de febrero el Tribunal Arbitral emitió la Orden Procesal n.º 9 ("**OP9**"), rechazando la solicitud de incorporación de nuevos documentos al expediente presentada por las Demandadas.

124. El día 21 de febrero 2023, Demandante y Demandadas presentaron sus EPAs con respectivos sus anexos.

125. El 22 de febrero de 2023, el Tribunal Arbitral acusó recibo de los EPAs de la Demandante y de las Demandadas. Asimismo, el Tribunal Arbitral invitó a las Partes a presentar sus declaraciones de costas no más tarde del 15 de marzo de 2023.

126. El día 23 de febrero de 2023, la Secretaría comunicó que la Corte había reconsiderado la provisión para gastos, fijándola en EUR 680 000. En la misma oportunidad, la Secretaría adjuntó la Tabla Financiera del caso y una solicitud de pago para la Demandante.

127. El mismo día, la Demandante acusó recibo de la comunicación de la Secretaría.

128. El día 15 de marzo de 2023, las Partes transmitieron sus certificaciones de costas.

129. El día 16 de marzo de 2023, el Tribunal Arbitral acusó recibo de las certificaciones de costas de las Partes.

130. El día 27 de marzo de 2023, de conformidad con el Artículo 27 del Reglamento, el Tribunal Arbitral cerró la instrucción.

131. En 13 de junio de 2023, la Corte fijó los costos del arbitraje en EUR 670 000.

## III. LA CONTROVERSIA

132. Los eventos relatados a continuación constituyen un resumen de los antecedentes de hecho de la controversia conforme lo relatado por las Partes. Tienen el único objeto de contextualizar el Laudo Final. No constituyen conclusiones del Tribunal sobre los hechos en disputa.

### 1. *Origen de la controversia*

133. El presente arbitraje tiene su origen en los siguientes contratos:

> (i) Contrato n.º n.º 4600057362 / 1B-121-015-A-14-N-5406, IPC AMPLIACIÓN PIGAP II ("**Contrato PIGAP**");

> (ii) Contrato n.º 4600057362 / 1B-121-015-A-14-N-5406, ADDENDUM n.º 1, CONTRATO DE INGENIERÍA, PROCURA Y CONSTRUCCIÓN "IPC AMPLIACIÓN PIGAP II" ("**Addendum 1 - PIGAP**");

> (iii) Contrato n.º 4600057362 / 1B-121-015-A-14-N-5406, ADDENDUM n.º 2, CONTRATO DE INGENIERÍA, PROCURA Y CONSTRUCCIÓN "IPC AMPLIACIÓN PIGAP II" ("**Addendum 2 - PIGAP**");

> (iv) Contrato n.º 4600071245/1B-121-015-F-16-N-0151, IPC INCREMENTO DE LA CAPACIDAD DE COMPRESIÓN DE GAS DE BAJA (60 PSIG) Y MEDIA PRESIÓN (450 PSIG) CARITO-PIRITAL ("**Contrato Carito-Pirital**");

> (v) Contrato n.º 4600071245/1B-121-015-F-16-N-0151, IPC INCREMENTO DE LA CAPACIDAD DE COMPRESIÓN DE GAS DE BAJA (60 PSIG) Y MEDIA PRESIÓN (450 PSIG) CARITO-PIRITAL ("**Addendum 1 - Carito-Pirital**").

### 2. *Los hechos relevantes respecto de la controversia*

134. El proyecto PIGAP II consistió en un proyecto para realizar un proceso secundario de recuperación de depósitos de petróleo en el Campo de Santa Bárbara, Estado Monagas en Venezuela. La sigla PIGAP significa "Proyecto de Inyección de Gas a Alta Presión"[1].

135. Entre los años de 2013 y 2014, PDVSA realizó un proceso de licitación para la ampliación de la planta PIGAP II. En junio de 2014, PDVSA adjudicó a la Demandante el referido proyecto de ampliación, suscribiéndose el Contrato PIGAP para el diseño, procura y construcción de la ampliación de la planta compresora de gas de alta presión PIGAP II por PDVSA Petróleo y QG el 27 de noviembre de 2014[2].

136. En el ínterin, PDVSA y QG realizaron esfuerzos conjuntos para obtención del financiamiento del Contrato PIGAP. Sin embargo, ante las dificultades para obtención de este financiamiento y debido a solicitudes para que se realizaran obras complementarias, QG y PDVSA Petróleo subscribieron una adenda al Contrato PIGAP (Addendum n.º 1 - PIGAP)[3].

---

[1] Solicitud, § 21.
[2] Solicitud, §§ 22-26; Contestación a la Solicitud, § 34.
[3] Solicitud, §§ 27-29; Contestación a la Solicitud, § 36.

27

137.　En 2016, PDVSA realizó un proceso de licitación para construcción de dos plantas compresoras de gas de alta presión en Carito y Pirital, Municipio Ezequiel Zamora, Estado Monagas en Venezuela. En julio de 2016, PDVSA fue notificada del otorgamiento del contrato para este proyecto (Contrato Carito-Pirital)[4], el cual fue suscrito el día 24 de enero de 2017[5].

138.　El 6 de abril de 2017, PDVSA y Banco San Juan Internacional Inc. ("**BSJI**") subscribieron un contrato de financiamiento para el Contrato Carito-Pirital y el Contrato PIGAP. El mismo día, QG, PDVSA y BSJI subscribieron un contrato de fideicomiso para la gestión del monto total de los dos proyectos. La diferencia entre el monto financiado por BSJI (USD 519 millones) y el monto total estimado para los proyectos (USD 561 millones) sería aportado por PDVSA. Además, el contrato de fideicomiso estableció el procedimiento para la aprobación de facturas de QG y el envío de las órdenes de pago al BSJI, que actuaba como agente de pago del fideicomiso[6].

139.　El 14 de julio de 2017, el Contrato PIGAP y el Contrato Carito-Pirital fueron modificados para adaptarlos a la modalidad de pagos del contrato de fideicomiso, generando respectivamente el Addendum n.º 2 - PIGAP y el Addendum n.º 1 - Carito-Pirital[7].

140.　Sin embargo, en el mismo año, comenzaron a producirse diferencias en torno a la falta de financiación y a los efectos de la misma sobre los derechos y obligaciones de las Partes respecto de los Contratos.

141.　Dichas diferencias persistieron y el 9 de octubre de 2018 PDVSA emitió las Providencias Administrativas 001-2018 y 002-2018, mediante las cuales rescindió unilateralmente los Contratos[8].

## IV. RESUMEN DE LAS POSICIONES Y PRETENSIONES DE LAS PARTES

### 1. *Posiciones y pretensiones de la Demandante*

142.　La Demandante afirma que, bajo el derecho venezolano, se aplica a los Contratos el régimen jurídico establecido por la Ley de Contrataciones Públicas ("**LCP**") y el Reglamento de la Ley de Contrataciones Públicas ("**RLCP**").

143.　La Demandante reconoce que, bajo la ley aplicable, su contraparte goza de potestades extraordinarias y exorbitantes, incluso la posibilidad de dar por terminado unilateralmente un contrato administrativo. Sin embargo, es la posición de la Demandante que "esta potestad tiene como limitante que no puede ser ejercida en forma irrazonable o arbitraria, sino que requiere que se haga mediante 'acto motivado' justificando los motivos de la

---

[4] Solicitud, §§ 30-31.
[5] Contestación a la Solicitud, § 40.
[6] Solicitud, §§ 34-35.
[7] Solicitud, § 36; Contestación a la Solicitud, §§ 39, 41 y 44.
[8] Anexos C-16 y C-17.

terminación" y que "la administración está vinculada por los motivos que alega en el 'acto motivado'"[9].

144.    La Demandante afirma que la única causal identificada por las Demandadas contemporáneamente a la terminación de los Contratos fue el incumplimiento de sus plazos de ejecución[10], así que las demás causales son extemporáneas y por lo tanto inadmisibles.

145.    Además, la Demandante rechaza todos los argumentos de las Demandadas de que la terminación se ha dado por causas imputables al contratista.

146.    La Demandante entiende que los Contratos fueron terminados unilateralmente por causas no imputables al contratista, así que deben aplicarse las reglas del Artículo 153 de la LCP y del Artículo 191 del RLCP. De acuerdo con la Demandante, y bajo los artículos mencionados, "cuando la entidad termine un contrato por causas no imputables al contratista, el órgano o ente contratante pagará al contratista: (i) el precio de la obra efectivamente ejecutada, calculado de acuerdo con el presupuesto vigente del contrato; (ii) el precio de los materiales y equipos que hubiere adquirido el contratista para ser incorporados a la obra; y (iii) una indemnización del diez por ciento (10%) del valor de la obra no ejecutada, si la rescisión ocurriere cuando no se hubieren comenzado los trabajos o los que se hubieren ejecutado tengan un valor inferior al treinta por ciento (30%) del monto original del contrato".[11]

147.    Además, la Demandante afirma que "[l]a causal contemporánea alegada por la parte que termina el contrato es la que debe analizarse a la hora de valorar la legalidad o ilegalidad de la terminación siendo que, a posteriori una parte no puede tratar de justificar la terminación basada en otras razones o motivos dado que, en ese caso, se estaría violentando el derecho de defensa de la parte que defiende la incorrección de la terminación de un contrato"[12].

148.    La Demandante sostiene que PDVSA Petróleo y PDVSA son solidariamente responsables por los actos de terminación de los Contratos.

149.    Finalmente, la Demandante plantea que las Demandadas deben pagar intereses de demora sobre los montos exigibles.

150.    La Demandante solicita al Tribunal Arbitral que[13]:

(i)    Declare que las Demandadas han incumplido el Contrato PIGAP y que la terminación fue contraria a la ley venezolana y/o al Contrato PIGAP;

---

[9] Demanda, § 164, a.
[10] Demanda, §§ 112 y 165.
[11] Demanda, § 105.
[12] Demanda, § 164, c.
[13] Demanda, § 210 y Réplica, § 189.

(ii)   Declare que las Demandadas han incumplido el Contrato Carito-Pirital y que la terminación fue contraria a la ley venezolana y/o al Contrato Carito-Pirital;

(iii)   Declare que las Demandadas son solidariamente responsables por los incumplimientos de los Contratos;

(iv)   Declare que las Demandadas han de compensar a QG por los montos reclamados en el Memorial de Demanda y Memorial de Réplica y ordene a las Demandadas el pago a QG de dichos montos;

(v)   Ordene a las Demandadas el pago de intereses sobre las sumas adeudadas, previas y posteriores al laudo, desde las fechas y de conformidad con las tasas correspondientes hasta su efectivo pago;

(vi)   Ordene a las Demandadas el pago de todos los costos asociados con este procedimiento arbitral y con la disputa en general, incluyendo, sin limitación, los costos y honorarios de la CCI y de los miembros del Tribunal Arbitral, y los costos y honorarios de la representación legal y de los expertos de QG; y,

(vii)   Otorgue a QG cualquier otro remedio que el Tribunal considere justo y apropiado según las circunstancias.

### 2. Posiciones y pretensiones de las Demandadas

151.   Las Demandadas rechazan todas las alegaciones de la Demandante.

152.   Las Demandadas afirman que "haciendo uso de los mecanismos de resolución pactados contractualmente, rescindió unilateralmente los Contratos, sin que deba indemnizar a QG por concepto alguno"[14].

153.   Asimismo, las Demandadas entienden que "[d]icha rescisión no está condicionada a incumplimiento alguno de alguna de las partes, por lo tanto, es irrelevante para su correcta aplicación – como en efecto ocurrió – el cumplimiento o no de las obligaciones contractuales de las partes"[15].

154.   Subsidiariamente, las Demandadas afirman que QG incumplió con sus obligaciones contractuales y que, de conformidad con la LCP y el RCLP, nada debe indemnizar a la Demandante.

155.   En particular, las Demandadas plantean que "QG incumplió con el plazo de ejecución de los Contratos, no mantuvo vigente la fianza de fiel cumplimiento y la fianza laboral durante

---

[14] Contestación, § 4.
[15] Contestación, § 4.

la vigencia de los mismos, y no entregó el recibo para el anticipo, ni la fianza de anticipo, en el plazo pactado"[16].

156. Asimismo, y de forma subsidiaria en el caso de que se considere que QG haya cumplido con todas sus obligaciones contractuales, las Demandadas alegan que jamás el Tribunal Arbitral podrá acordar la indemnización planteada por la Demandante, puesto que el monto establecido en el RLCP "representa un límite máximo a las indemnizaciones otorgadas bajos (sic) ese supuesto" y que "QG solo podría ser indemnizada por el monto del daño efectivamente demostrado, y no por una cantidad sin fundamento, so pena de ocurrir en pago de lo indebido o en un enriquecimiento sin causa"[17].

157. En la hipótesis de que las Demandadas sean condenadas, las Demandadas entienden que "ese Tribunal Arbitral debe condenar a cada una de las Codemandadas solo en la medida en que ha participado en la suscripción, ejecución y terminación de los Contratos, y no de forma solidaria por la totalidad del monto que sea establecido como indemnización como erróneamente solicita QG"[18].

158. Por fin, y subsidiariamente en caso de condenación, las Demandadas afirman que "ese Tribunal Arbitral debe declarar improcedente el reclamo realizado por QG sobre el pago de intereses pre-laudo debido a que el monto acordado por concepto de indemnización es ilíquido (indeterminado) e inexigible (sin plazo vencido) hasta el laudo, suma que, de acuerdo con la legislación venezolana, no puede generar intereses sino hasta que sea líquida y exigible"[19].

159. Las Demandadas solicitan al Tribunal Arbitral que[20]:

> (i)   Declare inadmisible la presente acción debido a que no cumplió con el antejuicio previo establecido en la legislación venezolana;
>
> (ii)  Declare que PDVSA ha ejercido válidamente su derecho a rescindir unilateralmente el Contrato PIGAP, previsto en la cláusula 5.8.3. de la Adenda 1 del Contrato PIGAG, sin que nada deba indemnizar a QG;
>
> (iii) Declare que PDVSA ha ejercido válidamente su derecho a rescindir unilateralmente el Contrato Carito-Piraltal, previsto en la cláusula 5.8.4. de ese contrato, sin que nada deba indemnizar a QG;
>
> (iv)  De forma subsidiaria, declare que PDVSA ha rescindido válidamente el Contrato PIGAG en virtud de los incumplimientos de QG;

---

[16] Contestación, § 6.
[17] Contestación, § 7.
[18] Contestación, § 8.
[19] Contestación, § 9.
[20] Contestación, § 217.

(v)   De forma subsidiaria, declare que PDVSA ha rescindido válidamente el Contrato Carito-Pirital en virtud de los incumplimientos de QG;

(vi)   De forma subsidiaria, declare que los costos y gastos reclamados por QG no son indemnizables de acuerdo a la ley venezolana;

(vii)  De forma subsidiaria, declare improcedente la indemnización solicitada por QG toda vez que no demostró el supuesto daño ni la relación de causalidad;

(viii) De forma subsidiaria, y en caso de que haya algún tipo de indemnización, declare que PDVSA y PDVSA Petróleo serán responsables individualmente en la medida que participaron en la ejecución de los Contratos;

(ix)   Declare improcedente la solicitud del pago de intereses de mora previas al laudo sobre las cantidades que puedan ser condenadas;

(x)    Que ordene a QG pagar todos los costos asociados con este procedimiento, incluyendo, sin limitaciones, los costos y honorarios de la CCI y de los miembros del Tribunal Arbitral, y los costos y honorarios de la representación legal y de los expertos de PDVSA y PDVSA Petróleo.

160.   En su Dúplica, las Demandadas expandieron su petitorio al Tribunal Arbitral de la siguiente manera[21]:

(i)    Declare inadmisible la presente acción debido a que no cumplió con el antejuicio previo establecido en la legislación venezolana;

(ii)   Declare que el Contrato PIGAP y el Contrato Carito-Pirital son inválidos, y, por lo tanto, no pueden producir efecto alguno por no tener autorización de la Asamblea Nacional;

(iii)  De forma subsidiaria, declare que QG renunció a cualquier indemnización prevista en el Contrato PIGAP y el Contrato Carito-Pirital, y, en consecuencia, no tiene derecho a indemnización alguna;

(iv)   De forma subsidiaria, declare que PDVSA ha ejercido válidamente su derecho a rescindir unilateralmente el Contrato PIGAP, previsto en la cláusula 5.8.3. de la Adenda 1 del Contrato PIGAG, sin que nada deba indemnizar a QG;

(v)    De forma subsidiaria, declare que PDVSA ha ejercido válidamente su derecho a rescindir unilateralmente el Contrato Carito-Pirital, previsto en la cláusula 5.8.4. de ese contrato, sin que nada deba indemnizar a QG;

(vi)   De forma subsidiaria, declare que PDVSA ha ejercido válidamente su derecho a terminar el Contrato PIGAP, previsto en la cláusula 18.1.1. del

---

[21] Dúplica, § 478.

Contrato PIGAP, y sólo debe indemnizar a QG los conceptos establecidos en la cláusula 18.1.2. de ese contrato;

(vii) De forma subsidiaria, declare que PDVSA ha ejercido válidamente su derecho a rescindir unilateralmente el Contrato Carito-Pirital, previsto en la cláusula 18.1.1. del Contrato PIGAP, y sólo debe indemnizar a QG los conceptos establecidos en la cláusula 18.1.2. de ese contrato;

(viii) De forma subsidiaria, declare que PDVSA ha rescindido válidamente el Contrato PIGAG en virtud de los incumplimientos de QG;

(ix) De forma subsidiaria, declare que PDVSA ha rescindido válidamente el Contrato Carito-Pirital en virtud de los incumplimientos de QG;

(x) De forma subsidiaria, declare que los costos y gastos reclamados por QG no son indemnizables de acuerdo a la Ley Venezolana y a los Contratos;

(xi) De forma subsidiaria, declare improcedente la indemnización solicitada por QG toda vez que no demostró el supuesto daño ni la relación de causalidad;

(xii) De forma subsidiaria, en caso de que haya algún tipo de indemnización, declare que PDVSA y PDVSA Petróleo serán responsables individualmente en la medida que participaron en la ejecución de los Contratos;

(xiii) De forma subsidiaria, y en caso de que haya algún tipo de indemnización, declare que operó el hecho de la víctima previsto en el Artículo 1.189 del CCV y que, en consecuencia, declare una compensación de culpas de, por lo menos, el cincuenta por ciento (50%) del monto que eventualmente sea acordado en el laudo;

(xiv) Declare improcedente la solicitud del pago de intereses de mora previas al laudo sobre las cantidades que puedan ser condenadas;

(xv) Que ordene a QG pagar todos los costos asociados con este procedimiento, incluyendo, sin limitaciones, los costos y honorarios de la CCI y de los miembros del Tribunal Arbitral, y los costos y honorarios de la representación legal y de los expertos de PDVSA y PDVSA Petróleo.

## V. ANALISIS

### 1. *Introducción*

161. El Tribunal Arbitral procederá a continuación al análisis de las alegaciones y posiciones de las Partes. Cabe señalar que su análisis no está necesariamente organizado de acuerdo con la estructura adoptada por las Partes, ya que el Tribunal Arbitral en su razonamiento no está vinculado por las calificaciones propuestas por el Demandante y las Demandadas.

162. Lo anterior no podría ser de otra manera, ya que el Demandante y las Demandadas califican de manera diferente determinados hechos y pretensiones. Por ejemplo, la Demandante entiende que las Demandadas han introducido tres nuevas alegaciones relativas a la admisibilidad de su demanda, mientras que la Demandante sólo plantea formalmente una alegación relativa a la admisibilidad de la demanda.

163. La naturaleza del pedido de la Demandante es clara y constante, planteando desde el inicio del procedimiento que los Contratos fueron rescindidos de forma indebida. Las postulaciones y alegaciones de las Demandadas son menos lineales, habiendo evolucionado gradualmente en el transcurso de este arbitraje. En esencia, la pretensión de las Demandadas, recogida en el Acta de Misión y reiterada a lo largo del procedimiento, es que el Tribunal Arbitral reconozca que su derecho a la resolución unilateral ha sido ejercido conforme a los términos de los Contratos.

164. Aun así, la naturaleza jurídica de la pretensión de las Demandadas no era la de constituir una nueva situación jurídica, sino la de calificar formalmente una situación jurídica preexistente. En otras palabras, se pidió al Tribunal Arbitral que analice si la resolución de los Contratos constituye, por vía transversal, el ejercicio regular del derecho a la resolución unilateral previsto en las cláusulas 5.8.3 del Addendum 1 - PIGAP y 5.8.4 del Contrato Carito-Pirital.

165. Nótese desde el principio que la actividad jurisdiccional emprendida por este Tribunal Arbitral en nada se asemeja a un proceso de revisión de actos administrativos dictados por la administración venezolana. No se discute aquí la nulidad de los actos administrativos de terminación de los Contratos, sino la responsabilidad y el derecho a la indemnización derivados de la terminación de ellos. Los actos administrativos subyacentes al litigio permanecen incólumes, subsistiendo en su existencia, validez y eficacia hasta tanto las instancias administrativas locales no los invaliden. Pese a su obviedad, no está de más enfatizar que este Tribunal Arbitral no forma parte de la jurisdicción contencioso-administrativa venezolana. Por lo tanto, los remedios otorgados en este laudo son fundamentalmente de naturaleza contractual, obviamente informados por la ley aplicable a los Contratos.

166. Además, el Tribunal Arbitral considera oportuno comentar en esta introducción dos pedidos formulados al final del procedimiento por las Demandadas. Concretamente, en su Dúplica, las Demandadas solicitaron que el Tribunal Arbitral declarase la nulidad de los Contratos por no haber sido aprobados por la Asamblea Nacional, así como que declarase que las relaciones contractuales fueron terminadas sobre la base de las cláusulas 18.1.1 y 18.1.2 de los Contratos[22].

167. La Demandante se opuso a la inclusión de estas nuevas solicitudes, afirmando que ellas "no se encuentran incluidas en las objeciones de jurisdicción incorporadas en el Acta de Misión

---

[22] Dúplica, § 478 (ii)(vi)(vii); EPA Demandadas, § 134 (ii)(vi)(vii).

y las Demandadas jamás solicitaron autorización del Tribunal Arbitral para formular las Nuevas Objeciones en los términos del Artículo 23(4) de las Reglas CCI"[23].

168. El Tribunal Arbitral considera que estos nuevos pedidos están flagrantemente fuera de los términos del Reglamento. En su Artículo 23(4), el Reglamento establece que "ninguna parte formulará nuevas pretensiones que estén fuera de los límites fijados en el mismo, a menos que lo autorice el tribunal arbitral, el cual, al decidir al respecto, tendrá en cuenta la naturaleza de las nuevas pretensiones, la fase en que se encuentre el procedimiento arbitral y otras circunstancias pertinentes". Las solicitudes de las Demandadas relativas a la nulidad y a la terminación de los Contratos no constituyen meras alegaciones defensivas, sino dos nuevas pretensiones reconvencionales, en los términos del Artículo 23(4) del Reglamento, formuladas fuera del ámbito del Acta de Misión y sin que se pidiera la autorización del Tribunal Arbitral. Por lo tanto, estas dos nuevas demandas y sus fundamentos deben ser rechazadas, no pudiendo ser consideradas por el Tribunal Arbitral sin violar el propio Reglamento al que las Partes voluntariamente se han sometido.

169. El presente laudo seguirá la estructura siguiente. Inicialmente se abordará la admisibilidad de la demanda ante la cuestión del antejuicio administrativo. A continuación, el Tribunal Arbitral abordará los fundamentos de la terminación de los Contratos PIGAP y Carito-Pirital. Una vez tratada la cuestión de la terminación de los Contratos, el Tribunal Arbitral procederá al análisis de las consecuencias jurídicas de las terminaciones, especialmente en materia de reembolso e indemnización. Por último, se abordarán las cuestiones relativas a la cuantificación de la indemnización debida.

170. En los términos de los Acuerdos de arbitraje y del Acta de Misión, los idiomas del arbitraje son el castellano y el inglés[24]. Sin embargo, el Tribunal Arbitral observa que todos los escritos y todas las presentaciones orales de las Partes fueron hechas en idioma castellano. Las audiencias fueron conducidas en castellano, los documentos en el expediente están mayoritariamente redactados en castellano, y fue en castellano que se presentaron y examinaron los testigos y expertos. También la comunicación entre el Tribunal Arbitral y las Partes, además de los documentos emitidos por el Tribunal Arbitral, incluido el Laudo Parcial, se hicieron en idioma castellano. Ha existido un verdadero acuerdo tácito entre las Partes en el sentido de conducir el procedimiento en idioma castellano, razón por la cual el Tribunal Arbitral ha redactado el presente laudo únicamente en castellano.

171. Con la estructura señalada, se presentan a continuación los fundamentos que sustentan este laudo.

### 2. La admisibilidad de la demanda y el antejuicio administrativo

#### A) La posición de las Demandadas

172. Las Demandadas plantean que QG no agotó el procedimiento administrativo previo establecido en la Ley Orgánica de la Procuraduría General de la República (la "**LOPGR**"),

---

[23] EPA Demandante, § 36 ss.
[24] Acta de Misión, § 99.

según el cual "quienes pretendan instaurar demandas de contenido patrimonial contra la República, deben manifestar tal voluntad al órgano al cual corresponda el asunto y tramitar el procedimiento previsto en esas normas"[25].

173.   Las Demandadas alegan que el Tribunal Arbitral sólo se ha pronunciado sobre la objeción de admisibilidad con base en los Contratos, pero cree que el Tribunal Arbitral tiene todavía que pronunciarse acerca de la admisibilidad de la Demanda ante el no agotamiento de las instancias administrativas previas, conforme a lo establecido en la legislación venezolana.

174.   Las Demandadas rechazan que hayan renunciado expresa o tácitamente a esta objeción, ya que, argumentan las Demandadas, las normas de la LOPGR no son disponibles. De hecho, es la posición de las Demandadas que el "antejuicio administrativo" previsto en la LOPGR es de orden público y que la legislación venezolana no establece excepciones al respecto en favor de tribunales arbitrales[26].

175.   Así, afirman las Demandadas que "de conformidad con el derecho venezolano, la presente acción debería ser declarada inadmisible, por no haber el recurrente agotado el referido procedimiento administrativo previo"[27].

   B) La posición de la Demandante

176.   La Demandante entiende que la fase de jurisdicción y admisibilidad ya se agotó, encontrándose ahora en su fase de mérito y cuantificación. Además, la Demandante afirma que, de conformidad con el Laudo de Jurisdicción, el Tribunal Arbitral confirmó la admisibilidad de la Demanda[28].

177.   Asimismo, la Demandante observa que los Artículos 56 a 62 de la LOPGR, originariamente citados por las Demandadas, tratan del "Personal de la Procuraduría General de la República" y no de procesos administrativos previos[29]. Por otro lado, la Demandante entiende que, si las Demandadas se refirieran al proceso previsto en los Artículos 68 a 74 de la LOPGR vigente, el "antejuicio administrativo" alegado recaería solamente sobre demandas de contenido patrimonial tramitadas ante la jurisdicción contencioso-administrativa y no en un procedimiento arbitral[30].

178.   Puesto que los tribunales arbitrales no forman parte del sistema contencioso-administrativo venezolano, la Demandante afirma que la jurisdicción arbitral no está sometida al requisito de agotamiento del procedimiento administrativo previo establecido en la legislación venezolana[31].

---

[25] Contestación, § 26.
[26] Dúplica, § 10, 13 y 19.
[27] Contestación, § 30.
[28] Réplica, § 9.
[29] Réplica, § 13 y nota 14.
[30] Réplica, § 14.
[31] Réplica, §§ 15-16.

### C)  El análisis del Tribunal

179.   Ciertamente, el arbitraje está dotado de mayor flexibilidad que los procedimientos judiciales, y no está sujeto a un régimen preclusivo rígido y formalista. Sin embargo, ello no significa que el Tribunal Arbitral pueda prescindir de su utilización, especialmente si se tiene en cuenta que el Laudo Parcial está investido de evidentes efectos preclusivos.

180.   Debe tenerse en cuenta que el principio de la buena administración de la justicia impone al Tribunal Arbitral y a las Partes el deber de conducir el procedimiento de manera "expedita y eficaz", conforme lo establece el Reglamento[32], en un todo de acuerdo con el moderno derecho del arbitraje[33]. La preclusión, instrumento utilizado ampliamente por distintos ordenamientos jurídicos del mundo, sirve para hacer efectivo dicho principio. De hecho, el efecto preclusivo garantiza la superación de materias ya analizadas y decididas, permitiendo que el procedimiento avance hacia la resolución final sobre el fondo. No sólo esto. De forma coherente, el Reglamento presume "que una parte que proceda con el arbitraje sin oponer reparo al incumplimiento de cualquiera de las disposiciones del Reglamento, de cualesquiera otras normas aplicables al procedimiento, de cualquier instrucción del tribunal arbitral o de cualquier estipulación contenida en el acuerdo de arbitraje relacionadas con la constitución del tribunal arbitral o con la conducción del proceso, ha desistido de su derecho a objetar"[34]. Ciertamente, esta disposición del Reglamento no constituye una particularidad. Por el contrario, ella se inscribe en lo que es la tónica habitual del derecho arbitral. Así, en el derecho de la sede de este arbitraje, se prevé de modo expreso que "si una parte, a sabiendas y sin motivo legítimo, se abstiene de invocar oportunamente una irregularidad ante el tribunal arbitral, se considerará que ha renunciado a invocarla"[35].

181.   La fase preliminar, que culminó con el Laudo Parcial de 24 de mayo de 2022, se dedicó a abordar tanto cuestiones jurisdiccionales como de admisibilidad. Como se señaló expresamente en el Laudo Parcial, este Tribunal Arbitral "decidió que el procedimiento arbitral se bifurcaría en dos fases: una para discutir exclusivamente sobre la competencia del Tribunal Arbitral y la admisibilidad de la demanda arbitral, y otra – en función del resultado de la primera – relativa al fondo y a la cuantificación de los daños y perjuicios"[36].

182.   En este contexto, y en atención al desarrollo eficaz del procedimiento, nada más razonable que esperar que todas las cuestiones relativas a la jurisdicción y a la admisibilidad fueran tratadas exhaustivamente en la fase preliminar. Con este entendimiento, la Demandante tiene razón al afirmar que "las Demandadas han tenido una amplia oportunidad de presentar y sustanciar sus defensas de admisibilidad" y que "[t]al es así que – ante la petición de las Demandadas – el Tribunal Arbitral instituyó la bifurcación del procedimiento para

---

[32] Cf. Artículo 22(1) del Reglamento.
[33] Cf., por ejemplo, el Artículo 1464, 3er párrafo, del Código de Proceso Civil francés.
[34] Cf. Artículo 40 del Reglamento.
[35] Cf. Artículo 1466 del Código de Proceso Civil francés [traducción libre].
[36] Laudo Parcial, § 19.

tratar las cuestiones de jurisdicción y admisibilidad en una etapa separada y exclusiva a tal fin"[37].

183.    De hecho, en la fase preliminar, incluso se realizó la Audiencia de Jurisdicción y Admisibilidad, dedicándose dos días a debatir la jurisdicción del tribunal arbitral y la admisibilidad de la demanda en profundidad. En esa ocasión, las Demandadas ni siquiera hicieron uso de todo el tiempo que les asignó el Tribunal Arbitral en dicha Audiencia, lo que demuestra que habían agotado sus argumentos respecto de la jurisdicción y admisibilidad en este procedimiento. Resulta sorprendente que, concluida la fase dedicada a las discusiones sobre jurisdicción y admisibilidad, las Demandadas planteen una nueva objeción relativa a la admisibilidad de la demanda. Evidentemente el tema ya fue decidido y superado, es decir, es materia precluida.

184.    Por supuesto, considerando los amplios poderes del Tribunal Arbitral en la conducción del procedimiento[38], la preclusión operada por el Laudo Parcial podría ser modulada o atenuada en circunstancias excepcionales y justificables. Tal sería el caso si nuevos hechos relacionados con la jurisdicción y la admisibilidad llegaran a conocimiento de las Partes de forma sobrevenida. Sin embargo, la objeción planteada por las Demandadas relativa al antejuicio administrativo no entra dentro de esta hipótesis. Las Demandadas podrían haber presentado tal objeción en la fase preliminar de este procedimiento, ya que conocían perfectamente el hecho alegado en el momento de iniciarse este arbitraje. De hecho, ni siquiera puede pensarse que, en la primera fase, las Demandadas hayan preferido centrarse en objeciones de jurisdicción sin prestar atención específicamente a la admisibilidad de la demanda. Al contrario, las Demandadas plantearon desde el inicio una objeción de admisibilidad relativa al supuesto incumplimiento de una condición suspensiva que estaría prevista en el acuerdo de arbitraje[39]. La cuestión de admisibilidad que ahora se invoca no fue ni sugerida expresamente ni reservada en términos generales en la primera fase de este procedimiento.

185.    Además, las Demandadas no ofrecen argumento alguno para explicar la presentación extemporánea de esta objeción, limitándose a recurrir al orden público venezolano como medio para eludir la preclusión de la cuestión. Concretamente, las Demandadas afirman que "[e]l requisito de admisibilidad del antejuicio administrativo es de orden público, por lo tanto, es indisponible e irrenunciable para las partes y por el Tribunal"[40]. Sin embargo, no está claro por qué se aplicarían disposiciones de orden público procesal administrativo del derecho venezolano para el análisis de la admisibilidad de la demanda en un arbitraje internacional con sede en París.

186.    Por un lado, cabe recordar que el Tribunal Arbitral determinó en su Laudo Parcial que la ley francesa es la ley aplicable a los Acuerdos de arbitraje[41]. De hecho, el Tribunal Arbitral

---

[37] EPA Demandante, § 37.
[38] Cf. Artículo 22(2) del Reglamento; Artículo 1509 del Código de Proceso Civil francés
[39] Memorial de Jurisdicción, §§ 24-34.
[40] EPA Demandadas, § 9. Es importante subrayar que, en su Contestación, las Demandadas parecen haberse referido, en efecto, como indica la Demandante a la LOPGR de 2008, la cual fue reemplazada en 2016. Dicho fallo fue corregido en los escritos posteriores.
[41] Laudo Parcial, §§ 144-161.

consideró que "la voluntad común de las Partes al establecer la cláusula arbitral invocada como fundamento de la jurisdicción del Tribunal Arbitral fue la de brindar confiabilidad, eliminando cualquier tipo de inseguridad relacionada con la resolución de las eventuales controversias que pudieran surgir en la ejecución de los Contratos" y que "[t]odo indica que las Partes decidieron que a tal fin Francia, que es unánimemente considerado como un Estado abiertamente favorable al arbitraje, debía ser el país del arbitraje, y que el arbitraje debía desarrollarse conforme a un Reglamento universalmente reconocido, como el de la CCI"[42].

187.  Por otro lado, es importante señalar que, en ausencia de toda estipulación en contrario de las Partes, la ley aplicable a las cuestiones de procedimiento no expresamente regidas por el Reglamento y demás disposiciones procesales acordadas por las Partes es el de la sede, de nuevo la ley francesa. Así pues, se observa que la ley francesa es apta para regir todas las dimensiones relativas a los requisitos de admisibilidad de la demanda de arbitraje, tanto si estos requisitos afectan al procedimiento arbitral como al consentimiento de las Partes. Es decir, ni la LOPGR ni el derecho sustantivo venezolano son aplicables respecto de la admisibilidad de este arbitraje.

188.  Nótese una vez más que la jurisdicción administrativa venezolana y la jurisdicción arbitral internacional son dos instancias distintas e independientes, por lo que no es necesario tratar cuestiones de derecho administrativo venezolano en la admisibilidad de una demanda arbitral presentada en un arbitraje internacional con sede en París. No está de más subrayar que el derecho francés no tiene ninguna norma, ni ordinaria ni de orden público, que imponga como requisito para la admisibilidad de una demanda arbitral el agotamiento de cualquier instancia administrativa, local o extranjera.

189.  Por todo lo anterior, el Tribunal Arbitral rechaza la pretensión de que la demanda de arbitraje es inadmisible por no haber sido objeto de un antejuicio administrativo previsto en la LOPGR.

### 3.  La terminación de los Contratos

#### A)  La posición de la Demandante

190.  La Demandante plantea que las Demandadas terminaron los Contratos con base en una causal inexistente, como es el incumplimiento del plazo. Desde la perspectiva de la Demandante, los incumplimientos contractuales no fueron imputables a QG sino a PDVSA, subrayando la Demandante que las Demandadas, en violación de los Contratos, no desembolsaron los anticipos debidos. Como consecuencia de ello, las Actas de Inicio nunca fueron firmadas y los plazos de ejecución de los Contratos nunca empezaron a correr[43].

191.  Para la Demandante, el anticipo del Contrato sí era debido, ya que está previsto en el Addendum 1 – PIGAP. Este era válido una vez pactado de conformidad con el Artículo

---

[42] Laudo Parcial, § 159.

[43] Demanda, §§ 116 y 122.

128 de la LCP[44]. La Demandante señala también que dicha modificación contractual benefició a las Demandadas, ya que les permitió ganar tiempo para buscar medios de financiamiento para el Contrato PIGAP y las protegió del pago de las indemnizaciones eventualmente debidas[45].

192.     La Demandante también argumenta por la validez de la obligación del pago del anticipo, al señalar que "conscientes de la validez de la cláusula y su ajuste al derecho venezolano, las Demandadas tratan de argumentar que la misma cláusula del Contrato Carito-Pirital sí es válida ya que esta condición se pactó desde el inicio y por ende no implica 'una desmejora o renuncia en perjuicio de la Administración en una misma contratación'[46]. Ello, a diferencia de la misma cláusula en el Contrato PIGAP, en que no habría estado desde el inicio sino solo desde la antedicha modificación contractual de que da cuenta el Addendum 1 - PIGAP.

193.     Asimismo, la Demandante rechaza el argumento de que no se podría supeditar el inicio de los trabajos al pago del anticipo en razón de que la excepción de contrato no cumplido no aplicaría en los contratos administrativos. La Demandante entiende que la excepción del contrato no cumplido nada tiene que ver con la presente controversia[47]. En cualquier caso, la Demandante afirma que la alegación de incumplimiento de las Demandadas consistente en que QG debía ejecutar los Contratos con sus propios fondos es contraria a los términos de los Contratos[48].

194.     En cuanto a las fianzas del Contrato PIGAP, la Demandante alega que las había presentado el 12 de diciembre de 2017, así como también había presentado el recibo del anticipo el 7 de diciembre de 2017 y luego el 9 de febrero de 2018[49].

195.     Respecto a la fianza y recibo del anticipo del Contrato Carito-Pirital, la Demandante alega que los había presentado el 20 de julio de 2017[50]. Por su parte, las fianzas de responsabilidad laboral y de fiel cumplimiento habían sido presentadas por la Demandante desde enero de 2017[51].

196.     Además, la Demandante observa que los Contratos preveían una excepción específica relativa a la no presentación de las fianzas de fiel cumplimiento o responsabilidad laboral, es decir que esos documentos podían ser sustituidos por retenciones en los pagos hechos a la Demandante[52].

197.     La Demandante señala que "incluso si *arguendo* se tomara como *dies a quo* la fecha de firma del Contrato (el 24 de enero de 2017) el plazo contractual finalizaría el 23 de febrero de

---

[44] Réplica, § 46.
[45] Réplica, § 50.
[46] Réplica, § 51.
[47] Réplica, §§ 48, 54.
[48] Réplica, § 56.
[49] Réplica, § 59.
[50] Demanda, § 46.
[51] Réplica, 69.
[52] Réplica, §§ 58 y 71.

2019", es decir "170 días después de la fecha (6 de septiembre de 2018) en que las Demandadas notificaron la Carta de Terminación del Contrato Carito-Pirital"[53].

198.    La Demandante afirma que no es posible *a posteriori* justificar una terminación contractual con razones que no fueron planteadas en el momento de la terminación, bajo pena de nulidad de la misma[54]. En apoyo de su posición, la Demandante alude al principio de amplia defensa, al artículo 156 de la LCP y a la jurisprudencia de la Sala Político Constitucional de la Corte Suprema de Justicia[55].

199.    La Demandante rechaza el argumento de que las Demandadas hicieron uso de las cláusulas 5.8.3 y 5.8.4 respectivamente del Addendum 1 – PIGAP y del Contrato Carito-Pirital, considerando que esta es una teoría *ex post facto*.

200.    De hecho, la Demandante entiende que esta explicación "parece incluso ser contradictoria con lo que defiende su propio testigo el Sr. Luis Vielma, quien sugiere que su entendimiento es que la terminación de los Contratos fue por la demora en la entrega de los documentos necesarios para gestionar el pago del anticipo"[56].

201.    La Demandante señala que ni la Providencia Administrativa n.º 001[57], de fecha 9 de octubre de 2018, relativa al Contrato PIGAP, ni la Providencia Administrativa n.º 002[58] de fecha 9 de octubre de 2018, relativa al Contrato Carito-Pirital, las cuales llevaron a efecto la terminación de los Contratos, hicieron referencia a las cláusulas 5.8.3 del Contrato PIGAP o 5.8.4 del Contrato Carito-Pirital. Las dos cartas enviadas el 31 de agosto de 2018[59], que notificaban del inicio del proceso de terminación de los Contratos con base en los Artículos 155 de la LCP y 193 del RLCP, tampoco hicieron referencia a dichas cláusulas.

202.    La Demandante argumenta también que las Demandadas no cumplieron cumulativamente con las condiciones establecidas por las cláusulas 5.8.3 y 5.8.4, además de no haber observado su deber de notificar previamente y por escrito el ejercicio del derecho de rescisión unilateral bajo dichas cláusulas.

203.    De acuerdo con la Demandante, "[l]a notificación, obviamente, tenía que hacer referencia a la cláusula y al supuesto de hecho"[60], observando que las comunicaciones enviadas pretendían resolver los Contratos en base a otras causales y sustentadas expresamente en provisiones legales distintas.

204.    Además, la Demandante sostiene que las cláusulas 5.8.3 y 5.8.4 establecían como condición para el ejercicio de la prerrogativa de rescisión unilateral que los plazos dispuestos no fueran extendidos de común acuerdo por las partes contratantes. Desde la perspectiva de la Demandante, la extensión de mutuo acuerdo del plazo y renuncia al ejercicio de este

---

[53] Demanda, § 126.
[54] Demanda, § 108.
[55] Informe Badell, §§62 y ss.
[56] Réplica, § 28.
[57] De-16.
[58] De-17.
[59] De-14 y De-49.
[60] Réplica, § 36.

derecho de terminación se concretizó con la firma de las adendas que ajustaban los Contratos al financiamiento obtenido del BSJI[61].

205. Asimismo, la Demandante argumenta que dichas cláusulas no podrían ser invocadas en el caso de que las condiciones previstas fueran imputables a la parte que las invoca[62]. Además, la Demandante plantea que incluso en el caso de terminación bajo las cláusulas 5.8.3 y 5.8.4 se estaría también en un escenario de terminación por causas no imputables a QG[63].

B) La posición de las Demandadas

206. La posición de las Demandadas es que la Demandante no ejecutó los Contratos en el plazo debido, no mantuvo vigentes las fianzas estipuladas en los Contratos, ni entregó los documentos necesarios para que se efectuara el pago de los anticipos[64].

207. Además, las Demandadas plantean que no fue pactado en el Contrato PIGAP el pago de ningún anticipo[65], ya que la cláusula primera del Addendum 1 – PIGAP era inválida. La invalidez de dicha cláusula sería el resultado de que las Demandadas no podían renunciar a sus prerrogativas exorbitantes bajo el derecho administrativo venezolano[66]. Así, la ejecución del Contrato PIGAP se encontraba bajo el mismo régimen establecido en el contrato inicial[67].

208. Las Demandadas señalan que la Demandante comenzó a ejecutar los Contratos a pesar de no recibir anticipo alguno, lo que implicaría ciertas consecuencias jurídicas: (i) un reconocimiento de que no se puede oponer su incumplimiento para ejecutar la no ejecución del Contrato ni hacerle renunciar a esa prerrogativa, (ii) renuncia de QG a las condiciones suspensivas establecidas a su favor, y (iii) hace nacer su obligación de ejecución del Contrato con sus propios fondos[68].

209. Respecto del Contrato PIGAP, las Demandadas afirman que su cláusula 6.1 estableció que el plazo de ejecución de los trabajos sería de cuatrocientos cuarenta y cinco días contados a partir de la "fecha efectiva". Ese término inicial, de acuerdo con las Demandadas, sería entendido como la fecha del día en que el contrato fue firmado, es decir, el 27 de noviembre de 2014[69].

210. De hecho, el entendimiento de las Demandadas es que "QG tenía la obligación de ejecutar sus obligaciones contractuales aún y cuando PDVSA Petróleo no hubiese realizado pago alguno"[70], dada la "prerrogativa que tiene el Estado y sus Empresas – en este caso PDVSA

---

[61] Réplica, § 37.
[62] Réplica, § 38.
[63] Réplica, § 39.
[64] Contestación, § 70.
[65] Contestación, §§ 81-83.
[66] Contestación, § 98.
[67] Contestación, § 101.
[68] Contestación, §§ 107-110 y 130-133.
[69] Contestación, §§ 78 a 80.
[70] Contestación, § 85.

Petróleo – de que no le es oponible la excepción de contrato no cumplido o *non adimpleti contractus*"[71].

211.    Las Demandadas reconocen que recibieron el 12 diciembre de 2017 la fianza y el recibo del anticipo respecto del Contrato PIGAP, pero observan que eso ocurrió más de tres años después de la firma del contrato y 9 meses después de la entrada en vigor del contrato de financiamiento del BSJI[72].

212.    Las Demandadas también reconocen que recibieron el 20 de julio de 2017 la fianza y recibo del anticipo respecto del Contrato Carito-Pirital, pero observan que eso ocurrió más de tres meses después de la firma del contrato de financiamiento del BSJI[73].

213.    Las Demandadas argumentan que "como nunca se firmó el Acta de Inicio, las Fianzas de Fiel Cumplimiento y la Fianza Laboral consignadas por QG, nunca entraron en vigencia, contrariando lo establecido en el Contrato Carito-Pirital referente a la vigencia de las Fianzas, y violando la prohibición de hacer depender la vigencia de las fianzas de alguna condición"[74].

214.    De acuerdo con las Demandadas, la Demandante fue negligente al no mantener vigentes las fianzas de responsabilidad laboral y de fiel cumplimiento, lo que podía dar causa a la terminación de los Contratos bajo las cláusulas 18.2.3 del Contrato PIGAP y 18.4.2 del Contrato Carito-Pirital[75].

215.    Las Demandadas rechazan que la legalidad de la terminación de los Contratos deba ser analizada con base en las causales alegadas contemporáneamente a la rescisión, ya que esa regla sólo se aplicaría a los procedimientos de nulidad de actos administrativos y no a controversias de naturaleza contractual. De acuerdo con las Demandadas, el Tribunal Arbitral puede analizar todas las circunstancias relativas a la terminación de los Contratos, especialmente las cuestiones relativas a su cumplimiento o incumplimiento[76].

216.    Las Demandadas entienden que QG asumió los riesgos de contratar con PDVSA Petróleo, puesto que la Demandante "era consciente de los posibles problemas políticos, económicos y de acceso a fuentes de financiamiento internacional" que afectaban a PDVSA Petróleo[77]. En particular, es la posición de las Demandadas que las cláusulas 5.8.3 del Contrato PIGAP y 5.8.4 del Contrato Carito-Pirital fueron establecidas como forma de prevenir los riesgos de incumplimiento de los Contratos[78].

217.    De acuerdo con las Demandadas, las cláusulas 5.8.3 del Addendum 1 – PIGAP y 5.8.4 del Contrato-Carito Pirital establecían que cualquiera de las partes podría rescindir unilateralmente los Contratos si ocurrieran alternativamente una de dos condiciones, a

---

[71] Contestación, § 85.
[72] Contestación § 117.
[73] Contestación, § 137.
[74] Contestación, § 142.
[75] Contestación, §§ 119 y 121.
[76] Contestación, § 71-74.
[77] Contestación, §§ 34 y 41.
[78] Contestación, §§ 36 y 43.

saber, la no concretización de los financiamientos o el no desembolso del anticipo en el plazo de doce meses después de la fecha efectiva[79].

218. Respecto del Contrato PIGAP, las Demandadas afirman que la "fecha efectiva" para el computo del plazo establecido en la cláusula 5.8.3 del Addendum 1 – PIGAP "ocurrió el 28 de julio de 2015 – fecha de la firma de la Adenda del Contrato PIGAP" y que "a partir del 28 de julio de 2016 el contrato podía ser resuelto, por cualquiera de las partes – no sólo por las Demandadas – en virtud del cumplimiento de la condición referida a la falta del primer desembolso y pago del anticipo"[80].

219. Las Demandadas alegan que la "fecha efectiva" para el computo del plazo establecido en la cláusula 5.8.4 del Contrato Carito-Pirital "fue el 24 de enero de 2017 – fecha de su suscripción – y el cumplimiento del término establecido en la cláusula 5.8.4 ocurrió el 24 de enero de 2018".

220. Asimismo, las Demandadas entienden que, en los contratos administrativos, como lo son el Contrato PIGAP y el contrato Carito-Pirital, las prerrogativas legales y exorbitantes son establecidas para beneficio del Estado y sus empresas, no en beneficio de particulares[81]. Además, los particulares tienen el poder de disponer de sus derechos patrimoniales y establecer una "ventaja especial" en favor del Estado; es bajo esta comprensión que las Demandadas consideran que las cláusulas 5.8.3 y 5.8.4 constituyen una "ventaja especial"[82].

221. En cuanto al ejercicio de su alegado derecho unilateral de rescisión, las Demandadas plantean que la notificación escrita manifestando la voluntad de terminar los Contratos no necesitaba exponer la motivación de la rescisión[83]. Asimismo, señalan las Demandadas que jamás se pactó la necesidad de un procedimiento, o de alegar y probar el incumplimiento para que la rescisión sea válida. Del punto de vista de las Demandadas, incluso si no fuera obligatorio, el proceso administrativo para terminación de los Contratos demuestra "un exceso de garantismo de PDVSA"[84].

222. Por lo tanto, no habiendo ocurrido el desembolso del anticipo, las Demandadas afirman que ejercieron regularmente su derecho de rescisión unilateral, ya que enviaron el correo electrónico de fecha 6 de septiembre de 2018 manifestando su voluntad de terminar los Contratos de conformidad con las cláusulas 5.8.3 y 5.8.4[85], siendo irrelevante las causales de la rescisión[86].

---

[79] Contestación, § 38 y 45.
[80] Contestación, § 39.
[81] Contestación, § 48.
[82] Contestación, §§ 54-55.
[83] Contestación, § 58.
[84] Contestación, §§ 64-65.
[85] Véase De-50.
[86] Contestación, §§ 60 y 62.

C) El análisis del Tribunal

223. El presente arbitraje se refiere a dos contratos celebrados entre las Partes, a saber, el Contrato PIGAP y el Contrato Carito-Pirital, firmados respectivamente en 2014 y 2017. El primero contemplaba la construcción de "todas las instalaciones de superficie de una planta compresora de gas de alta presión"[87] y el segundo la ejecución de la "ingeniería, procura, suministro y construcción de dos (02) plantas compresoras en las áreas de Carito y Pirital"[88].

224. Es un hecho incontrovertido que los Contratos fueron rescindidos unilateralmente por las Demandadas. La controversia que se somete a la decisión del Tribunal Arbitral se refiere a saber si la rescisión unilateral fue operada de modo regular y a quién se deben imputar los hechos que dieron lugar a dicha rescisión unilateral.

225. La Demandante y las Demandadas presentan posiciones diametralmente opuestas respecto a las causas de resolución de los Contratos PIGAP y Carito-Pirital. De un lado, la Demandante sostiene que los Contratos fueron rescindidos unilateralmente por causas no imputables a QG, argumentando que la eventual presentación tardía de documentos y los retrasos en la ejecución de los Contratos son imputables a las Demandadas. Del otro lado, las Demandadas alegan que sólo utilizaron los medios de resolución previstos los Contratos, todo ello de conformidad con la legislación aplicable.

226. Existen algunos factores que complican el análisis que debe realizar el Tribunal Arbitral. En particular, las Partes construyen sus argumentos sobre bases diferentes. Para la Demandante, la terminación de los contratos debe analizarse a partir de las causales alegadas contemporáneamente a su terminación. En cambio, las Demandadas no se ciñen a las causas alegadas coetáneamente a la resolución del contrato, sino que en el Arbitraje han planteado nuevas hipótesis que validarían la resolución unilateral tal y como se llevó a cabo. Así, las Demandadas solicitan, de un lado, que se declare que los Contratos han sido rescindidos en ejercicio de su derecho de resolución unilateral previsto en las cláusulas 5.8.3[89] del Addendum 1 - PIGAP y 5.8. 4[90] del Contrato Carito-Pirital[91] y, de otro lado, que se declare que los Contratos fueron terminados por incumplimientos contractuales imputables a la Demandante[92].

---

[87] Cf. Cláusula 3 del Contrato PIGAP, De-1, p. 12.

[88] Cf. Cláusula 3 del Contrato Carito-Pirital, De-2, p. 10.

[89] La cláusula 5.8.3 del Addendum 1 – PIGAP establece lo que sigue: "En caso que no se concrete el FINANCIAMENTO COMERCIAL y/o no se produzca el primer desembolso bajo el FINANCIAMENTO COMERCIAL y pago del ANTICIPO en el plazo de doce (12) meses después de la FECHA EFECTIVA, cualquier de las PARTES podrá dar por terminado este CONTRATO mediante notificación previa y por escrito a la otra parte, a menos que este plazo sea extendido de común acuerdo entre ellas, sin que la PARTE que decida por la terminación tenga responsabilidad alguna ante la otra PARTE por daños y perjuicios, indemnizaciones, penalidades y/o lucros cesantes, no siendo debido monto alguno a la otra PARTE en razón de la terminación prevista en esta cláusula". Cf. De-6, p. 8.

[90] La cláusula 5.8.4 del Contrato Carito-Pirital tiene la misma redacción de la Cláusula 5.8.3 del Addendum 1 - PIGAP. Cf. De-2, p. 16.

[91] Acta de Misión, § 89(a)(b); Contestación, § 217 (ii)(iii); Dúplica, §478 (iv)(v); EPA Demandadas, §134 (iv)(v).

[92] Acta de Misión, § 89,(d); Contestación, §§ 217 (iv)(v); Alegato, §478 (viii)(ix); EPA Demandadas, §134 (viii)(ix)

227.   Los Contratos fueron terminados mediante las Providencias Administrativas n° 001 y 002 de 9 de octubre de 2018, emitidas por PDVSA[93]. No hay controversia al respecto. En estos documentos se hacía referencia a la presentación extemporánea de la fianza del anticipo, al incumplimiento de los plazos de ejecución de los Contratos y al no mantenimiento de la vigencia de las fianzas de fiel cumplimiento y laboral como causales para la terminación de los Contratos. En este sentido, las dos providencias administrativas se basaban en la cláusula 18.2.3 de los Contratos[94], en los Artículos 145[95] y 155[96] de la LCP y en el Artículo 193[97] del RLCP, es decir, en la hipótesis de resolución unilateral imputable al contratista[98].

228.   Aunque las Partes hayan empleado mucha energía en torno de la discusión de la fuerza vinculante de las causales vehiculadas en las providencias administrativas, este Tribunal Arbitral no entiende su mandato en esos términos. La jurisdicción arbitral no fue instituida para definir si las causales de un acto administrativo son vinculantes; tampoco es su mandato revisar actos administrativos. El Tribunal Arbitral tiene como misión analizar una

---

[93] Véanse De-16 y De-17.

[94] La cláusula 18.2.3 de los Contratos establece una lista ejemplificativa de causas de terminación imputables a la Contratista. Por un error de numeración, en el Contrato Carito-Pirital la lista en cuestión se encuentra estipulada de la cláusula 18.3 hasta la cláusula 18.5. La recisión de los Contratos se basaba en dos hipótesis. De un lado, la letra "b" de la cláusula 18.2.3. del Contrato PIGAP y la cláusula 18.4 del Contrato Carito-Pirital preveían que estos podrían ser terminados "[c]uando LA CONTRATISTA ejecute o haya ejecutado el TRABAJO sin sujetarse a las estipulaciones del presente CONTRATO, o cuando ejecute el TRABAJO sin dar cumplimiento al CRONOGRAMA DE EJECUCIÓN, de manera tal que no permita la terminación de la OBRA o la conclusión del PROYECTO, dentro del plazo estipulado en la Cláusula 6 (PLAZO DE EJECUCIÓN Y VIGENCIA) del presente CONTRATO". De otro lado, la letra "d" de la cláusula 18.2.3. del Contrato PIGAP y la cláusula 18.4.2. del Contrato Carito-Pirital preveían que estos podrían ser terminados "[c]uando [la Contratista] no presente o mantenga vigentes las pólizas de seguros contempladas en la Cláusula 19 (PÓLIZAS DE SEGUROS) y Cláusula 20 (FIANZAS LABORAL Y DE FIEL CUMPLIMIENTO) del presente CONTRATO, con excepción a lo previsto en el Numeral 20.2.5. Véase respectivamente De-1, p. 40 y De-2, pp. 45-46.

[95] El Artículo 145 de la LCP establece el siguiente: "El contratista velará por el cumplimiento de las obligaciones por parte del contratista, particularmente la fecha de entrega de la ejecución de las obras, de lo cual deberá dejar constancia que permita soportar el cierre administrativo del contrato. Esta disposición también es aplicable en los casos de suministro de bienes y prestación de servicios. El contrato podrá terminar por: 1. Cumplimiento del objeto del contrato. 2. Rescisión unilateral por causa no imputable al contratista. 3. Resolución por mutuo acuerdo. 4. Rescisión por causa imputable al contratista". Cf. DeL-29, p. 44.

[96] El Artículo 155 de la LCP establece lo que sigue: "El contratante previa sustanciación del respectivo procedimiento administrativo, respetando el debido proceso y garantizando el derecho a la defensa, podrá rescindir unilateralmente el contrato en cualquier momento, cuando el contratista: 1. Ejecute los trabajos en desacuerdo con el contrato, o los efectúe en tal forma que no le sea posible cumplir con su ejecución en el término señalado. 2. Acuerde la disolución o liquidación de su empresa, solicite se le declare judicialmente en estado de atraso o de quiebra, o cuando alguna de esas circunstancias haya sido declarada judicialmente. 3. Ceda o traspase el contrato, sin la previa autorización del contratante, dada por escrito. 4. Incumpla con el inicio de la ejecución de la obra de acuerdo con el plazo establecido en el contrato o en su prórroga, si la hubiere. 5. Cometa errores u omisiones sustanciales durante la ejecución del contrato. 6. Cuando el contratista incumpla con sus obligaciones laborales durante la ejecución del contrato. 7. Haya obtenido el contrato mediante tráfico de influencias, sobornos, suministro de información o documentos falsos, concusión, comisiones o regalos, o haber empleado tales medios para obtener beneficios con ocasión del contrato, siempre que esto se compruebe mediante la averiguación administrativa o judicial que al efecto se practique. 8. Incurra en cualquier otra falta o incumplimiento de las obligaciones establecidas en el contrato, a juicio del contratante. 9. No mantenga al frente de la obra a un ingeniero o ingeniera residente de acuerdo a lo establecido en el presente Decreto con Rango, Valor y Fuerza de Ley. Lo dispuesto en los numerales 1 al 8 del presente artículo son aplicables también, en los casos de suministro de bienes y prestación de servicios". Cf. DeL-29, p. 45.

[97] El Artículo 193 del RLCP establece el siguiente: "Cuando el órgano o ente contratante decida rescindir unilateralmente el contrato por haber incurrido el Contratista en alguna o algunas de las causales indicadas en la Ley de Contrataciones Públicas, las disposiciones de este Reglamento 6 las establecidas en el contrato, lo notificará por escrito a éste, a los garantes y cesionarios si los hubiere". Cf. DeL-28, p. 43.

[98] Véanse De-16, pp. 5-8; De-17, pp. 5-8.

situación contractual delimitada temporalmente, a saber, la resolución del contrato. Por eso, debe mirar todos los hechos relevantes relativos a las pretensiones de las Partes.

229.    En otros términos, corresponde a este Tribunal Arbitral valorar en qué medida los hechos que dieron lugar a la resolución de los Contratos se subsumen en las hipótesis contractuales y legales articuladas por las Partes, así como apreciar si los actos de resolución se llevaron a cabo de conformidad con lo previsto en los Contratos y en la ley o en violación de aquellos o de esta.

230.    Esto es lo que se hará en los puntos que siguen.

> *a) El desembolso del anticipo y el derecho unilateral de rescisión previsto en las cláusulas 5.8.3 del Addendum 1 - PIGAP y 5.8.4 del Contrato Carito-Pirital.*

231.    La ejecución de los Contratos, incluidas sus modalidades de pago, siempre ha estado vinculada a la obtención de un financiamiento comercial[99]. Este se obtuvo del BSJI en el año 2017; el contrato de financiamiento propiamente dicho fue firmado concretamente el 6 de abril de 2017[100]. El Contrato PIGAP fue objeto de dos modificaciones para ajustarlo a las condiciones del préstamo bancario, a saber, el Addendum 1 - PIGAP y el Addendum 2 - PIGAP. El Contrato Carito-Pirital fue modificado una vez con el fin de ajustarlo al financiamiento acordado por el BSJI, como se puede ver en el Addendum 1 - Carito-Pirital.

232.    No resulta controvertido que, desde su inicio, el Contrato Carito-Pirital preveía el desembolso de un anticipo del 10% del valor en dólares estipulado para la adquisición de materiales y equipos[101]. De hecho, en su cláusula 5.8.7 se establecía que el desembolso del anticipo debía ser pagado con fondos del financiamiento comercial, en dólares, los cuales serían amortizados deduciendo el 10% del valor de cada factura presentada en dólares[102]. Finalmente, la misma cláusula establecía que, "inmediatamente después del cierre del financiamiento comercial", el contratista debería presentar el recibo del pago del anticipo[103]. El Addedum 1 - Carito-Pirital mantuvo esencialmente intacta la redacción de la cláusula 5.8.7.

233.    Una disposición como esta no existía originalmente en el Contrato PIGAP, pero se la incluyó posteriormente mediante la cláusula 2 del Addendum 1 - PIGAP. La modificación en cuestión suprimía la cláusula 5.7.4 del contrato original y añadía, entre otras, la cláusula 5.8.6[104]. La nueva disposición contractual se había redactado en términos análogos a la cláusula 5.8.7 del Contrato Carito-Pirital, con sólo dos puntos de diferencia. En primer lugar, la cláusula 5.8.6 del Addendum 1 - PIGAP preveía un valor nominal de setenta millones de dólares para el desembolso del anticipo. En segundo lugar, el reembolso debía

---

[99] Véase la cláusula 5.7.4 del Contrato PIGAP, De-1, p. 16; y la cláusula 5.8 del Contrato Carito-Pirital, De-2, p. 10.
[100] De-3.
[101] De-2, p. 17.
[102] De-2, p. 17.
[103] De-2, p. 17.
[104] De-6, p. 10.

efectuarse sobre la base de una deducción del 20% del valor de cada factura a pagar en dólares[105].

234.  El Addendum 2 - PIGAP, que detalló la relación entre el contrato principal y el contrato de financiamiento comercial con BSJI, reiteró la esencia de la cláusula 5.8.6 introducida por el Addendum 1 – PIGAP. Sin embargo, se introdujeron ciertas modificaciones, especialmente respecto del monto del anticipo. Así, en lugar de un valor nominal, el Addendum 2 - PIGAP estipuló que el monto del anticipo debería totalizar el 15% del monto en dólares relativo a la adquisición de materiales y equipos.

235.  Dicho esto, cabe señalar que las Demandadas alegan que el Contrato PIGAP no establece ninguna obligación con respecto al desembolso del anticipo. El argumento se basa en una interpretación superficial de los términos originales del Contrato PIGAP[106]. Las Demandadas alegan que la cláusula primera del Addendum 1 - PIGAP es inválida porque vulnera las prerrogativas exorbitantes del Estado[107].

236.  Esta tesis será objeto de un análisis detallado más abajo[108], pero es oportuno subrayar ya en este punto que la mencionada alegación fue la única impugnación presentada en cuanto a la validez de las modificaciones del Contrato PIGAP. Por lo tanto, debe asumirse que todas las demás cláusulas del Addendum 1 - PIGAP y del Addendum 2 - PIGAP son reconocidas como válidas por las Demandadas. De hecho, las propias Demandadas afirman en su Contestación que sus pretensiones relativas a la nulidad del Addendum 1 - PIGAP se limitan a su cláusula primera[109].

237.  Debe recordarse una vez más que la obligación de pagar el anticipo se introdujo en el Contrato PIGAP mediante la cláusula segunda del Addendum 1 - PIGAP, reiterada con modificaciones, como se ha visto anteriormente, por la cláusula tercera del Addendum 2 - PIGAP. La cláusula primera del Addendum 1 – PIGAP, de su lado, solo efectuó modificaciones terminológicas respecto de ciertas definiciones del Contrato PIGAP. A través de esta cláusula, las Partes modificaron la definición de "fecha efectiva" y "fecha de inicio", además de incluir definiciones para los términos "banco", "cuenta conjunta", "contrato de préstamo", "financiamiento comercial", "prestamista" y "precio del contrato"[110]. En resumen, la cláusula primera del Addendum 1 - PIGAP no tiene nada que ver con la obligación del pago del anticipo. Consecuentemente, considerando el texto de las enmiendas analizadas anteriormente, el argumento de que el Contrato PIGAP no preveía la obligación de desembolso del anticipo no puede sostenerse desde un punto de vista lógico.

238.  Ahora bien, la obligación de desembolso del anticipo si existía, ya que fue válida y voluntariamente pactada por las Partes bajo las cláusulas segunda del Addendum 1 – PIGAP y tercera del Addendum 2 – PIGAP. Lo que no existía, como no existe, es una

---

[105] De-6, p. 10.
[106] Contestación, § 81.
[107] Contestación a la Demanda, §§ 94 y ss.
[108] Cf. §§ 262 y ss.
[109] Dúplica, § 101.
[110] Cf. De-6.

prohibición bajo la LCP respecto de la validez de estas cláusulas. Al contrario, el Artículo 128 de la LCP expresamente permite que los contratos administrativos estipulen el pago de un anticipo. De hecho, este artículo dispone que "en los contratos que se celebren podrá concederse un anticipo, cuyo pago no será condición indispensable para iniciar el suministro del bien o servicio, o la ejecución de la obra, salvo que en el contrato se establezca el pago previo del mismo"[111].

239.    Es decir, el Tribunal Arbitral no está convencido de que se pueda hablar de vulneración de prerrogativas exorbitantes del Estado, ya que la propia ley autoriza a la administración a celebrar contratos concediendo un pago del anticipo al contratista. Así, a la luz de las consideraciones anteriores, el Tribunal Arbitral entiende que las Demandadas tenían la obligación de pago del anticipo tanto en el contrato Carito Pirital cuanto en el Contrato PIGAP.

240.    Superada esta cuestión, deben analizarse las condiciones para el desembolso del anticipo previsto en los Contratos. Es un hecho incontrovertido que la entrega del recibo del anticipo era una condición necesaria para su desembolso. Así lo reconoce la propia Demandante cuando afirma que "[a] principios de julio de 2017, hubo reuniones entre las Partes para definir cómo tenía que ser la factura del anticipo, documento necesario para el desembolso que debía hacer PDVSA"[112].

241.    El desembolso del anticipo también estaba condicionado a la presentación de una fianza que cubriera el valor total del monto anticipado. Reflejando la previsión legal establecida en el apartado 3 del Artículo 128 de la LCP, los Contratos también estipulaban esta condición. De hecho, ya la cláusula 20.1.3 del Contrato PIGAP, en sus términos originales, estipulaba que el contratista debía presentar una fianza que cubriera el 100% del valor anticipado en dólares, la cual debería mantenerse vigente hasta que el anticipo fuera amortizado en los términos del Contrato[113]. Esta disposición se reiteró en la cláusula cuarta del Addendum 2 - PIGAP, modificándose únicamente la forma de reembolso del anticipo. Una disposición esencialmente idéntica también había sido incluida en la cláusula 20.1.3 del Contrato Carito-Pirital.

242.    Las Partes dedicaron considerable atención en sus escritos al tema de la presentación de documentos relativos al desembolso del anticipo. Asimismo, el tema fue tratado ampliamente durante la Audiencia, y fue objeto central del interrogatorio realizado a los Sres. Nielsen[114], Alvim[115] y Vielma[116].

243.    Las posiciones de las Partes son, una vez más, opuestas y contradictorias. Las Demandadas se aferran a toda costa a los argumentos relativos a la forma y al momento de la presentación

---

[111] DeL-29, p. 41.
[112] Demanda, §45.
[113] De-2, p. 54.
[114] Cf. Audiencia, Día 1, 2023-01-30-CCI 24306-Audio-Parte 5.mp3, 12min20s a 57min03s.
[115] Cf. Audiencia, Día 2, 2023-01-31-CCI 24306-Audio-Parte 1.mp3, 37min25s a 51min20s.
[116] Cf. Audiencia, Día 2, 2023-01-31-CCI 24306-Audio-Parte 4.mp3, 41min20s a 2h24min25s.

de los documentos, ya que no discuten que dichos documentos fueron efectivamente presentados.

244. En resumen, la posición de las Demandadas es que el desembolso de los anticipos no podía llevarse a cabo puesto que los documentos necesarios al pago del anticipo, a saber, el recibo del anticipo y la fianza del anticipo, fueron presentados fuera de plazo e incumpliendo determinadas formalidades. De hecho, las Demandadas señalan que los recibos de anticipo del Contrato PIGAP se emitieron por un importe del 5% del valor de la obra y no del 15% como se había acordado. Además, las Demandadas también alegan que las fianzas del anticipo no se presentaron correctamente.

245. El Sr. Nielsen, que había sido gerente de proyecto encargado de los Contratos por parte de QG[117], fue preguntado durante la Audiencia cómo explicaría el monto menor consignado en el recibo del anticipo del Contrato PIGAP. En su respuesta, el testigo afirmó que esta modificación había sido solicitada por las Demandadas y que supondría una reducción del monto a recibir a título de anticipo[118]. Según su testimonio, tal conducta fue consensuada entre las Partes para permitir la ejecución del Contrato PIGAP. No obstante, instado por el Tribunal, el testigo señaló que tales modificaciones se habían realizado de manera informal, alegando que era práctica normal "entrar y salir del contrato" para ejecutar la obra, y que esto tiene que ver con un diálogo técnico entre los ingenieros[119].

246. El mismo Sr. Nielsen, en su primera declaración testimonial, informó que las Partes habían acordado que las garantías previstas en los Contratos deberían estar vigentes solo al momento de la firma del Acta de Inicio[120]. Corroborando esta afirmación, fue aportada al expediente una minuta de la reunión celebrada entre las Partes el 8 de diciembre de 2017 en la que se dejó constancia de este acuerdo, leyéndose en dicho documento entre otras cosas que "PDVSA informa que todas las fianzas y seguros deben estar vigentes al momento de la firma del acta de inicio del proyecto"[121].

247. El expediente contiene abundantes pruebas de que las Partes mantuvieron un flujo constante de comunicación y coordinación, con numerosos mensajes intercambiados sobre el tema de la documentación necesaria para el desembolso del anticipo. Sobre este punto, es bastante esclarecedor el correo electrónico del 8 de diciembre de 2017 enviado por la Sra. Eimara Pérez, en aquel momento la Gerente de Asuntos Legales Corporativos de PDVSA. En efecto, tras una serie de comunicaciones intercambiadas entre la Demandante y las Demandadas en relación con el monto del anticipo, la Sra. Pérez afirmó que los documentos enviados por QG habían sido revisados y no hizo ningún comentario sobre irregularidades relativas a los recibos de anticipo presentados[122].

248. Las Demandadas alegan que la Sra. Eimara Pérez, a pesar de su alto cargo jerárquico, no estaba facultada para dar aprobación alguna en relación con las modificaciones de los

---

[117] DeT-1, Testimonio de Ariel Nielsen, § 15.
[118] Cf. Audiencia, Día 1, 2023-01-30-CCI 24306-Audio-Parte 5.mp3, 38min29s a 39min45s.
[119] Cf. Audiencia, Día 1, 2023-01-30-CCI 24306-Audio-Parte 5.mp3, 1h08min55s a 1h14min25s.
[120] DeT-1, Testimonio Ariel Nielsen, §44.
[121] Ver De-42, punto 3, p. 3.
[122] De-43.

Contratos. Es cierto que los Contratos no podían ser modificados verbalmente, lo que está expresamente estipulado en la cláusula 38.3. de ambos Contratos[123]. Así, está claro que la Sra. Pérez, mediante su mensaje de correo electrónico, no introdujo ninguna modificación formal a los términos del contrato. Sin embargo, el Tribunal Arbitral no está convencido de que la relación contractual entre las Partes se basara en un formalismo contractual rígido, existiendo numerosos momentos en los que las Partes, de hecho, "entraron y salieron"[124] de los Contratos[125]. Ignorar esta realidad fáctica por las Partes constituiría un atentado a la buena fe, que a juicio del Tribunal debe presidir siempre toda relación contractual. Efectivamente, el Artículo 2º de la LCP consagra la honestidad, la igualdad y la transparencia como principios rectores de la contratación administrativa, constituyendo el amparo legal de la protección de la buena fe en los contratos celebrados entre la administración y los particulares bajo el derecho venezolano[126]. Estos principios son verdaderas cláusulas generales implícitas en todo contrato administrativo celebrado al amparo de la LCP.

249.   En este sentido, y en línea con lo que había sido aceptado por la dirección corporativa de PDVSA, los correos de 9 de febrero de 2018, firmados y aceptados por los Sres. Luis Becerra y Jesús Mago, respectivamente gerentes de proyecto del Contrato PIGAP y del Contrato Carito-Pirital, ofrecen una importante recapitulación de los hitos para el desembolso del anticipo de los Contratos e indican que la cuestión de los montos de los anticipos nunca fue objeto de cuestionamiento alguno[127].

250.   Del análisis de estos correos, puede constatarse que el Demandante dejó constancia de los trámites para el desembolso de anticipo en los siguientes términos: "Como es de su conocimiento, desde ese momento, los equipos de ambas partes han estado tramitando y negociando los términos y condiciones de la Fianza de Anticipo. En este sentido: (i) En la respuesta de ustedes antes mencionada, de fecha 8 de diciembre de 2017, se nos indicó que su Gerencia Corporativa de Asuntos Jurídicos revisaría la fianza propuesta. (ii) En fecha 12 de enero de 2018 recibimos su comunicación de fecha 9 de enero de 2018 solicitando ciertas modificaciones a la fianza propuesta. (iii) En fecha 19 de enero de 2018 enviamos a ustedes la fianza modificada siguiendo sus instrucciones. (iv) En fecha 25 de enero _de 2018 recibimos respuesta de ustedes solicitando modificaciones adicionales a la fianza. (v) En fecha 30 de_ enero de 2018 enviamos a ustedes una nueva fianza modificada siguiendo sus instrucciones. (vi) En fecha 2 de febrero de 2018 recibimos respuesta de ustedes solicitando modificaciones adicionales a la fianza. (vii) En fecha 5 de febrero de 2018 los gerentes del proyecto de ambas partes se reunieron a los fines de aprobar en forma definitiva el texto de la fianza incluyendo las modificaciones solicitadas por ustedes. (viii) En fecha 6 de

---

[123] De-1, p. 65; De-2, p. 75.
[124] Cf. Audiencia, Día 1, 2023-01-30-CCI 24306-Audio-Parte 5.mp3, 1h09min00s a 1h15min25s.
[125] Véanse De-42, De-43, De-44, De-45 y De-46.
[126] El Artículo 2º tiene la redacción siguiente: "Las disposiciones del presente Decreto con Rango, Valor y Fuerza de Ley se desarrollarán respetando los principios de economía, planificación, transparencia, honestidad, eficiencia, igualdad, competencia, publicidad y simplificación de trámites; y deberán promover la participación popular a través de cualquier forma asociativa de producción". Véase DeL-29, p. 20.
[127] De-45 y De-46.

febrero de 2018 fue emitida la fianza definitiva en los términos y condiciones acordados por ambas partes"[128].

251. Los mismos correos indican que la Demandante y las Demandadas habían mantenido largas conversaciones sobre la presentación de la fianza del anticipo. Estos mensajes demuestran que una serie de modificaciones a las fianzas presentadas por QG habían sido solicitadas por PDVSA en momentos distintos, a saber, el 12 de enero de 2018, el 19 de enero de 2018 y el 2 de febrero de 2018. Además, los correos en cuestión también prueban que los gerentes de proyecto de cada uno de los Contratos recibieron la versión definitiva de los recibos del anticipo y de las fianzas de los anticipos en los términos que habían sido solicitados por la propia PDVSA.

252. La Demandante ha podido probar que existía, aunque de manera informal, una confianza fundada respecto a la documentación a presentar para el desembolso del anticipo. Además, ha quedado demostrado que, actuando de buena fe y de conformidad con dicho acuerdo, las Partes decidieron no cumplir estrictamente con los términos de los Contratos. Es cierto que, en virtud de las cláusulas 38.2[129] y 38.3[130] de los Contratos, tal conducta no puede interpretarse como una renuncia de derechos de la parte de las Demandadas o como una modificación formal de la relación contractual. Sin embargo, no es de renuncia de lo que aquí se trata, y tampoco de modificación de la relación contractual. El problema central con los hechos narrados es que la pretensión de las Demandadas se basa en un claro ejemplo de *venire contra factum proprium*. Los hechos probados demuestran que las Demandadas actuaron en clara violación de los principios rectores del contrato administrativo, establecidos en la LCP en su Artículo 2º, en particular de los principios de honestidad y transparencia.

253. Cabe subrayar que las Demandadas han reconocido la normatividad de la doctrina de los actos propios, habiéndose referido a ella en los siguientes términos: "la doctrina y la jurisprudencia han desarrollado la teoría de los actos propios (*venire contra factum proprium no valet*), que supone que cuando una persona dentro de una relación jurídica ha suscitado en otra con su conducta una confianza fundada conforme a la buena fe, en una determinada conducta futura, no debe defraudar esa confianza suscitada y es inadmisible toda actuación incompatible con ella"[131]. El Tribunal Arbitral coincide con la posición de las Demandadas sobre la doctrina de los actos propios, cuando propugnan "la prohibición de

---

[128] De-45 y De-46.
[129] La cláusula 38.2. de los Contratos estipula lo siguiente: "Si en una o más ocasiones, LA COMPAÑÍA dejare de exigir el estricto cumplimiento de cualesquiera de las estipulaciones del presente CONTRATO o dejare de hacer uso de cualesquiera opciones o derechos contemplados en el mismo CONTRATO o en la Ley, ello no será interpretado como una renuncia de su parte a tales estipulaciones, opciones o derechos, ni a las demás estipulaciones del presente CONTRATO". Véase De-1, p. 65; De-2, p. 75.
[130] La cláusula 38.3 de los Contratos estipula lo que sigue: "Este CONTRATO no podrá modificarse por ningún compromiso verbal o de cualquier otra manera, excepto por escrito, firmado por los representantes legales de las PARTES debidamente acreditados para tal propósito dentro de Venezuela, y de conformidad con las leyes de Venezuela". Véanse, De-1, pp. 65-66; De-2, p. 75.
[131] Escrito Complementario de las Demandadas, §57.

contradicciones e incoherencias porque una conducta contradictoria es entonces una contravención o infracción del deber de buena fe"[132].

254.   La conducta de las Demandadas respecto de la terminación de los Contratos debe ser considerada como tal. Tras largas negociaciones, las Demandadas indujeron a la Demandante a aceptar un anticipo de menor monto, obligándola repetidas veces a ajustar los documentos relativos a su desembolso. A continuación, resolvieron rescindir los Contratos basándose, entre otras cosas, en que la Demandante no había consignado en tiempo y forma, según los términos de los Contratos, los recibos y las fianzas del anticipo[133]. Esta actuación es innegablemente contradictoria y viola de manera frontal la situación de confianza fundada en la que se encontraba la Demandante.

255.   Aún más contradictoria es la pretensión de que, más de cuatro años después de dictada la providencia de terminación de los Contratos, el Tribunal Arbitral ignore las razones expuestas en aquellos documentos. La tesis de las Demandadas es que, a pesar de los motivos expuestos en las providencias administrativas, las verdaderas razones de la resolución de los Contratos serían el ejercicio del derecho de resolución unilateral previsto en las cláusulas 5.8.3 del Addendum 1 - PIGAP y 5.8.4 del Contrato Carito-Pirital. Si estas alegaciones reflejaran lo que en realidad sucedió, estaríamos en presencia de una admisión expresa de que la motivación de las providencias administrativas era falsa y que las razones de la rescisión de los Contratos fueron ocultadas deliberadamente. En otras palabras, si se aceptan los argumentos de las Demandadas, esta conducta representaría una violación todavía más evidente de los principios de honestidad y transparencia estipulados en el Artículo 2º de la LCP.

256.   Por consiguiente, el Tribunal Arbitral considera improcedente la pretensión que los Contratos fueron rescindidos con base en el derecho de rescisión unilateral previsto en las cláusulas 5.8.3 del Addendum 1 - PIGAP y 5.8.4 del Contrato Carito-Pirital.

257.   La situación es aún más clara cuando se verifica que, en los términos de las cláusulas analizadas, la terminación debe estar precedida de un "notificación previa por escrito a la otra parte"[134]. Es lógico suponer que la notificación en cuestión debería reflejar el manejo del derecho de rescisión contenido en las cláusulas referidas, especialmente cuando se considera que el Estado venezolano y sus empresas están obligados a emitir actos motivados. Sin embargo, en ninguno de los actos de terminación de los Contratos[135], ni en las cartas de notificación del inicio del procedimiento de rescisión unilateral de los Contratos[136], ni en cualquiera de los documentos aportados al expediente, se mencionó que los Contratos se estaban rescindiendo con base en las cláusulas 5.8.3 del Addendum 1 - PIGAP y 5.8.4 del Contrato Carito-Pirital.

---

[132] Escrito Complementario de las Demandadas, §57.
[133] De 16, p. 5; De 17, p. 6.
[134] Cf. Cláusula 5.8.3 de la Adenda 1 - PIGAP, De-6, p. 8; y cláusula 5.8.4 del Contrato Carito-Pirital, De-2, p. 16
[135] De-16 y De-17.
[136] De-14 y De-39.

258.    Cabe destacar que el profesor Mouriño, experto de las propias Demandadas, subrayó que la resolución unilateral de los contratos administrativos debe estar sujeta a una motivación suficiente del acto y a una notificación al contratista de forma que se garantice su derecho de defensa[137]. Este deber de motivación, explica también el profesor Mouriño, viene avalado por la jurisprudencia de la Sala Político-Administrativa del Tribunal Supremo de Justicia[138]. Es evidente que carece de motivación suficiente el acto de terminación que no se refiere a las causas que lo motivan, o que se refiere a causas distintas a las reales[139]. En ambos casos, el administrado se encuentra imposibilitado de ejercer su derecho de defensa.

259.    Una vez más, estas consideraciones del Tribunal Arbitral no cuestionan la existencia, validez o eficacia de las Providencias Administrativas n.° 001 y 002 de 9 de octubre de 2018, materia que sigue sometida a la jurisdicción contencioso-administrativa venezolana. Lo que este Tribunal Arbitral reprueba en la conducta de las Demandadas es la violación de los principios de honestidad y transparencia que deben presidir toda relación contractual bajo la LCP.

260.    Efectivamente, la LCP, que ambas Partes invocan como el texto legal que rige los Contratos, establece claramente como principios rectores de la contratación administrativa los principios de buena fe, honestidad y transparencia[140]. En razón de las sólidas pruebas que obran en el expediente, el Tribunal Arbitral está convencido de que la terminación de los Contratos se operó en violación de los principios de honestidad y transparencia, violación imputable a las Demandadas.

261.    No es razonable suponer que las Demandadas estaban autorizadas a inducir a la Demandante a no observar los términos contractuales y que después estaban también autorizadas a terminar los Contratos sobre la base de dichas situaciones de inobservancia de los términos estrictos de los Contratos que ellas mismas causaron. Tampoco puede aceptarse que se oculten las verdaderas razones de una resolución contractual. Las partes en una relación contractual bajo la égida de la buena fe deben comportarse de forma cooperativa, honesta, transparente y leal. Este no fue el caso con respecto a la conducta de las Demandadas en relación con el desembolso del anticipo o con las causales de terminación de los Contratos, y este Tribunal Arbitral no puede aceptar este tipo de proceder.

262.    En consecuencia, y a la vista de los hechos descritos, el Tribunal Arbitral acepta el argumento de la Demandante según el cual el no desembolso del anticipo es imputable a las Demandadas, y rechaza el argumento de las Demandadas de que los Contratos fueron rescindidos sobre la base del derecho de resolución unilateral previsto en las Cláusulas 5.8.3 del Addendum 1 - PIGAP y 5.8.4 del Contrato Carito-Pirital.

---

[137] Informe Mouriño, § 79.
[138] Sentencias n.° 01811 del 10 de diciembre de 2009 y n.° 00422 del 19 de mayo de 2010, DaE-29.
[139] Sobre el contenido de las Providencias Administrativas n.° 001 y 002 de 9 de octubre de 2018, véase el párrafo 227 *supra*.
[140] Cf. Artículo 2 LCP, De-29, p. 20.

*b)  El plazo de ejecución de los Contratos*

263.    Las Demandadas formulan alegaciones separadas con relación a la inejecución de los Contratos PIGAP y Carito-Pirital. En el caso del Contrato PIGAP, las Demandadas alegan que la Demandante ha incumplido su plazo de ejecución[141]. El argumento esgrimido por las Demandadas respecto del Contrato Carito-Pirital es de naturaleza diferente. Según las Demandadas, una vez iniciada la ejecución de las obras, la Demandante estaba obligada a realizarlas en su totalidad y con sus propios fondos[142]. En ambos casos, las Demandadas basan sus alegaciones en ciertas prerrogativas exorbitantes atribuidas al Estado y a sus empresas.

264.    Conviene analizar por separado las alegaciones relativas al Contrato PIGAP y al Contrato Carito-Pirital.

265.    La cláusula 6 del Contrato PIGAP preveía un plazo de 445 días para su ejecución, contados originalmente desde la "fecha efectiva" hasta la fecha de recepción provisional de la obra[143]. En sus términos originales, la cláusula 1.11 del Contrato PIGAP definía la "fecha efectiva" como la fecha de firma del Contrato[144].

266.    Sin embargo, el Addendum 1 - PIGAP introdujo algunos cambios en la forma de contabilizar el plazo de ejecución del Contrato PIGAP. La cláusula primera del Addendum 1 - PIGAP promovió la distinción entre "fecha efectiva" y "fecha de inicio". Por un lado, la "fecha efectiva" sería la fecha de firma del Contrato, marco de su respectiva entrada en vigor. Por otro lado, la "fecha de inicio" sería una fecha posterior a la "fecha efectiva", que se especificaría en una notificación emitida por PDVSA determinando el inicio de las obras. La "fecha de inicio" sería también la fecha en que se firmaría el "Acta de Inicio"[145].

267.    Consecuentemente, la cláusula tercera del Addendum 1 - PIGAP modificó la cláusula 6.1 del Contrato PIGAP, estipulando que el cómputo del plazo de 445 días para la ejecución de las obras previstas en el contrato debía contarse desde la "fecha de inicio" hasta la fecha de "recepción provisional"[146].

268.    Sin embargo, las Demandadas alegan que la cláusula primera del Addendum 1 - PIGAP es inválida, lo que llevaría a computarse el plazo de ejecución de las obras en los términos originalmente pactados en el Contrato PIGAP. El argumento de la invalidez de la cláusula primera del Addendum 1 - PIGAP está basada en la tesis de que la citada modificación alteró condiciones que serían obligatorias en los términos de los Artículos 1, 119 y 128 de la LCP[147]. La Demandante rechaza plenamente el argumento de las Demandadas[148].

---

[141] Escrito Complementario de las Demandadas, § 94 y ss.
[142] Contestación, §§ 128 y ss.
[143] De-1, p.16.
[144] De-1, p. 8.
[145] De-6, p. 4.
[146] De-6, p. 11.
[147] Dúplica, §101 y ss.
[148] Réplica, §45 y ss.

269.    El Artículo 1 de la LCP no proporciona ninguna orientación concreta a este Tribunal Arbitral sobre la invalidez de la cláusula impugnada. En efecto, la disposición en cuestión delimita apenas el objeto de la LCP, disponiendo genéricamente que "[l]os procesos a que se refiere el presente Decreto con Rango, Valor y Fuerza de Ley, son de obligatorio cumplimiento, salvo las excepciones aquí previstas"[149].

270.    Del mismo modo, el Artículo 119 de la LCP no trata específicamente de la validez de modificaciones contractuales, estipulando solamente un deber general de mantener "lo contemplado en el pliego de condiciones o condiciones de la contratación y en la oferta beneficiaria de la adjudicación"[150].

271.    Finalmente, el Tribunal Arbitral no comparte la lectura propuesta por las Demandadas del Artículo 128 de la LCP. La disposición no contempla la invalidez de las cláusulas en que sean pactados un anticipo de modo sobrevenido a la celebración de los contratos, como pretenden las Demandadas. En rigor de verdad, la norma en cuestión tiene otra naturaleza, estableciendo que el pago del anticipo podrá ser condición indispensable para iniciar el suministro del bien o servicio, desde que así sea pactado en el contrato[151]. En cualquier caso, no debe perderse de vista que la cláusula primera del Addendum 1 – PIGAP no dispuso sobre el pago del anticipo, sino sobre definiciones de términos de los Contratos.

272.    Para el Tribunal Arbitral, el argumento atacando la validez de la cláusula primera del Addendum 1 - PIGAP está delineado de forma abstracta, casi etérea, careciendo de soporte legal y probatorio[152]. Las Demandadas no han probado la existencia de la alegada desmejora en su posición contractual en función de las modificaciones efectuadas por la cláusula primera del Addendum 1 – PIGAP, tampoco han probado la ocurrencia de violaciones a las referidas "prerrogativas exorbitantes del Estado". Además, si se aceptara el argumento de las Demandadas, cualquier modificación – adoptada por las Partes de mutuo acuerdo – que supusiera una ampliación de plazos o un ajuste del precio, aunque fuera *de minimis*, sería necesariamente nula.

273.    Debe tenerse en cuenta que la LCP, en su Artículo 130, establece que "[e]l contratista podrá, antes o después de iniciado el suministro de bienes, la prestación de servicios o la ejecución de la obra, introducir las modificaciones que estime necesarias"[153]. Asimismo, y dando mayor concreción a las hipótesis de modificación contractual, la LCP también prevé que las variaciones del presupuesto original, de precios, así como las prórrogas, suspensiones y paralizaciones de obra podrán ser reguladas mediante modificaciones contractuales en los términos de los Artículos 131, 132, 133 y 135 de la LCP[154]. Es decir, las alteraciones vehiculadas por la cláusula primera del Addendum 1 - PIGAP fueron efectuadas voluntariamente, de conformidad con la cláusula 38.3 del Contrato PIGAP y sin violación de cualquier disposición de la LCP. El objetivo del Addendum 1 PIGAP, incluso de su

---

[149] DeL-29, p. 20.
[150] DeL-29, p. 40.
[151] DeL-29, p. 41. *Supra*, § 238.
[152] Véase Contestación, §§ 94-100; Dúplica, §§ 104-107.
[153] DeL-29, p. 130.
[154] DeL-29, p. 41-42.

cláusula primera, era el de ajustar el Contrato PIGAP al financiamiento comercial en negociación a la época junto a *Credit Suisse* – un hecho que en nada desmejora la situación de la Contratista o viola el orden público venezolano.

274. El Tribunal Arbitral considera que las Demandadas no han podido probar que el Addendum 1 - PIGAP es inválido, por lo cual todas las modificaciones introducidas por esta Adenda deben ser tenidas en cuenta con vistas a la correcta interpretación del Contrato PIGAP. Recuérdese que bajo la cláusula primera del Addendum 1 – PIGAP la "fecha efectiva" fue definida como "la fecha de firma del CONTRATO por todas las PARTES, oportunidad en la cual el CONTRATO entrará en vigor, aunque las obras previstas en el mismo se comiencen a ejecutar en la FECHA DE INICIO tal como dicho término se define más adelante"[155]; y que la "fecha de inicio" fue definida como la "fecha posterior a la FECHA EFECTIVA especificada en la notificación para iniciar los TRABAJOS, la cual será emitida por LA COMPAÑÍA una vez que se hayan cumplido las siguientes condiciones, quedando entendido que dicha fecha debe ser posterior también a la notificación que se realice: (i) recepción por parte de LA COMPAÑÍA de la Fianza de Anticipo y la Fianza del Fiel Cumplimiento; y, (ii) recepción del monto del ANTICIPO por parte de LA CONTRATISTA con el FINANCIAMENTO COMERCIAL en los términos y condiciones previstos en la Sección 5.8.6. del Addendum nº 1"[156]. La cláusula primera del Addendum 1- PIGAP también dispuso que "[e]n la FECHA DE INICIO la PARTES subscribirán un Acta de Inicio de los TRABAJOS dejando constancia del cumplimiento de las condiciones antes mencionadas"[157].

275. Efectivamente, la Demandante ha probado que en ninguno de los Contratos comenzaron a correr los plazos para su ejecución, ya que PDVSA nunca le indicó la "fecha de inicio" ni se han firmado las respectivas "Actas de Inicio". Esta información fue corroborada por el Sr. Luis Vielma, testigo de las Demandadas, durante la Audiencia de Fondo[158]. Por lo tanto, en los términos del Addendum 1 - PIGAP, no hubo incumplimiento del plazo para la ejecución del Contrato PIGAP.

276. Ahora, conviene pasar al análisis relativo al Contrato Carito-Pirital.

277. Es un hecho incontrovertido que el plazo para la ejecución del Contrato Carito-Pirital siempre ha estado sujeto a la firma de un "Acta de Inicio"[159], la cual nunca fue firmada como se demostró más arriba. Sorprendentemente, la Providencia Administrativa n.º 002 presentó el incumplimiento del plazo de ejecución de la obra como fundamento de la terminación del Contrato Carito-Pirital[160]. Aún más sorprendente, dicha providencia administrativa utilizó un lenguaje absolutamente idéntico al de la Providencia

---

[155] Cf. Addendum 1 – PIGAP, clausula primera, 1.11, p. 4.
[156] Cf. Addendum 1 – PIGAP, clausula primera, 1.38, pp. 4-5.
[157] Cf. Addendum 1 – PIGAP, clausula primera, 1.38, p. 5.
[158] Cf. Audiencia, Día 2, 2023-01-31 - CCI 24306 - Audio - Parte 4.mp3, 12m25s a 16m25s.
[159] EPA Demandadas, §80.
[160] Los fundamentos son los siguientes: "Sobre la normativa citada, se observa que LA CONTRATISTA ejecutó trabajos en desacuerdo con el contrato, incumpliendo con la ejecución del mismo de acuerdo al cronograma establecido por la misma a solicitud de PDVSA; no honrando los compromisos contractuales en el plazo de ejecución señalado de 445 días establecido en el contrato". De-17, p. 7.

Administrativa n.º 001, que rescindió el Contrato PIGAP[161]. Incluso, la Providencia Administrativa n.º 002 se refirió erróneamente a que el plazo de ejecución del Contrato Carito-Pirital era de 445 días, que era el plazo pactado para el Contrato PIGAP, y no al plazo correcto de 760 días[162].

278.   Es evidente, en cualquier forma de cómputo de los plazos de ejecución, que el Contrato Carito-Pirital fue rescindido mucho antes de que expirara su plazo de ejecución. En efecto, el Contrato se firmó el 24 de enero de 2017[163], por lo que, incluso si el plazo se contara desde su firma, el mismo no hubiera expirado hasta el febrero de 2019. Sin embargo, la terminación del contrato, operada mediante la Providencia Administrativa No. 002, se efectuó en octubre de 2018. Es evidente, pues, que no pudo haber un incumplimiento del plazo de ejecución.

279.   Las Demandadas también alegan que, al iniciar la ejecución de la obra por iniciativa propia, la Demandante renunció a la condición suspensiva establecida en el Contrato Carito-Pirital – *i.e.*, la firma del Acta de Inicio[164]. En consecuencia, las Demandadas consideran que la Demandante debería haber completado por su cuenta la totalidad de la obra contratada[165]. Esta alegación escapa a la comprensión del Tribunal Arbitral, dado su carácter desproporcionado y arbitrario.

280.   Sería irrazonable sancionar a una parte contratante que, de buena fe y a título gratuito, hace sus mejores esfuerzos para poner en marcha la ejecución de un contrato. Suponer que la Demandante renunció a la condición suspensiva del Contrato por el mero hecho de haber sido diligente y cooperadora equivaldría a castigar la buena fe contractual. Por lo tanto, la tesis de las Demandadas no merece ser aceptada.

281.   En conclusión, el Tribunal Arbitral considera que no hubo ningún incumplimiento de la Demandante respecto al plazo de ejecución de los Contratos.

   c)  *La validez de las fianzas de fiel cumplimiento y laboral*

282.   El Tribunal Arbitral pasa ahora a una última alegación de las Demandadas respecto a un supuesto incumplimiento contractual imputable a la Demandante, el cual toca a las fianzas de fiel cumplimiento y laboral. En relación con el Contrato PIGAP, las Demandadas alegan que la Demandante no mantuvo dichas fianzas vigentes. Respecto del Contrato Carito-Pirital, las Demandadas acusan a la Demandante de no haberlas presentado debidamente.

283.   Ambos Contratos tratan de las fianzas de fiel cumplimiento y laboral en sus cláusulas 20[166]. De la lectura de dichas cláusulas se desprende que estos documentos debían ser entregados

---

[161] El texto de la Providencia Administrativa n.º 001 en la parte relevante es el siguiente: "Sobre la normativa citada, se observa que LA CONTRATISTA ejecutó trabajos en desacuerdo con el contrato, incumpliendo con la ejecución del mismo de acuerdo al cronograma establecido por la misma a solicitud de PDVSA; no honrando los compromisos contractuales en el plazo de ejecución señalado de 445 días establecido en el contrato". De-16, p. 6-7.
[162] De-17, p. 7.
[163] De-17, p. 1.
[164] Contestación, § 109.
[165] Contestación, § 133.
[166] De-1, p. 47; De-2, p. 53.

en el momento de la firma de los Contratos. Por un lado, en virtud de la cláusula 20.1.1 de los Contratos, la fianza de fiel cumplimiento debía permanecer en vigor hasta la fecha de emisión del "Acta de Recepción Provisional". Por otro lado, en virtud de la cláusula 20.1.2 de los Contratos, la fianza laboral debía permanecer en vigor hasta seis meses después de la emisión del "Acta de Recepción Provisional".

284.   Según los Contratos, la fianza laboral debía ser equivalente al 10% del costo estimado de la mano de obra a ser empleada en la ejecución de cada Contrato[167]. En cuanto a la fianza de fiel cumplimiento, los montos cubiertos no eran exactamente los mismos en cada uno de los Contratos. En el Contrato PIGAP, el monto acordado de la fianza de fiel cumplimiento cubría el 15% del valor total del Contrato, mientras que, en el Contrato Carito Pirital, este monto debía ser equivalente al 20% del valor total del Contrato.

285.   Cabe señalar que las Providencias Administrativas n.º 001 y 002 de octubre de 2018 ya hacían referencia a unas irregularidades relativas a las fianzas de fiel cumplimiento y laboral. Así, al rescindir el Contrato PIGAP, la Providencia Administrativa n.º 001 afirmó que "las Fianzas de Fiel Cumplimiento y Fianza Laboral presentadas por [la Demandante] teniendo una vigencia por el periodo de un año desde la firma del contrato, resultaron vencidas por el transcurrir de ese lapso"[168]. Por su parte, la Providencia Administrativa n.º 002, que rescindió el Contrato Carito-Pirital, señaló que las fianzas de fiel cumplimiento y laboral "resultaron vencidas por falta de pago de la prima anual"[169].

286.   Las Demandadas, en sus alegaciones, reiteraron parcialmente los motivos expuestos en las Providencias Administrativas n.º 001 y 002. De hecho, respecto del Contrato PIGAP, son reproducidos los fundamentos de la Providencia Administrativa n.º 001. Es decir, aunque se reconozca que las fianzas habían sido presentadas en el momento de la firma del Contrato, las Demandadas alegan que la Demandante no las mantuvo vigentes como se exigía en el Contrato PIGAP[170]. En lo que respecta al Contrato Carito-Pirital, la posición de las Demandadas ha evolucionado. De hecho, la alegación de las Demandadas es que la Demandante no entregó ni la fianza de fiel cumplimiento ni la fianza laboral en los términos contractualmente acordados, ya que las fianzas en cuestión tenían una condición suspensiva que no había sido pactada contractualmente[171].

287.   La Demandante rechaza las alegaciones de las Demandadas. En particular, la Demandante sostiene que las fianzas fueron revisadas y aprobadas por las Demandadas[172] y que "si hubiesen tenido alguna objeción con dichas fianzas, pudieron haberlo comunicado, cosa que nunca hicieron". Asimismo, la Demandante también alega que durante el curso de los Contratos, las Partes acordaron que las fianzas de fiel cumplimiento y laboral solamente debían estar vigentes a partir de la firma del "Acta de Inicio"[173]. Además, la Demandante alega que los Contratos establecieron "un *carve-out* específico para las fianzas de

---

[167] Cf. Cláusula 20.1.2. de los Contratos. Ver De-1, p. 48 y De-2, p. 54.
[168] De-16, p. 7.
[169] De-17, p. 8.
[170] Contestación, §122; Dúplica, §§ 142-147; EPA Demandadas, §55.
[171] Contestación, §§ 140; Dúplica, §209; EPA Demandadas, §§85-89.
[172] Réplica, §§57 y 69.
[173] Réplica, §69.

cumplimiento de contrato y laboral, estableciendo que su no presentación generaría su reemplazo por retenciones en los pagos al Contratista"[174].

288.   Es oportuno notar que la cláusula 20.2.2 de los Contratos establece que "[e]l documento de las fianzas no deberá contener ninguna cláusula o condición que haga depender su duración o vigencia de la expiración del plazo, del pago de su prima, de la realización de algún acto, sea por parte de la Contratista o de la institución bancaria o la compañía aseguradora o de terceras personas, o de cualquier circunstancia o condición"[175].

289.   También es oportuno subrayar que la cláusula 20.2.5 de los Contratos estipula que "[e]n caso de que [...] la Contratista no presente las fianzas a que se refiere esta Cláusula, a satisfacción de la Compañía, las fianzas de Fiel Cumplimiento o de Responsabilidad Laboral, serán sustituidas por retenciones a sus pagos"[176].

290.   Después de revisar los documentos de la fianza de fiel cumplimiento y de la fianza laboral relativos al Contrato PIGAP, este Tribunal Arbitral no quedó convencido de que su vigencia estuviera restringida a un año.

291.   Hay mucha información contradictoria contenida en los documentos aportados respecto de las fianzas del Contrato PIGAP. En la primera página de estos documentos, figura una declaración notarial indicando que las fianzas fueron otorgadas "de acuerdo con las Condiciones Generales del Contrato de Fianza con Organismos del Estado" y que su "texto idéntico se anexa a este documento formando parte integrante del mismo"[177]. Al analizar dichas Condiciones Generales del Contrato de Fianza con Organismos del Estado, se observa que su Cláusula 2 establece expresamente que "[l]as fianzas emitidas por las Empresas de Seguros para garantizar el cumplimiento de los contratos públicos en cualquiera de sus modalidades, estarán vigentes hasta que el Órgano o Ente Contratante dicte el acto administrativo de liberación de las fianzas, una vez que efectúe la recepción definitiva del objeto de la contratación, otorgue el finiquito contable, la evaluación de desempeño, certifique el cumplimiento del compromiso de responsabilidad social, cuando aplique, o cualquier otra obligación que al contratista imponga la legislación que regula la materia de contrataciones públicas o el contrato"[178]. Ahora bien, en la primera página de los documentos respecto de las fianzas del Contrato PIGAP también figura una declaración notarial haciendo referencia a una vigencia de un año[179].

292.   La situación narrada genera muchas dudas, las cuales no fueron disipadas por las Demandadas. Por un lado, si su plazo de vigencia era de un año, las fianzas del Contrato PIGAP claramente no estarían de acuerdo con las Condiciones Generales del Contrato de Fianza con Organismos del Estado. De otro lado, es posible contemplar la posibilidad de que la mención a una vigencia de un año haya sido un error material, ya que las fianzas debían estar sometidas a las Condiciones Generales del Contrato de Fianza con

---

[174] Réplica, §§58 y 71.
[175] De-1, p. 49; De-2, p. 55.
[176] De-1, p. 48; De-2, p. 56.
[177] De-34, pp. 5 y 13.
[178] De-34, pp. 7-15.
[179] De-34, pp. 6 y 14.

Organismos del Estado. Es decir, o la fianza tenía vigencia de un año y es falsa la declaración notarial de que las fianzas fueron otorgadas observando las Condiciones Generales del Contrato de Fianza con Organismos del Estado; o la declaración notarial respecto de la vigencia de un año fue es falsa (o equivocada) y las fianzas sí estaban de acuerdo las Condiciones Generales del Contrato de Fianza con Organismos del Estado en los términos de su Cláusulas 2.

293.    El Tribunal Arbitral observa que las Demandadas han señalado selectivamente una parte del documento de las fianzas del Contrato PIGAP que contiene información útil a su tesis. Sin embargo, omitieron en su análisis la existencia de una importante cláusula que disponía lo contrario, *i.e.*, la Cláusula 2 de las Condiciones Generales del Contrato de Fianza con Organismos del Estado – la cual, debe ser subrayado, era parte integrante de las fianzas del Contrato PIGAP. La omisión es muy relevante, ya que de la citada cláusula se desprende que las fianzas podrían estar vigentes bajo los términos de las Condiciones Generales del Contrato de Fianza con Organismos del Estado. A pesar de la contradicción existente, las Demandadas nada dijeron para aclarar la situación. Además, las propias Demandadas reconocen haber recibido las fianzas en el momento de la firma del Contrato PIGAP[180], pero no presentaron ninguna objeción al respecto hasta la terminación de la relación contractual, hecho que milita en favor de la regularidad de las fianzas en cuestión.

294.    Es bien sabido que la carga de la prueba recae sobre la Parte que alega, por lo que corresponde a las Demandadas probar que las fianzas de fiel cumplimiento y laboral del Contrato PIGAP habían expirado durante el curso de la relación contractual. A juicio del Tribunal Arbitral, la afirmación de que las fianzas del Contrato PIGAP no estaban en vigor es meramente especulativa, basada en un lectura aislada y estratégica de apenas un pequeño extracto de los documentos de fianza del Contrato PIGAP, por lo que las Demandadas no han podido probar sus alegaciones.

295.    En cambio, las alegaciones relativas al Contrato Carito-Pirital constituyen una situación diferente. De hecho, tanto la fianza de fiel cumplimiento como la fianza laboral del Contrato Carito-Pirital condicionan su vigencia a la firma del "Acta de Inicio". En este punto, el Tribunal Arbitral reconoce que la inclusión de dicha condición suspensiva vulneraría en abstracto los términos de la Cláusula 20.2.2 del Contrato Carito-Pirital.

296.    No obstante, como se ha señalado anteriormente al tratar del desembolso del anticipo, este Tribunal Arbitral está convencido de que las Demandadas eran conscientes de este hecho y, con su conducta, generaron ciertas expectativas legítimas en la Demandante sobre la continuidad de la relación contractual. En otros términos, la doctrina de los actos proprios prohíbe el comportamiento incoherente o contradictorio, ya que el *venire contra factum proprium* constituye verdadera violación de la buena fe – la cual es protegida bajo los principios de honestidad y transparencia plasmados en la LCP ya discutidos más arriba[181].

---

[180] Contestación, § 122.
[181] Cf. §§ 252-256 *supra*.

297.    Como se desprende de la minuta de la reunión mantenida entre las Partes el 8 de diciembre de 2017, las Demandadas dejaron constancia de que "las fianzas y seguros deben estar vigentes en el momento de la firma del acta de inicio del proyecto"[182]. En otros términos, la posición de las Demandadas en diciembre de 2017 era que las fianzas no tendrían que estar en vigor hasta que se firmara el "Acta de Inicio".

298.    El reconocimiento de ese hecho por el Tribunal Arbitral no significa que los Contratos hubieran sido modificados o que las Demandadas hubieran renunciado a un derecho suyo. Se trata aquí de una constatación fáctica, relativa a la conducta de las Partes y a las expectativas derivadas de dicha conducta. La información contenida en la minuta de la reunión deja claro que PDVSA generó una situación de confianza en relación con la Demandante. Es decir, no existía una expectativa de terminación de la relación contractual, sino de continuidad de la misma.

299.    Las Demandadas no registraron una amenaza de rescisión, ni el más mínimo atisbo de protesta respecto de la condición suspensiva contenida en las fianzas, sino un mensaje de tranquilidad de que hasta la firma del "Acta de Inicio" no habría razón para preocupación. En este contexto, las Demandadas no pueden, en abierta contradicción con la confianza generada, adoptar una posición diametralmente opuesta. Tanto más, cuando se tiene en cuenta que los propios Contratos no preveían su terminación como sanción directa e inmediata por la no presentación de las fianzas.

300.    Recuérdese que la Cláusula 20.2.5 de los Contratos preveía que las fianzas de fiel cumplimiento y laboral podían ser sustituidas por la retención de un porcentaje de los pagos adeudados. Así que la no entrega de las fianzas no ameritaba la terminación de los Contratos, por cuanto establecían un remedio específico para dicha contravención distinta de la terminación.

301.    En resumen, el Tribunal Arbitral no está convencido de que los Contratos se rescindieran debido a irregularidades relativas a la presentación y validez de las fianzas de fiel cumplimiento y laboral, por lo que rechaza las pretensiones de las Demandadas al respecto.

### 4.   *El derecho a la indemnización bajo la LCP y el RLCP*

#### A)  La posición de la Demandante

302.    La Demandante afirma que el RCLP "establece que cuando la entidad termine un contrato por causas no imputables al contratista, el órgano o ente contratante pagará al contratista: (i) el precio de la obra efectivamente ejecutada, calculado de acuerdo con el presupuesto vigente del contrato; (ii) el precio de los materiales y equipos que hubiere adquirido el contratista para ser incorporados a la obra; y (iii) una indemnización del diez por ciento (10%) del valor de la obra no ejecutada, si la rescisión ocurriere cuando no se hubieren

---

[182] De-42, punto 3, p.3.

comenzado los trabajos o los que se hubieren ejecutado tengan un valor inferior al treinta por ciento (30%) del monto original del contrato"[183].

303.    En particular, la Demandante argumenta que se aplica a la situación en análisis los Artículos 153 y 191 del RLCP, observando que la LCP no establece una facultad de pago sino una obligación de pago bajo esas normas[184]. De hecho, la posición defendida por la Demandante es que la normativa en cuestión es de orden público, siendo por lo tanto de obligatorio cumplimiento[185].

     B)   La posición de las Demandadas

304.    Las Demandadas plantean que "cumplida como ha sido la condición resolutoria establecida en las Cláusulas de Rescisión, la consecuencia es que ninguna de las partes, ni las Codemandadas - PDVSA Petróleo y PDVSA - ni QG tienen nada que reclamar a la otra por concepto de daños y perjuicios, indemnizaciones, penalidades y/o lucros cesantes, no debiendo ningún monto a la otra por motivo de la terminación de los Contratos en los términos acordados"[186].

305.    Subsidiariamente, las Demandadas alegan que, bajo la LCP y el RLCP, el Tribunal Arbitral debe desestimar los reclamos de la Demandante, puesto que los Contratos fueron terminados por causas imputables a la propia Demandante[187]. De hecho, sostienen las Demandadas que, de conformidad con los Artículos 155 de la LCP y 193 del RLCP, los incumplimientos contractuales de la Demandante les autorizaban a rescindir los Contratos sin que deban pagar cualquier tipo de indemnización[188].

306.    Además, las Demandadas argumentan que "QG no puede pretender que por los mismos hechos – supuesta rescisión unilateral de los Contratos por causas no imputables al contratista – sea indemnizado de acuerdo al Artículo 191 del RLCP, y, a su vez, también sea indemnizado de acuerdo a los Contratos"[189].

307.    Las Demandadas entienden que "siendo el cumplimiento de contrato la vía para presentar la reclamación por los supuestos costos y gastos – que, como ya se afirmó, pretende una doble indemnización por los mismos hechos y constituye un enriquecimiento sin causa – no se observa en el petitorio del Memorial de Demanda, ni en el Memorial de Réplica, el reclamo de cumplimiento de contrato"[190].

308.    Por fin, las Demandadas también plantean que los Contratos, por su carácter de Contratos de Interés Público Nacional, no son aptos para producir efectos, incluso relativos a

---

[183] Demanda, § 105.
[184] Demanda, § 110.
[185] Demanda, § 106.
[186] Contestación, § 67.
[187] Contestación, § 69.
[188] Contestación, § 125.
[189] Dúplica, § 32.
[190] Dúplica, § 35.

indemnizaciones eventualmente establecidas, puesto que no contaron con la aprobación de la Asamblea Nacional[191].

### C) El análisis del Tribunal

309.    Las Partes coinciden en que los Contratos deben calificarse como contratos administrativos[192]; sus expertos legales también coinciden sobre el tema[193]. Por eso, ambas Partes invocan la LCP y el RLCP como base jurídica para analizar las consecuencias jurídicas de la resolución de los Contratos.

310.    Es importante señalar que el Artículo 152 de la LCP autoriza al contratante a rescindir unilateralmente un contrato administrativo aun cuando no exista incumplimiento contractual por parte del contratista[194].

311.    Asimismo, los Artículos 152 y 153 de la LCP y el Artículo 191 del RLCP estipulan el pago de una indemnización y otros reembolsos en compensación a la resolución unilateral de un contrato administrativo por causas no imputables al contratista, dispositivos utilizados por la Demandante para fundamentar su pretensión indemnizatoria.

312.    Sin embargo, las Demandadas alegan que la Demandante ha renunciado a cualquier derecho a indemnización contractual o legal en virtud de las Cláusulas 18.2.5 del Contrato PIGAP y 18.5.1.7 del Contrato Carito-Pirital. Esta renuncia reflejaría lo dispuesto en los Artículos 155 de la LCP y 193 del RLCP[195].

313.    Es oportuno recordar que la Cláusula 18.2.5 del Contrato PIGAP establece que "[l]a Contratista renuncia al derecho de reclamar por todo daño derivado de la terminación anticipada a que se refiere el Numeral 18.2.3. de esta Cláusula, pero tendrá como única compensación el derecho al pago de acuerdo al Numeral 18.4. de esta misma Cláusula". Se observa que la disposición comentada hace referencia a los supuestos de resolución del contrato por causas imputables al contratista (es decir, la Cláusula 18.2.3. del Contrato PIGAP). Además, la disposición ahora comentada también se refiere a la Cláusula 18.4 del Contrato PIGAP, que establece una serie de montos debidos en caso de resolución anticipada de los Contratos por causas imputables al contratista[196]. La Cláusula 18.5.1.7 del Contrato Carito-Pirital *mutatis mutandis* tiene redacción idéntica.

314.    Las Demandadas dedicaron mucha energía a la discusión de la disponibilidad del derecho a compensación previsto en la LCP y el RLCP[197]. No obstante, debe señalarse que, a la vista de los elementos ya expuestos en este laudo, el Tribunal Arbitral está convencido de que los Contratos fueron resueltos por causas no imputables al contratista. Así que las citadas cláusulas de renuncia carecen de relevancia para el análisis del caso concreto. Tampoco es

---

[191] Dúplica, § 171 y 213.
[192] Demanda, § 104; Contestación, § 49.
[193] Informe Badell, § 19; Informe Mouriño, § 24.
[194] Ver DeL-29, p. 45.
[195] EPA Demandadas, §§ 18-20.
[196] Cf. cláusulas 18.4, 18.4.1, 18.4.2 y 18.4.3 del Contrato PIGAP, De-1, p. 44.
[197] Contestación, §§ 47 y ss; Informe Mouriño, §§ 127 – 142.

necesario discutir si la renuncia sería válida o inválida, ni analizar si constituirían o no "ventajas especiales".

315. Los Artículos 155 de la LCP y 193 de la RLCP tampoco son relevantes para el análisis del Tribunal Arbitral, considerando que estas reglas tratan de la terminación unilateral por causas imputables a la contratista.

316. Este Tribunal Arbitral entiende que las consecuencias jurídicas del presente caso se rigen por los Artículos 152 y 153 de la LCP y por los Artículos 190 y 191 del RLCP, ya que estas normas sí disponen sobre la terminación unilateral por causas no imputables a la contratista. De hecho, mientras que el Artículo 152 y 153 de la LCP y el 190 del RLCP establecen en contra de la contratante un deber de indemnización, el Artículo 191 del RLCP establece los términos en los que debe abonarse dicha indemnización. En este sentido, el Artículo 191 del RLCP establece que el contratante pagará el precio de la obra efectivamente ejecutada, el precio de los materiales y equipos adquiridos para incorporación en la obra, y una indemnización calculada sobre el porcentaje del valor de los contratos[198].

317. En otros términos, el Tribunal Arbitral está convencido que, bajo los Artículos 152 y 153 de la LCP y los Artículos 190 y 191 del RLCP, las Demandadas tienen el deber de indemnizar la Demandante por ciertos conceptos, los cuales serán analizados oportunamente al discutirse el *quantum* de la indemnización.

318. Por fin, conviene pasar a la cuestión de la responsabilidad solidaria. La Demandante alega que las Demandadas deben responder solidariamente por el pago de las indemnizaciones previstas en la LCP y en el RLCP[199]. La posición de las Demandadas es que cada una de ellas debe ser responsabilizada en la medida de su participación en la celebración, ejecución y terminación de los Contratos[200].

319. El apartado 1, Artículo 6 de la LCP define el "Contratante" como el "[s]ujeto contemplado en el ámbito de aplicación de este Decreto con Rango, Valor y Fuerza de Ley, que ejecuta los procesos previstos para la selección y administración de contratos referidos a la adquisición de bienes, prestación de servicios o ejecución de obras"[201]. En la medida en que PDVSA y PDVSA Petróleo son personas jurídicas distintas, es necesario analizar si ambas Demandadas pueden ser entendidas como "Contratantes" en los términos de la LCP.

320. De un lado, no cabe duda de que PDVSA Petróleo es signataria de los Contratos, habiendo sido parte central en la negociación y administración de los mismos. Así, está claro que PDVSA Petróleo debe ser calificada como "Contratante" conforme al Artículo 6º de la LCP[202].

---

[198] DeL-28, 43.
[199] Demanda, §§ 134-136; Réplica, §§ 183-188.
[200] Contestación, §§ 205-207; Dúplica, §§ 420-423.
[201] DeL-29, p. 22.
[202] El Artículo 6º de la LCP define el término Contratante como sigue: "Sujeto contemplado en el ámbito de aplicación del presente Decreto con Rango, Valor y Fuerza de Ley, que ejecuta los procesos previstos para la selección y administración de contratos referidos a la adquisición de bienes, prestación de servicios o ejecución de obras". Cf. DeL-29, p. 22.

321.    De otro lado, también fue demostrado de modo abundante que PDVSA, aunque no haya sido formalmente signataria de los Contratos, actuó conjunta e indistintamente con PDVSA Petróleo en la selección, administración y resolución de los Contratos. De hecho, las pruebas que obran en el expediente constatan que PDVSA participó activamente en el proceso de negociación y licitación de los Contratos[203], que fue PDVSA quien suscribió el financiamiento vinculado a los Contratos[204] y, finalmente, que PDVSA fue quien rescindió los Contratos[205]. Así, se observa que PDVSA también debe ser entendida como "Contratante" en los términos del Artículo 6 de la LCP. De hecho, las apreciaciones del Tribunal Arbitral en el Laudo Parcial, al evaluar la participación de PDVSA en los Acuerdos de arbitraje, son en general también válidas respecto de los Contratos en general[206].

322.    En vista de lo expuesto, el Tribunal Arbitral está convencido de que las Demandadas, PDVSA Petróleo y PDVSA, actuaron conjunta e indistintamente durante toda la vida del Contrato, por lo que deben ser condenadas solidariamente al pago a la Demandante de la indemnización prevista bajo los Artículos 152 y 153 de la LCP y en el Artículo 191 del RLCP.

### 5.   El quantum *de la indemnización bajo la LCP y el RLCP*

A)  La posición de la Demandante

323.    La Demandante afirma que las condiciones suspensivas de los Contratos solo suspendían el cómputo del plazo para las actividades de construcción, no suspendiendo la validez o eficacia de los mismos[207]. Asimismo, la Demandante señala que las Demandadas no han explicado cómo una eventual suspensión de los Contratos obstaría al pago de las indemnizaciones debidas[208].

324.    La Demandante entiende que el idioma en el cual se realiza la descripción de ciertos gastos no cambia su monto, su cuantificación ni la procedencia de la indemnización[209]. Sostiene además la Demandante que los costos y gastos incurridos tienen que ver con trabajos en sitio, la ingeniería requerida para la obra, construcción y montaje, y la movilización de personal, necesarios para la ejecución de las obligaciones contractuales[210].

325.    De acuerdo con la Demandante, esos gastos sí son indemnizables en aplicación del Artículo 191 del RLCP[211]. Asimismo, la Demandante entiende que "los Contratos fueron terminados unilateralmente por las Demandadas, y con base en el principio de

---

[203] De-4, De-5, De-9, De-26 y De-27.
[204] De-3.
[205] De-16 y De-17.
[206] Laudo Parcial, §§ 72-82, esp. § 82: "el Tribunal Arbitral considera que PDVSA es clara e inequívocamente Parte de los Acuerdos de arbitraje".
[207] Réplica, § 80.
[208] Réplica, § 82.
[209] Réplica, § 95-99.
[210] Réplica, § 106.
[211] Réplica, § 104.

responsabilidad patrimonial del Estado, las Demandadas deben reembolsar a QG estos montos incurridos"[212].

326.  Igualmente, la Demandante observa que las Cláusulas 18.4 y 18.7, respectivamente, del Contrato PIGAP y del Contrato Carito-Pirital, permiten la recuperación de los costos y gastos incurridos en la ejecución de los Contratos[213].

327.  La Demandante alega que presentó soporte probatorio detallado para 70% de los costos y gastos sobre los cuales se pide reembolso[214]. La Demandante también afirma que ha presentado un extracto de su sistema interno que serviría como soporte probatorio para el 30% restante[215].

328.  Respecto de la tasa de cambio utilizada en sus cálculos, la Demandante afirma que la tasa utilizada en su contabilidad "refleja el tipo de cambio real al que QG estaba expuesto y al cual se vio sujeto al momento del pago" y que "[e]l registro contable de QG refleja esta realidad y es la que se presentó en el Memorial de Demanda"[216].

329.  Además, la Demandante señala que la intención de las Partes al redactar los Contratos fue la de proteger los montos debidos de la fluctuación cambiaria, así que los Contratos sí preveían el pago de sumas en dólares americanos[217].

330.  La Demandante igualmente afirma que la indemnización establecida en el RLCP se concreta en montos fijos y predeterminados, no en un límite máximo. De hecho, la Demandante entiende que, por aplicación del RLCP, tiene derecho a la indemnización del 10% del valor de los Contratos además del reembolso por los gastos incurridos[218].

331.  Entiende la Demandante que "el RLCP establece que: (i) la indemnización no es un techo y (ii) no se requiere probar el daño, basta que se configure el supuesto de hecho de la norma (que no es otro que la terminación unilateral sin que medie incumplimiento del contratista)"[219]. Siendo una sanción legal y de orden público, la Demandante entiende que no cabe hablar de enriquecimiento sin causa[220].

332.  Finalmente, la Demandante plantea que "las deudas reclamadas sí son líquidas y vencidas habiéndose devengado la obligación de pago en el momento en que se generó el incumplimiento reclamado: la terminación de los Contratos" y que "[l]as Demandadas están en mora desde que fueron requeridas para revertir la terminación"[221].

---

[212] Réplica, § 105.
[213] Réplica, § 103.
[214] Réplica, § 110.
[215] Réplica, § 111.
[216] Réplica, § 124.
[217] Réplica, §§ 130-131.
[218] Réplica, § 152.
[219] Réplica, § 154.
[220] Réplica, § 155.
[221] Réplica, § 177-178.

B)  La posición de las Demandadas

333.   Las Demandadas califican las postulaciones respecto del reembolso por costos y gastos incurridos con la ejecución de los Contratos como "carentes de toda lógica"[222], particularmente porque, dada la no realización de sus condiciones suspensivas, la ejecución de los Contratos estaría suspendida[223].

334.   Las Demandadas también plantean que la Demandante asumió todos los riesgos de la ejecución de los Contratos, visto que el interés público debe primar sobre el interés privado[224].

335.   Las Demandadas señalan que los cálculos presentados por el Sr. Gediel Deleo carecen de valor probatorio, teniendo en cuenta que fueron presentados en un idioma distinto del pactado en este arbitraje[225].

336.   Asimismo, según las Demandadas, los costos y gastos presentados por la Demandante no son indemnizables en aplicación del Artículo 191 del RCLP, ya que no tendrían relación con la ejecución de los Contratos[226]. De hecho, las Demandadas afirman que "[n]inguno de esos supuestos gastos se refiere al precio de materiales y equipos que hubiere adquirido el Contratista para ser efectivamente incorporado a la Obra"[227].

337.   Las Demandadas señalan que 4.201 ítems referentes a gastos reflejados en el anexo De-63 no tienen soporte probatorio alguno[228], y que la Demandante no ha probado la relación de causalidad entre los gastos alegados y la ejecución de los Contratos[229].

338.   Las Demandadas también afirman que la indemnización del Artículo 191 del RLCP debe ser entendido como un límite máximo, cabiendo a la Demandante probar el daño, su relación con los Contratos y su *quantum*[230]. Además, las Demandadas afirman que los intereses pre-laudo no son debidos, dado que los montos eventualmente indemnizables no son todavía líquidos o exigibles[231].

339.   Asimismo, las Demandadas alegan que la Demandante sobrestimó sus gastos utilizando una tasa de cambio que no sería aplicable. De acuerdo con las Demandadas, los reembolsos en concepto de costos y gastos postulados por la Demandante pasarían de USD 20.906.717,81 a USD 160.424,25 si se aplicara la tasa de cambio correcta[232].

---

[222] Contestación, § 152.
[223] Contestación, § 151.
[224] Contestación, § 164.
[225] Contestación, §§ 166-167.
[226] Contestación, § 171.
[227] Contestación, § 172.
[228] Contestación, § 177-180.
[229] Contestación, § 181.
[230] Contestación, § 197.
[231] Contestación, § 208.
[232] Escrito Complementario, § 139.

340.    Finalmente, las Demandadas afirman que los gastos supuestamente incurridos por la Demandante fueron realizados en bolívares, así que, en caso de una eventual indemnización, la misma debería ser calculada también en bolívares[233].

    C) El análisis del Tribunal

341.    El Artículo 191 del RLCP, como ya se ha comentado, impone al contratante la obligación de pagar al contratista montos de tres órdenes distintos, a saber: (i) el precio de la obra efectivamente ejecutada, calculado sobre el valor del Contrato, (ii) el precio de materiales y equipos adquiridos por el contratista para su incorporación a la obra, y (iii) una indemnización relativa al 10% del valor de la obra no ejecutada, cuando la rescisión se haya producido en un momento en que la obra aún no se hubiera iniciado o cuando tuviera un valor inferior al 30% del importe original del contrato.

342.    Además, la Cláusula 18.4 del Contrato PIGAP y la Cláusula 18.7 del Contrato Carito-Pirital estipulan el derecho al reembolso de determinados montos en caso de resolución anticipada de los Contratos por causas imputables al contratante. En efecto, las disposiciones en cuestión otorgan al contratista la posibilidad de ser reembolsado de todas las sumas pagadas o por pagar relativas a las obras ejecutadas total o parcialmente, o a los bienes y servicios adquiridos para la ejecución de las obras, siempre que éstas hayan sido recibidas a "entera satisfacción de la Compañía"[234].

343.    Sobre la base de estas disposiciones, la Demandante estima que el monto de su reclamación asciende a los valores siguientes:

    *Contrato PIGAP[235]*
    Costos y gastos:
    USD 15.811.121
    Indemnización del 10% del valor de la obra no ejecutada:
    USD 20.999.984 y Bs. 88.198.725

    *Contrato Carito-Pirital[236]*
    Costos y gastos:
    USD 14.116.186
    Indemnización del 10% del valor de los trabajos no ejecutados:
    USD 30.869.234 y Bs. 2.608.428.129

---

[233] Escrito Complementario, §§ 159-160.
[234] Cf. Cláusulas 18.4.1 y 18.4.2 del Contrato PIGAP, De-1, p. 44; y Cláusulas 18.7.1 y 18.7.2 del Contrato Carito-Pirital, De-2, p. 49.
[235] Demanda, § 185.
[236] Demanda, § 138.

344. Además, la Demandante también solicita la condenación de las Demandadas al pago de intereses sobre las sumas adeudadas, antes y después de la sentencia, calculados según la tasa del 12%[237].

345. Las Demandadas señalan que la cuantía del 10% para la indemnización establecida en el Artículo 191 del RLCP representa un límite máximo concedido al efecto, el cual está sujeto a los daños efectivamente probados de conformidad con los principios generales del derecho civil venezolano. Asimismo, las Demandadas niegan que los costos y gastos reclamados por la Demandante sean indemnizables. En cuanto a los intereses, las Demandadas afirman que la deuda no es líquida y vencida, no habiendo razón para la condenación en intereses de mora.

346. El Tribunal Arbitral examinará a continuación cada uno de estos puntos.

   *a) La indemnización estipulada en la letra c, apartado 1, del Artículo 191 del RLCP*

347. Ha quedado establecido que los Contratos fueron rescindidos unilateralmente por las Demandadas debido a causas no imputables a la Demandante. También se ha comprobado que los Contratos fueron terminados incluso antes de la firma del "Acta de Inicio", por lo que la ejecución de las obras contratadas aún no había comenzado[238]. La situación descrita se subsume perfectamente en la hipótesis prevista en la letra c, apartado 1, del Artículo 191 del RLCP. Recuérdese que el dispositivo en cuestión estipula el pago de una indemnización de "[u]n diez por ciento (10%) del valor de la obra no ejecutada, si la rescisión ocurriere cuando no se hubieren comenzado los trabajos o los que se hubieren ejecutado tengan un valor inferior al treinta por ciento (30%) del monto original del contrato"[239]. En otras palabras, el Tribunal Arbitral está convencido de que la rescisión unilateral por causas no imputables a la Demandante, operada por las Demandadas, tuvo lugar antes de que se hubieran iniciado los trabajos de la obra.

348. Las Demandadas suscitan una serie de consideraciones respecto de la forma de cálculo de la indemnización prevista en la letra c, apartado 1, del Artículo 191 del RLCP. Es su entendimiento que los parámetros de cálculo ahí establecidos no constituyen montos tasados, sino límites máximos que deben ser apreciados por el juzgador. En este sentido, las Demandadas afirman que cualquier indemnización concedida en virtud del Artículo 191 del RLCP debe cumplir con los principios generales del derecho civil venezolano, calculándose sobre la base del principio del daño probado[240]. De ser cierta la posición de las Demandadas, la Demandante tendría que probar la existencia del daño y la relación de causalidad entre el daño causado y el hecho de la administración[241].

---

[237] Demanda, § 207.
[238] Véase *supra* §§ 265-266, 274 y ss.
[239] El Artículo 191, letra c, apartado 1, tiene la redacción siguiente: "En el caso previsto en el artículo anterior [terminación de contrato por causas no imputables al contratista], el órgano o ente contratante pagará al Contratista: […] c) Una indemnización que se estimará así: 1. Un diez por ciento (10%) del valor de la obra no ejecutada, si la rescisión ocurriere cuando no se hubieren comenzado los trabajos o los que se hubieren ejecutado tengan un valor inferior al treinta por ciento (30%) del monto original del contrato". Cf. DeL-28, p. 43.
[240] Contestación, § 310.
[241] Demandada, § 312.

349.    Las tesis de Demandante y Demandadas sobre el cálculo de la indemnización del Artículo 191 del RLCP se basan en un profundo desacuerdo sobre los fundamentos últimos del régimen administrativo, que quedó claramente expresado en los informes elaborados por los profesores Badell y Mouriño. Por un lado, la Demandante presenta un régimen normativo que busca reducir el espacio en el que la administración puede comportarse de forma arbitraria. Por otro lado, las Demandadas defienden una visión de un régimen normativo basado en la cuasi infalibilidad de la Administración, que se articula sobre multitud de – en los propios términos utilizados por las Demandadas – prerrogativas exorbitantes y ventajas especiales. Se tratan de puntos de vista irreconciliables que reflejan antiguas controversias doctrinales en la literatura del derecho administrativo comparado.

350.    A pesar de su interés doctrinal, no corresponde a este Tribunal Arbitral afiliarse a uno u otro enfoque abstracto del derecho administrativo venezolano. Ya se ha dicho más arriba, pero conviene insistir una vez más sobre el punto, que este Tribunal Arbitral no forma parte de la jurisdicción contencioso-administrativa venezolana. No le corresponde valorar las cualidades del régimen administrativo vigente, ni tomar partido en controversias doctrinales. La función de este Tribunal Arbitral es la de interpretar y aplicar concretamente las disposiciones contractuales y legales en cuestión.

351.    De acuerdo con su misión, el Tribunal Arbitral ha quedado convencido de los argumentos presentados por la Demandante sobre la correcta interpretación de los parámetros para el cálculo de la indemnización previstos en la letra c, apartado 1, del Artículo 191 del RLCP. A este respecto, deben hacerse algunas observaciones.

352.    El profesor Mouriño entiende que los parámetros estipulados en el Artículo 191 del RLCP deben concebirse "para limitar el daño que resulta resarcible en detrimento de la administración contratante y de esa manera proteger el patrimonio público, tal como lo ordena el artículo 1 de la LCP"[242]. Sin embargo, el profesor Badell expuso que la indemnización prevista en la LCP "no parte de un daño alegado por el contratista, sino que nace de una presunción del legislador conforme a la cual toda rescisión anticipada por causa no imputable al contratista produce un daño antijurídico resarcible"[243].

353.    Cabe recordar que el Artículo 191 del RLCP utiliza términos como "pagará" y "estimará", expresando un alto grado de imperatividad en cuanto a la obligación de pago. En ese contexto, la letra c del mismo artículo dispone que el monto de la indemnización "se estimará" en "[u]n diez por ciento (10%) del valor de la obra no ejecutada, si la rescisión ocurriere cuando no se hubieren comenzado los trabajos o los que se hubieren ejecutado tuvieren un valor inferior al treinta por ciento (30%) del monto original del contrato"[244].

354.    El Tribunal Arbitral está convencido de que el texto de la ley no abre ningún espacio semántico para la libre apreciación del *quantum* indemnizatorio, una vez que existe un deber de indemnizar sobre la base de los porcentajes predeterminados por el legislador.

---

[242] Segundo Informe Mouriño, § 95.
[243] Segundo Informe Badell, § 53.
[244] DeL-28, p. 43.

355.   Por si la claridad del texto legal no fuera suficiente, la tesis de la aplicación del principio civilista del daño probado no resulta muy convincente. El Informe Mouriño, en apoyo del argumento del daño probado, hizo uso de una sentencia de la Sala Político-Administrativa como prueba de la corrección de su tesis[245]. Sin embargo, la sentencia citada fue dictada en 2002, mientras que la LCP fue promulgada en 2014. En este sentido, el Profesor Mouriño no discutió en qué medida la entrada en vigor de la LCP en 2014 podría haber afectado al régimen basado en el daño probado. Tampoco aclaró la compatibilidad de la decisión de 2002 con los Artículos 152 y 153 de la LCP.

356.   Por el contrario, el profesor Badell, de forma muy didáctica, demostró que "(i) la indemnización no parte de un daño alegado por el contratista, sino que nace de una presunción del legislador conforme a la cual toda terminación anticipada por causa no imputable al contratista produce un daño antijurídico resarcible; (ii) la prueba del daño no responde a una cuantificación particular (e.g.: lucro cesante, daño emergente, etc. ), sino que se limita a que se verifique el supuesto en el cual la administración termine (resuelva) un contrato de manera anticipada antes del inicio en la ejecución, aspecto que parece no ser controvertido en este caso (lo controvertido es si procedía la rescisión por incumplimiento); y (iii) la cuantía de la indemnización no responde a daños probados, sino que es tasada de manera directa por el legislador, razón por la cual los argumentos esgrimidos por el profesor [Mouriño] no se compadecen con la situación de hecho y de derecho del caso analizado"[246].

357.   Consecuentemente, el Tribunal Arbitral considera que, estando reunidas las condiciones establecidas en los Artículos 152 y 153 de la LCP y 190 del RLCP, los parámetros para el cálculo de la indemnización previstos en la letra c, apartado 1, del Artículo 191 de la LCP son de aplicación obligatoria, no siendo posible su modulación y resultando innecesario acreditar daño alguno.

358.   Cumple señalar que las Demandadas solicitaron que la eventual condenación al pago de una indemnización tuviera en cuenta la compensación de culpas, materializada en el hecho de la víctima, de conformidad al Artículo 1.189 del Código Civil venezolano[247].

359.   No es necesario analizar en detalle esta pretensión, ya que este Tribunal Arbitral ha constatado que los Contratos fueron rescindidos unilateralmente por las Demandadas por causas no imputables a la Demandante. En otras palabras, el Tribunal Arbitral no ha constatado incumplimiento alguno del Contrato por parte de la Demandante, por lo que no procede operar compensación de culpas o hecho de la víctima.

360.   En vista de lo anterior, el Tribunal Arbitral declara procedente la pretensión indemnizatoria de la Demandante basada en la letra c, apartado 1, Artículo 191 del RLCP, fijando el monto de la indemnización debida en virtud de la terminación del Contrato PIGAP en USD

---

[245] Informe Mouriño, § 156.
[246] Segundo Informe Badell, § 53.
[247] Dúplica, §§ 449 ss.

20.999.984 y VEF 88.198.725[248], y en virtud de la terminación del Contrato Carito-Piratal en USD 30.869.234 y VEF 2.608.428.129[249].

361.   Por último, es un hecho público y notorio, también alegado por las Demandadas[250], que Venezuela se sometió a dos procesos de reconversión monetaria, uno en 2018 y otro en 2021. Los Contratos no contienen ninguna cláusula relativa a la devaluación de la moneda, ni tampoco ninguna cláusula que distribuya expresamente los riesgos por una posible devaluación inflacionaria. Esta omisión significa que el riesgo derivado de los procesos inflacionistas se ha dejado sobre los hombros de la Demandante.

362.   Adicionalmente, debe notarse que la Demandante no ha formulado solicitud alguna de ajuste monetario de las sumas adeudadas en bolívares, por lo que este Tribunal Arbitral se encuentra impedido de indexar dichas sumas a cualquier índice de precios que pudiera ser aplicable. Considerando que el pago de la indemnización se hará en moneda corriente, los montos adeudados en bolívares fuertes (VEF) se actualizaron de manera que reflejen los procesos de reconversión monetaria antes mencionados.

363.   Bajo la reconversión monetaria de 2018, a partir de 20 agosto de 2018, los importes en bolívares fuertes (VEF) tuvieron de ser convertidos a bolívares soberanos (VES), dividiéndolos por cien mil (100.000)[251]. Así, los montos adeudados en VES por concepto de indemnización son de VES 881,98725 en el Contrato PIGAP y VES 26.084,28129 en el Contrato Carito-Piratal.

364.   Asimismo, a la luz de la reconversión monetaria de 2021, a partir del 1 de octubre de 2021, los importes en bolívares soberanos (VES) tuvieron de ser convertidos a bolívares digitales (VED), dividiéndolos por un millón (1.000.000)[252]. Por lo tanto, los montos adeudados en VED por concepto de indemnización son VED 00,0008 en el Contrato PIGAP y VED 00,0260 en el Contrato Carito-Piratal.

   *b)  El reembolso de los costos y gastos*

365.   La discusión sobre el reembolso de los costos y gastos reclamados por la Demandante gira en torno de las Cláusulas 18.4 del Contrato PIGAP y 18.7 del Contrato Carito-Piratal, y se relaciona también con las estipulaciones de las letras a y b del Artículo 191 del RLCP.

366.   De hecho, los Contratos contienen disposiciones que prevén el reembolso de determinados montos en caso de la resolución anticipada por causas imputables al contratante, a saber, las Cláusulas 18.4.1 y 18.4.2 del Contrato PIGAP y 18.7.1 y 18.7.2 del Contrato Carito-Piratal[253]. La Demandante se basa en estas disposiciones para fundamentar su pretensión de

---

[248] Valor denominado en Bolívar Fuertes (VEF), de acuerdo con el Contrato PIGAP.
[249] Valor denominado en Bolívar Fuertes (VEF), de acuerdo con el Contrato Carito-Piratal.
[250] Contestación, §322.
[251] Cf. Artículo 1° del Decreto nº 3.548 de 5 de julio de 2018, publicado en la Gaceta Oficial nº 41.446.
[252] Cf. Artículo 1° del Decreto nº 4.553 de 6 de agosto de 2021, publicado en la Gaceta Oficial nº 42.185.
[253] De-1, p. 44; De-2, p. 49.

reembolso por unos costos y gastos incurridos con la ejecución de "actividades preliminares" de los Contratos.

367.   Sin embargo, el Tribunal Arbitral ha detectado problemas respecto de la pretensión de reembolso de la Demandante bajo estas cláusulas, ya que ellas establecen que sólo los trabajos recibidos por el contratante a su "entera satisfacción" generan un derecho de reembolso. De hecho, no se ha probado que las mencionadas "actividades preliminares" fueran recibidas por las Demandadas, menos aún que fueran recibidas a su "entera satisfacción". Así, las Cláusulas 18.4.1 y 18.4.2 del Contrato PIGAP[254] y 18.7.1 y 18.7.2 del Contrato Carito-Pirital[255] son de escasa utilidad para sustentar la pretensión de reembolso de la Demandante.

368.   No obstante, el Tribunal Arbitral observa que el Artículo 191 del RLCP autoriza el reembolso de los trabajos efectivamente realizados, así como el reembolso de las sumas incurridas para la compra de materiales y equipos incorporados a la obra[256]. Como es lógico, a este Tribunal Arbitral le compete analizar concretamente qué costos y gastos han sido probados y cuáles de estos podrían ser reembolsados en los términos del Artículo 191 del RLCP.

369.   Aunque la Demandante solicita el reembolso de unas 4351 partidas contables clasificadas como costos y gastos, su propia tabla Excel demuestra que sólo respecto de 819 de estas partidas contables existe alguna referencia a documentos capaces de respaldar la solicitud de reembolso[257]. Entre las partidas que referencian documentos de soporte, las Demandadas pudieron demostrar que varios de estos documentos se anulan entre sí o no están relacionadas con los Contratos[258].

370.   Conviene dejar sentado que el Tribunal Arbitral quedó sorprendido con la afirmación del Sr. Gediel Deleo, realizada durante la Audiencia, de que todos los comprobantes de gastos existen en un depósito de la Demandante en Venezuela, pero que, por razones logísticas, sólo se presentaron los comprobantes de aquellos gastos que se consideraron más significativos[259]. No está de más recordar que la carga de la prueba recae sobre el que alega. Es decir, no basta afirmar que unos gastos fueron incurridos para que se demuestre que efectivamente se incurrió en ellos.

371.   Debe tenerse en cuenta que la Demandante hizo una opción en su estrategia procesal respecto a la sustanciación de la prueba de los conceptos reclamados como costos y gastos. Esta opción implica la necesaria improcedencia de la pretensión de reembolso relativa a 3720 partidas contables sobre las cuales ni siquiera se presentó medio de prueba confirmando su existencia. Pero eso no es todo. Incluso en el caso de los costos y gastos

---

[254] De-1, p. 44.
[255] De-2, p. 49.
[256] DeL-28, p. 43.
[257] De-69.
[258] Segundo Informe Freitas, párrafos 12-27.
[259] Cf. Audiencia, Día 2, 2023-01-31 - CCI 24306 - Audio - Parte 2.mp3, de 25min13s a 26min21s.

en los que existe algún soporte documental que los respalde, el Tribunal Arbitral no siempre quedó convencido de su relación efectiva con los Contratos.

372. De hecho, las Demandadas, así como su experto contable, plantean problemas con varias de las facturas presentadas por la Demandante[260]. La Demandante, por su lado, afirma que "[e]l hecho de que una factura no tenga la frase 'Contrato Carito-Pirital' o 'Contrato PIGAP' no hace que dicha factura no esté relacionada a esos contratos" y que "[e]stas facturas fueron cargadas al sistema contemporáneamente clasificándolas por contrato, por lo que sí existe la vinculación a los Contratos que las Demandadas dicen ser inexistente"[261]. Para el Tribunal Arbitral, en cambio, la tesis de la Demandante no puede ser aceptada.

373. Es cierto que una factura podría tener vinculación con los Contratos sin hacer referencia expresa al Contrato PIGAP o al Contrato Carito-Pirital. No obstante, en tal hipótesis, es necesario presentar otros medios de prueba que permitan asociar dicha factura a los Contratos. Por ejemplo, la presentación de una factura respecto del alquiler de vehículos, sin ningún otro soporte que la asocie a los Contratos, no es un medio adecuado para probar que dicho gasto estaba efectivamente relacionado con los Contratos. Téngase en cuenta que la Demandante no estaba abocada exclusivamente a los Contratos que son el objeto de este arbitraje, como se verá más abajo.

374. Sin embargo, la Demandante argumenta que la clasificación interna elaborada por su propio sistema contable constituye prueba suficiente de que los costos y gastos reclamados están relacionados con los Contratos[262]. Este argumento tampoco resulta convincente para el Tribunal Arbitral. En otras palabras, tampoco es suficiente presentar una factura y afirmar que la misma Parte que la presenta, mediante su propio sistema contable, ha clasificado esa factura como relacionada con los Contratos. Esa premisa podría dar lugar a todo tipo de abusos.

375. Es sabido que un sistema de contabilidad empresarial puede ser manipulado y está sujeto a fallos. Incluso el Sr. Gediel Deleo, testigo de la Demandante, declaró que los registros presentados fueron realizados por los operadores del sistema y no por él mismo[263]. Se desconoce quiénes son estos operadores, dónde se encuentran, cuáles son los parámetros del ejercicio de su actividad contable y cuál es el grado de seguridad de este sistema interno. Por lo tanto, es evidente que el Tribunal Arbitral no puede tomar la información generada automáticamente por este sistema contable interno como si reflejara una verdad incontrovertible. Por eso, a partir de un análisis concreto de los documentos presentados, el Tribunal Arbitral tiene la misión de verificar la relación del soporte documental con los gastos reclamados.

376. Otro argumento esgrimido por la Demandante sobre la relación de las facturas presentadas con los Contratos merece también un comentario. La Demandante afirma que el Contrato PIGAP y el Contrato Carito-Pirital eran los únicos contratos que la Demandante tenía en

---

[260] Contestación, §§ 135 y ss; Informe Freitas, §§ 5.5 y ss.
[261] Réplica, § 121.
[262] Réplica, § 121.
[263] Cf. Audiencia, Día 2, 2023-01-31 - CCI 24306 - Audio - Parte 2.mp3, de 18min30s a 18min50s.

Venezuela y que, por eso, todos los gastos realizados en Venezuela tendrían necesariamente relación con los Contratos[264].

377. Este argumento no convence al Tribunal Arbitral. Es posible imaginar muchas circunstancias en las cuales los empleados de una empresa que no opera en un país determinado incurren en gastos diversos en aquel país, incluso con el fin de prospectar nuevos negocios.

378. Sin embargo, hay algo más grave respecto de esta alegación. El Sr. Gediel Deleo declaró expresamente durante la Audiencia que, contemporáneamente a los Contratos, existía otro proyecto de QG en Venezuela, refiriéndose al proyecto del Valle de Quibor[265]. Por lo tanto, existe una contradicción en la propia tesis de la Demandante, ya que su testigo confirmó que QG realizaba otras actividades en Venezuela además de los Contratos. En este escenario, ¿cómo puede el Tribunal Arbitral verificar, por ejemplo, que facturas sin referencia no corresponden al proyecto del Valle de Quibor? Basándose en las pruebas que obran en el expediente, el Tribunal Arbitral no dispone de los medios necesarios para realizar tal apreciación.

379. Otro problema relativo al reembolso de los costos y gastos se refiere a su liquidación en dólares. La Demandante liquida indiscriminadamente en dólares todos los costos y gastos reclamados, incluso cuando los desembolsos originales fueron hechos en bolívares. Las Demandadas reprochan este proceder, afirmando que los costos y gastos, en el caso de ser debidos, "deberán ser reembolsados en la moneda en que supuestamente fueron realizados y bajo los límites de la partida asignada para cada etapa del proyecto"[266].

380. La situación descrita ha dado lugar a una larga discusión sobre qué tipo de tasa de cambio debe aplicarse para convertir los gastos incurridos en bolívares a dólares. El Tribunal Arbitral está convencido de que se trata de una discusión superflua, ya que los Contratos establecían que "[l]a Compañía pagará a la contratista, en bolívares, el componente nacional de los trabajos" y "en moneda extranjera solamente el componente foráneo de los trabajos"[267]. Es decir, los gastos en dólares debían pagarse en dólares, mientras que los gastos incurridos en bolívares debían pagarse en bolívares.

381. Por esta razón, en ambos Contratos, la disposición de pago en dólares sólo existía en relación con la adquisición de máquinas y equipos, debiendo pagarse en bolívares todo el resto de los precios de los Contratos[268]. Se observa, por lo tanto, que no existe razón alguna que sustente el reembolso en dólares de los gastos incurridos en bolívares, como tampoco existe razón alguna que sustente la conversión a dólares de los gastos denominados en bolívares.

---

[264] Réplica, §122.
[265] Cf. Audiencia, Día 2, 2023-01-31 - CCI 24306 - Audio - Parte 2, 11min11s - 11min43s.
[266] EPA Demandadas, § 122.
[267] Cf. Cláusulas 5.4 y 5.5 del Contrato PIGAP, De-1, p. 14; y Cláusulas 5.4 y 5.5 del Contrato Carito-Pirital, De-2, p. 12.
[268] Cf. Cláusula 5.1 del Contrato PIGAP, De-1, p. 13-14; y Cláusula 5.1 del Contrato Carito-Pirital, De-2, p.11-12.

382.     Tras analizar las pruebas documentales presentadas por la Demandante[269] y compararlas con la revisión producida por las Demandadas[270], el Tribunal Arbitral ha constatado que existen 632 partidas contables relativas a costos y gastos respaldadas por algún tipo de prueba documental verificable[271]. En este sentido, el análisis efectuado por el Licenciado Diego de Freitas durante la Audiencia de los soportes documentales presentados por la Demandante fue bastante esclarecedor[272]. El Tribunal Arbitral ha verificado que, de las 632 partidas contables soportadas por documentos, 615 son partidas relativas a gastos efectuados en bolívares y 17 son partidas respecto de gastos efectuados en dólares[273]. De las 615 partidas denominadas en bolívares, el Tribunal Arbitral está convencido de que 43 de ellas están directamente relacionadas con los Contratos[274]. En cuanto a las partidas denominadas en dólares, el Tribunal Arbitral entiende que todas ellas tienen relación directa con los Contratos[275].

383.     No obstante, queda por dilucidar si los costos y gastos contenidos en estas 60 partidas contables restantes son susceptibles de indemnización bajo el Artículo 191 del RLCP. Es importante recordar que la norma en cuestión se refiere al pago del precio de la obra efectivamente ejecutada, así como al pago del precio de los materiales y equipos adquiridos para incorporación a la obra[276].

384.     En cuanto a la primera hipótesis, no es controvertido que la ejecución de la obra nunca fue ni siquiera iniciada. En cuanto a la segunda hipótesis, la Demandante no ha podido probar que los costos y gastos reclamados corresponden a la adquisición de equipos y materiales. E incluso si se presentaran facturas respecto de la adquisición de equipos y materiales, la Demandante tendría el deber de probar que estos fueron incorporados a la obra ejecutada. Sin embargo, hay un obstáculo lógico a que este hecho pueda ser probado: no existiendo obra ejecutada, no es posible incorporar ningún equipo y material a ella.

385.     A la luz de lo anterior, el Tribunal Arbitral rechaza en su integralidad la solicitud de reembolso de costos y gastos presentada por la Demandante.

         c)   Intereses

386.     El Tribunal Arbitral entiende que el pago de la condenación bajo los Artículos 152 y 153 de la LCP y 191 del RLCP sólo es exigible a partir del dictado del presente laudo. Efectivamente, como señala el experto de la Demandante, la indemnización prevista en estos artículos "no parte de un daño alegado por el contratista, sino que nace de una presunción del legislador"[277]. Es decir, la obligación de pago de la indemnización bajo los

---

[269] De-65 y De-66.
[270] Revisión Especial De-069.
[271] Véase De-066.
[272] Audiencia, Día 3, 2023-02-01 - CCI 24306 - Audio – Parte 3, 6min25s – 46min50s.
[273] Cf. Revisión Especial De-069.
[274] Véase Revisión Especial De-069, líneas 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 20, 23, 24, 25, 27, 28, 29, 30, 31, 32, 34, 36, 43, 72, 78, 104, 119, 174, 177, 180, 226, 235, 252, 284, 285, 301, 303, 342, 359, 419, 429, 453.
[275] Véase Revisión Especial De-069, líneas 86, 89, 96, 103, 107, 191, 217, 266, 333, 343, 367, 371, 402, 403, 411, 455, 624.
[276] Cf. Artículo 191 del RLCP, letras a y b, DeL-28, p. 43.
[277] Segundo Informe Badell, §53.

Artículos 152 y 153 de la LCP y 191 del RLCP surge apenas en el momento de la condena, *i.e.* en el momento en que el laudo es dictado. Hasta que el juzgador verifique la subsunción de los hechos a estas normas, no ha que se hablar de deber de indemnizar bajo estos dispositivos de la LCP y del RLCP. En el mismo sentido, el Tribunal Arbitral considera que la mora sólo puede tener lugar una vez exista la obligación de pago bajo los Artículos 152 y 153 de la LCP y 191 del RLCP. Por esa razón, el Tribunal Arbitral tiene que rechazar el pedido de intereses pre-laudo.

387.    La situación es diferente respecto de los intereses post-laudo. Recuérdese que los Acuerdos de arbitraje, los Contratos y la LCP guardan silencio sobre la posibilidad de conceder intereses post-laudo arbitral. Ante la ausencia de acuerdo de las Partes o disposición expresa sobre este tema, el Reglamento[278] otorga al Tribunal Arbitral amplia discreción para determinar la conducción del procedimiento, incluso en lo que se refiere al cumplimiento del laudo. En efecto, utilizando esta discreción, el Tribunal Arbitral considera que el principio ampliamente aceptado de integridad de la compensación conduce inexorablemente a la fijación de intereses entre la fecha de la notificación del laudo y la fecha del pago efectivo.

388.    Los intereses post-laudo tienen dos funciones. De un lado, ellos sirven para compensar a la parte que se vio privada del uso y disposición del capital que no recibió debido a la omisión de su contraparte de efectuar el pago de un laudo arbitral a su debido tiempo. De otro lado, los intereses post-laudo sirven como instrumento disuasorio, exhortando a la parte a cumplir el laudo en tiempo y forma.

389.    Al fijar la tasa de interés adecuada, el Tribunal Arbitral tiene que considerar estos dos elementos, es decir la remuneración del capital inmovilizado y la sanción de la parte deudora por el retraso. Nótese que es habitual tomar como referencia para la remuneración del capital la tasa practicada con relación a las letras del Tesoro estadounidense con vencimiento de un año, la cual está actualmente fijada alrededor del 5%.

390.    Sin embargo, el Tribunal Arbitral considera excesiva la tasa de interés del 12% reclamada por la Demandante[279], tasa que se basa en una sentencia del Tribunal Supremo de Justicia de Venezuela de 1 de junio de 2017[280]. Empero, la sentencia citada establece la tasa del 12% sobre la base de lo estipulado en el Artículo 108 del Código de Comercio de Venezuela[281], lo cual no es aplicable en nuestro caso, tanto por estar referido a los intereses de mora en relaciones comerciales (y los Contratos tienen naturaleza administrativa), como por el hecho de que este es un arbitraje internacional con sede en París, Francia.

391.    Así, considerando la dimensión compensatoria y sancionadora de los intereses post-laudo y su discreción respecto del tema, el Tribunal Arbitral entiende que la tasa de interés anual adecuada, tanto para la suma en dólares como para la suma en bolívares, es la del 6%, es decir, 5% como compensación al capital inmovilizado sobre la base de la tasa practicada

---

[278] Cf. Artículo 22(2) del Reglamento.
[279] Demanda, §§ 208 y nota 198.
[280] DeL-32.
[281] Véase DeL-32, p.28.

con relación a las letras del Tesoro estadounidense y 1% como medida disuasoria al incumplimiento.

392.   Consecuentemente, el Tribunal Arbitral rechaza la pretensión de la Demandante de pago de intereses pre-laudo y, en cambio, ordena el pago de intereses sobre el monto de la indemnización establecido en este laudo, los cuales se calcularán a una tasa anual de 6%, aplicable entre la fecha de la notificación del presente laudo y la fecha del pago efectivo.

## VI. COSTAS

393.   Cada Parte solicita que el Tribunal Arbitral condene la otra Parte a asumir la integralidad de honorarios y gastos de los árbitros, así como los gastos administrativos de la CCI. Cada Parte pide también que la otra Parte sea condenada a reembolsarle los gastos que ha incurrido para presentar su caso en este arbitraje.

394.   En su sesión del 13 de junio del 2023, la Corte fijó los costos del arbitraje en EUR 670 000 – USD 731.774,00[282]. Las demandas de reembolso por cada parte de los gastos incurridos por presentar sus respectivos casos son de USD 1.024.210,90 por la Demandante[283] y USD 1.772.061,83 por las Demandadas[284]. Así, el monto de costos totales en este arbitraje es fijado a USD 3.528.046,73.

395.   Los Acuerdos de arbitraje disponen que "[l]os costos del proceso serán cubiertos por ambas PARTES, en partes idénticas, a menos que el tribunal arbitral decida en contrario en su laudo"[285]. El apartado 5 del Artículo 38 del Reglamento CCI dispone que "[a]l tomar decisiones sobre costos, el tribunal arbitral podrá tomar en cuenta las circunstancias que considere relevantes, incluyendo la medida en la que cada parte haya conducido el arbitraje de forma expedita y eficaz en término de costos".

396.   El Tribunal Arbitral observa que las Demandadas resultaron vencidas en la primera fase del procedimiento, ya que sus objeciones a la jurisdicción del Tribunal Arbitral y a la admisibilidad de la demanda fueron rechazadas en el Laudo Parcial. Respecto del mérito, el Tribunal Arbitral constata que la pretensión principal de la Demandante ha sido reconocida. Asimismo, el Tribunal Arbitral también reconoce que ha considerado procedente la defensa de las Demandadas de que los costos y gastos reclamados por la Demandante no son indemnizables. Por fin, el Tribunal Arbitral señala que, más allá de algunas demoras y complicaciones que podrían haberse evitado, ambas Partes se condujeron con corrección.

---

[282] Conversión realizada sobre la base de la tasa de cambio de 1 EUR para USD 1.0922, vigente en 19 de junio de 2023. Datos del Banco Central Europeo. Accesible en: https://www.ecb.europa.eu/stats/policy_and_exchange_rates/euro_reference_exchange_rates/html/eurofxref-graph-usd.en.html
[283] Cf. Certificación de Costas de la Demandante.
[284] Cf. Certificación de Costas de las Demandadas.
[285] Cf. De-6, p. 14; De-2, p. 68.

397. En vista de dichas consideraciones, el Tribunal Arbitral entiende que los costos de este arbitraje deberán ser repartidos bajo una regla de proporcionalidad, en donde las Demandadas soporten el porcentaje de los costos equivalente a las pretensiones obtenidas por la Demandante. En particular, el Tribunal Arbitral observa que ha concedido el 63% de los montos pedidos por la Demandante. Por consiguiente, las Demandadas deberán asumir el 63% del monto de los costos totales de este arbitraje, es decir USD 2.222.669,43. La Demandante, por su lado, deberá soportar el 37% del monto de los costos totales de este arbitraje, es decir USD 1.305.377,29.

## VII.   DISPOSITIVO

1. En razón de todo lo anterior, el Tribunal Arbitral decide:

   a) rechazar como inadmisible la pretensión de las Demandadas de que el Contrato PIGAP y el Contrato Carito-Pirital son inválidos, y que, como tales, no pueden producir efecto alguno por no tener autorización de la Asamblea Nacional;

   b) desestimar la pretensión de las Demandadas de que la Demandante había renunciado a cualquier indemnización prevista en el Contrato PIGAP y el Contrato Carito-Pirital;

   c) desestimar la pretensión de las Demandadas de que la demanda sería inadmisible por incumplimiento del antejuicio previo establecido en la legislación venezolana;

   d) desestimar la pretensión de las Demandadas de que PDVSA había ejercido válidamente su derecho a rescindir unilateralmente el Contrato PIGAP, previsto en la Cláusula 5.8.3 de la Adenda 1 de este Contrato;

   e) desestimar la pretensión de las Demandadas de que PDVSA había ejercido válidamente su derecho a rescindir unilateralmente el Contrato Carito-Pirital, previsto en la Cláusula 5.8.4 de este Contrato;

   f) desestimar las pretensiones de las Demandadas de que PDVSA ha ejercido válidamente su derecho a terminar el Contrato PIGAP, previsto en la Cláusula 18.1.1 de este Contrato, y sólo debe indemnizar a QG los conceptos establecidos en la cláusula 18.1.2 del mismo;

   g) desestimar las pretensiones de las Demandadas de que PDVSA ha ejercido válidamente su derecho a rescindir unilateralmente el Contrato Carito-Pirital, previsto en la Cláusula 18.1.1 de este Contrato, y sólo debe indemnizar a QG los conceptos establecidos en la cláusula 18.1.2 del mismo;

h) declarar que las Demandadas han rescindido unilateralmente el Contrato PIGAP y el Contrato Carito-Piratal por causas no imputables a la Demandante;

i) condenar a las Demandadas solidariamente al pago de la indemnización estipulada en los Artículos 152 y 153 de la LCP y 191 del RLCP en razón de la rescisión unilateral por causas no imputables a la Demandante de los Contratos PIGAP y Carito-Piratal, de acuerdo con las sumas fijadads en los apartados j), k) y l);

j) fijar la indemnización estipulada en los Artículos 152 y 153 de la LCP y 191 del RLCP respecto de la terminación del Contrato PIGAP en USD 20.999.984 y VED 00,0008;

k) fijar la indemnización estipulada en los Artículos 152 y 153 de la LCP y 191 del RLCP de la terminación del Contrato Carito-Piratal en USD 30.869.234 y VED 00,0260;

l) determinar que las sumas de los apartados j) y k) del presente dispositivo son debidas con un interés anual del 6%, calculados desde la fecha de notificación de este laudo y hasta fecha del pago efectivo de la indemnización;

m) declarar que los costos y gastos reclamados por la Demandante no son indemnizables bajo el derecho venezolano y los Contratos;

n) declarar improcedente la pretensión de las Demandadas respecto del hecho de la víctima previsto en el Artículo 1.189 del Código Civil venezolano;

o) declarar improcedente la pretensión de la Demandante al pago de intereses pre-laudo sobre los montos de la condenación;

p) ordenar que las Demandadas asuman el 63% del monto de los costos totales de este arbitraje, es decir USD 2.222.669,43;

q) ordenar que la Demandante asuma el 37% del monto de los costos totales de este arbitraje, es decir USD 1.305.377,29;

r) ordenar el pago inmediato de las indemnizaciones establecidas en este laudo, así como de los montos debidos a título de honorarios de los árbitros y costos administrativos;

s) desestimar toda otra demanda de las Partes.

Arbitraje CCI 24306/JPA/AJP, Laudo Final

Paris (Francia),  25 de julio de 2023.


**Cristián Conejero Roos**
Co-árbitro

**Franco Ferrari**
Co-árbitro

**Diego P. Fernández Arroyo,**
Presidente del Tribunal Arbitral

# CERTIFIED TRANSLATION

---

### INTERNATIONAL COURT OF ARBITRATION
### OF THE
### INTERNATIONAL CHAMBER OF COMMERCE

---

### CCI Case 24306/JPA/AJP

### ÁLYA CONSTRUTORA S.A.

### (formerly CONSTRUTORA QUEIROZ GALVÃO S.A.) (Brazil)

*(Claimant)*

**c.**

### 1. PDVSA PETROLEO S.A. (Venezuela)

### 2. PETROLEOS DE VENEZUELA S.A. (Venezuela)

*(Respondent)*

---

### FINAL AWARD

---

*Arbitral tribunal*
Prof. Diego P. Fernández Arroyo (President Arbitrator)
Mr. Cristián Conejero Roos
Prof. Franco Ferrari

*Tribunal Secretary*
Dr. Bruno Sousa Rodrigues

**Arbitration Venue: Paris, France**

1

*This page was intentionally left blank*

## INDEX

I. INTRODUCTION ................................................................................................ 11

1. The Parties ...................................................................................................... 11

A) Claimant ......................................................................................................... 11
B) Respondents ................................................................................................... 11
2. The Attorneys-In-Fact of the Parties ........................................................... 11

A) The Attorneys-In-Fact of the Claimant ........................................................ 11
B) The Respondents' Attorneys-In-Fact ............................................................ 12
3. The Arbitral tribunal ..................................................................................... 12

4. The Arbitration Contracts ............................................................................. 13

II. PROCEDURAL HISTORY .............................................................................. 15

III. THE CONTROVERSY .................................................................................... 27

1. Origin of the Controversy .............................................................................. 27

2. The Relevant Facts Regarding the Dispute .................................................. 27

IV. SUMMARY OF PARTIES' POSITIONS AND PRETENSIONS ................... 28

1. Claimant's Positions and Claims .................................................................. 28

2. Respondents' Positions and Claims .............................................................. 30

V. ANALYSIS ......................................................................................................... 33

1. Introduction .................................................................................................... 33

2. The Admissibility of the Claim and the Administrative Pre-Trial ............. 35

A) The Respondents' Position ............................................................................ 35
B) The Claimant's Position ................................................................................. 36
C) The Tribunal's Analysis ................................................................................ 36
3. Termination of the Contracts ........................................................................ 39

A) The Position of the Claimant ........................................................................ 39
B) The Respondents' Position ............................................................................ 42
C) The Analysis of the Tribunal ........................................................................ 44
4. The Right to Compensation under the LCP and the RLCP " ....................... 62

A) The Position of the Claimant ........................................................................ 62
B) The Respondents' Position ............................................................................ 62
C) The Analysis of the Tribunal ........................................................................ 63
5. The Quantum of Compensation under the LCP and the RLCP .................... 66

ICC Arbitration 24306/JPA/AJP, Final Award

A) The Position of the Claimant ................................................................................................ 66

B) The Respondents' Position ................................................................................................... 67

C) The Analysis of the Tribunal ............................................................................................... 68

**VI. COSTS** ............................................................................................................................. **78**

**VII.      DEVICE** .................................................................................................................... **79**

## DEFINED TERMS

| | |
|---|---|
| **Mission Statement** | Mission statement, drafted in accordance with the provisions of Article 23 of the ICC Rules of Arbitration in force as of March 1, 2017, signed on February 6, 2020 |
| **Arbitration Contracts** | Reference in accordance with Clause SIXTH of Addendum No. 1 - PIGAP, Clause 29 of the PIGAP Contract and Article 29 of the Carito-Pirital Contract. |
| **Addendum 1 - Carito-Pirital** | Contract No. 4600071245/1B-121-015-F-16-N-0151, IPC INCREASE IN LOW (60 PSIG) AND MEDIUM PRESSURE GAS COMPRESSION CAPACITY (450 PSIG) CARITO-PIRITAL |
| **Addendum 1 - PIGAP** | Contract No. 4600057362 / 1B-121-015-A-14N-5406, ADDENDUM No. 1, ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT IPC PIGAP II EXTENSION |
| **Addendum 2 - PIGAP** | Contract No. 4600057362 / 1B-121-015-A-14N-5406, ADDENDUM No. 2, ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT IPC PIGAP II EXTENSION |
| **Hearing** | Merit Hearing, held between January 30-February 1, 2023 in a hybrid manner with a in person format at the Dentons Office, located at 5 Blv. Malasherbes, 75008, Paris, France |
| **Jurisdiction and Admissibility Hearing** | Jurisdiction and Admissibility hearing, held on November 8 and 9, 2021 in a hybrid manner, with a in person format in the |

|  | Dentons Office, located at 5 Blv. Malasherbes, 75008, Paris, France |
|---|---|
| **BSJI** | Banco San Juan International Inc. |
| **ICC** | International Chamber of Commerce |
| **Counter Memorial** | Counter-Memorial filed jointly by the Respondents on September 20, 2022 |
| **PIGAP Contract** | Contract No. 4600057362 / 1B-121-015-A-14N-5406, IPC PIGAP II EXTENSION |
| **Carito-Pirital Contract** | Contract No. 4600071245/1B-121-015-F-16-N-0151, IPC INCREASE IN LOW (60 PSIG) AND MEDIUM PRESSURE GAS COMPRESSION CAPACITY (450 PSIG) CARITO-PIRITAL |
| **Contracts** | Jointly PIGAP Contract and Carito-Pirital Contract |
| **New York Convention** | United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, New York, June 10, 1958. |
| **Claimant** | Álya Construtora S.A. (formerly Construtora Queiroz Galvão S.A.) |
| **Respondents** | PDVSA Petróleo S.A and Petróleos de Venezuela S.A. |
| **Claim** | Claim Memorial filed by Claimant on August 17, 2022 |

| | |
|---|---|
| **Rejoinder** | Rejoinder Memorial filed by Respondents on November 9, 2022 |

| | |
|---|---|
| **PHB Claimant** | Post-Hearing brief filed by the Claimant on February 21, 2023 |
| **PHB Respondents** | Post-Hearing writing filed by Respondents on February 21, 2023 |
| **Supplemental brief to the Response** | Supplemental brief to the Counter-Memorial filed jointly by the Respondents on October 4, 2023 |
| **Badell's Report** | Expert Opinion on Venezuelan Law Issues by Professor Rafael Badell Madrid |
| **Freitas's Report** | Diego de Freitas' Expert Opinion on the Truthfulness of Supporting Information Shared by the Claimant (Exhibits De63, De-64 and De-65) |
| **Mouriño's Report** | First Legal Opinion by Professor Carlos Enrique Mouriño Vaquero |
| **Partial Award** | Partial Award rendered on May 24, 2022 |
| **LCP** | Decree with Rank, Value and Force of Law on Public Procurement, published in Extraordinary Official Gazette No. 6.154 dated November 19, 2014. |
| **LOPGR** | The Organic Law of the Office of the Attorney General of the Republic |
| **PO1** | Procedural Order No. 1, dated February 10, 2020 |

| | |
|---|---|
| **PO2** | Procedural Order No. 2, dated August 10, 2021 |
| **PO3** | Procedural Order No. 3, dated November 1, 2021 |

| | |
|---|---|
| **PO4** | Procedural Order No. 4, dated November 8, 2021 |
| **PO5** | Procedural Order No. 5, dated August 2, 2022 |
| **PO5 (amended)** | Procedural Order No. 5 (as amended), dated September 6, 2022 |
| **PO6** | Procedural Order No. 6, dated October 12, 2022 |
| **PO7** | Procedural Order No. 7, dated January 6, 2023 |
| **PO8** | Procedural Order No. 8, dated January 25, 2023 |
| **Parties** | Claimant and Respondent jointly |
| **PDVSA** | Petróleos de Venezuela S.A. |
| **PDVSA Petróleo** | PDVSA Petróleos S.A. |
| **First Respondent** | PDVSA Petróleos S.A. |

| | |
|---|---|
| **Administrative rulings for termination** | Administrative Ruling No. 001, dated October 9, 2018, related to PIGAP Contract; and Administrative Ruling No. 002 dated October 9, 2018, related to Carito-Pirital Contract, which decided to terminate the Contracts for causes attributable to CONTRACTOR. |
| **QG** | Álya Construtora S.A. (formerly Construtora Queiroz Galvão S.A.) |
| **RLCP** | Public Procurement Law Regulation, published in Official Gazette No. 39.181 of May 1, 2009. |
| **Rules** | ICC Rules of Arbitration effective as of March 1, 2017 |
| **Reply** | Reply Memorial filed by Claimant on October 25, 2022 |
| **Secretariat** | The Secretariat of the International Chamber of Commerce Court |
| **Second Respondent** | Petróleos de Venezuela S.A. |
| **Badell's Second Report** | Second Expert Opinion on Venezuelan Law Issues by Professor Rafael Badell Madrid |
| **Freitas's Second Report** | Expert Opinion of Diego de Freitas on the Truthfulness of Supporting Information Shared by the Claimant (Exhibits De-65, De-66 and De-69) and Review of Second Testimonial by Gediel Deleo |
| **Mouriño's Second Report** | Second Legal Opinion by Professor Carlos Enrique Mouriño Vaquero |

| Request | Request for Arbitration submitted by the Claimant on March 2, 2019 with the Secretariat |
|---------|------------------------------------------------------------------------------------------|

## I. INTRODUCTION

### 1. The Parties

A) Claimant

1.      The Claimant is Álya Construtora S.A., formerly Construtora Queiroz Galvão S.A. ("**QG**" or the "**Claimant**"). A company incorporated under the laws of the Federative Republic of Brazil and registered with the Commercial Registry of the city of Rio de Janeiro, under No. CNPJ/MF 33.412.792/0001.60, whose branch in the Bolivarian Republic of Venezuela was registered with the Fifth Commercial Registry of the Capital City and Miranda State Judicial District on January 15, 2010, under No. 5, Volume 6-A. The registered office of the QG branch in the Bolivarian Republic of Venezuela is located at Av. Venezuela, Torre Mariana, Piso 7, Urbanización El Rosal, Caracas, Municipality of Chacao, Bolivarian Republic of Venezuela.

B) Respondents

2.      The respondents are: (i) PDVSA Petróleo S.A., a state-owned company engaged in oil activities, registered under the laws of the Bolivarian Republic of Venezuela, whose registered office is located at Avenida Libertador, Urbanización La Campiña, Edificio Petróleos de Venezuela Building, East Tower, Caracas, Bolivarian Republic of Venezuela ("**PDVSA Petróleo**" or "**First Respondent**"); (ii) Petróleos de Venezuela S.A., a state-owned oil company, registered under the laws of the Bolivarian Republic of Venezuela, whose registered office is located at Avenida Libertador, Urbanización la Campiña, Edificio Petróleos de Venezuela, Torre Este, Caracas, Bolivarian Republic of Venezuela ("**PDVSA**" or "**Second Respondent**", jointly the "**Respondents" and, together with the Claimant, the "Parties**").

### 2. The Attorneys-In-Fact of the Parties

A) The attorneys-in-fact of the Claimant

3.      Claimant is represented by:

**José Ignacio García Cueto**
**Marie Isabelle Delleur**
**Ignacio Diaz**
**Florencia Bohl**
**Hernan Chiriboga**
**Nicolás De La Flor Puccinelli**
CLIFFORD CHANCE US LLP
2001 K Street, N.W.
Washington, DC, 20006
UNITED STATES OF AMERICA

Emails: jose.garciacueto@cliffordchance.com;

mi.delleur@cliffordchance.com;
ignacio.diaz@cliffordchance.com;
florencia.bohl@cliffordchance.com;
hernan.Cchiriboganovillo@cliffordchance.com
nicolas.delaflorpuccinelli@cliffordchance.com

B) The Respondents' attorneys-in-fact

4.      The Respondents are represented by:

**Miguel Barráez**
**Annabella Rivas**
**Aldo Galindo**
PDVSA PETROLEOS, S.A.
PETROLEOS DE VENEZUELA, S.A.
Avenida Libertador, Urbanización la Campiña
Petróleos de Venezuela Building, East Tower, Caracas
BOLIVARIAN REPUBLIC OF VENEZUELA
E-mails: barraezms@gmail.com;
rivasaay@pdvsa.com;
galindoa@pdvsa.com;
cjlitigios@pdvsa.com.

**Roberto Antonio Leyba**
VENATT INTERNATIONAL ADVISORS KFT A.C.
Urbanización San Antonio, Sabana Grande
Sur, Prolongación Las Acacias, between
Casanova Avenue and Abraham Lincoln
Avenue.
Domus Tower, 7th Floor, Office 7-C
Caracas
BOLIVARIAN REPUBLIC OF VENEZUELA
E-mails: rleyba@venezuelanattorneys.com;

### *3. The Arbitral tribunal*

5.      The arbitral tribunal is composed of the following members:

**President:**
Prof. Diego P. Fernández Arroyo
4 rue Rollin
75005 Paris
FRANCE
E-mail: diego.fernandezarroyo@dpfa-arb.com

**Co-Arbitrator Appointed by the Claimant:**
Mr. Cristián Conejero Roos
CUATRECASASAS
Santiago de Chile Office
Nueva Costanera Ave. 3300, 4th floor Vitacura
7630413 Santiago de Chile
CHILE
E-mail: cristian.conejero@cuatrecasas.com

**Co-Arbitrator Appointed by the Respondents:**
Prof. Franco Ferrari
CENTER FOR TRANSNATIONAL LITIGATION
ARBITRATION AND COMMERCIAL LAW
NYU School of Law 409B
40 Washington Square South
New York, 10012
UNITED STATES OF AMERICA
E-mail: franco.ferrari@nyu.edu

### *4. The Arbitration Contracts*

6.    The present arbitration is based on Clause 6 of Contract No. 4600057362 / 1B-121015-A-14-N-5406, ADDENDUM No. 1, ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT IPC EXTENSION (**"Addendum No. 1 - PIGAP**), in clause 29 of the Contract No. 4600057362 / 1B-121-015-A-14-N-5406, IPC PIGAP II EXTENSION (**"PIGAP Contract**), and in clause 29 of Contract No. 4600071245/1B-121-015-F-PRESSURE GAS COMPRESSION CAPACITY CARITO-PIRITAL (**"Carito-Pirital Contract"** and, together with the PIGAP Contract, the **"Contracts"**). Together, the three clauses are referred to in this arbitration as the **"Arbitration Contracts"**. These arbitration contracts were signed by PDVSA Petróleo and QG.

7.    Clause SIXTH of Addendum No. 1 - PIGAP states the following:

*The PARTIES agree to amend CLAUSE 29 – DISPUTE RESOLUTION with the purpose of replacing Subclause 29.1 with the following:*

*29.1 In the event of disputes arising from the performance or interpretation of this CONTRACT, the PARTIES will make their best efforts to achieve a friendly settlement of their differences. If no agreement is reached between the REPRESENTATIVE OF THE CONTRACTOR and the REPRESENTATIVE OF THE COMPANY within thirty (30) DAYS of notification by one party to the other regarding a dispute, the dispute will be submitted by a Director of THE CONTRACTOR to the highest level of management authority from the CONTRACTING ORGANIZATION of THE COMPANY, for its consideration and resolution.*

*If the dispute is not resolved at that level within a period of thirty (30) DAYS from the notification made by a Director of THE CONTRACTOR to the highest level of management authority from the CONTRACTING ORGANIZATION of the COMPANY, the President of THE*

*CONTRACTOR shall submit the dispute to the Liaison Director of THE COMPANY's CONTRACTING ORGANIZATION for resolution within thirty (30) DAYS.*

*Upon expiration of the latter period and in the event that the dispute or difference has not been resolved by application of the above procedure, either PARTY may submit it to arbitration, in accordance with the following rules:*

1. *The Arbitration shall be conducted in accordance with the Arbitration Rules of the International Chamber of Commerce (ICC).*

2. *The place for arbitration will be Paris, France.*

3. *The languages of the arbitration proceedings shall be Spanish and English.*

4. *The arbitration shall be an arbitration of law.*

5. *The arbitral tribunal shall consist of three (3) arbitrators. The arbitrators shall be appointed as follows: each PARTY shall appoint an arbitrator. The appointment by the party that initiated the arbitration shall be made on the request for arbitration or otherwise, at the time the arbitration is initiated. Within ten (10) DAYS after the confirmation by the last arbitrator appointed by the PARTIES, the arbitrators appointed by both PARTIES shall appoint a third party, who shall act as president of the arbitral tribunal. If the arbitrators appointed by both PARTIES fail to designate the president of the arbitral tribunal within the period set forth herein, the president shall be appointed by the ICC International Court of Arbitration, in accordance with the ICC Rules. None of the arbitrators may have been employed or a consultant to either PARTY, or its affiliates, or engaged by the PARTIES or their subsidiaries as an attorney, public accountant, or similar, or have been a member, officer, director or employee of any entity related to one of the PARTIES or any of its subsidiaries or having a financial interest in the dispute. The arbitrators shall be lawyers, of any nationality other than that of all PARTIES, and shall speak fluently the English language and the Spanish language.*

6. *The costs of the process shall be covered by both PARTIES, in identical parts, unless the arbitral tribunal decides otherwise in its award.*

7. *The PARTIES will do their best to continue to perform their obligations under the CONTRACT despite any dispute between them, so that the performance of the CONTRACT is not suspended.*

8. *Any arbitral award shall be final and binding on the PARTIES.*

8.  Accordingly, clause 29 of the PIGAP Contract should be read as follows:

***29.1*** *In the event of disputes arising from the performance or interpretation of this CONTRACT, the PARTIES will make their best efforts to achieve a friendly settlement of their differences. If no agreement is reached between the REPRESENTATIVE OF THE CONTRACTOR and the REPRESENTATIVE OF THE COMPANY within thirty (30) DAYS of notification by one party to the other regarding a dispute, the dispute will be submitted by a Director of THE CONTRACTOR to the highest level of management authority from the CONTRACTING ORGANIZATION of THE COMPANY, for its consideration and resolution.*

*If the dispute is not resolved at that level within a period of thirty (30) DAYS from the notification made by a Director of THE CONTRACTOR to the highest level of management authority from the CONTRACTING ORGANIZATION of the COMPANY, the President of THE CONTRACTOR shall submit the dispute to the Liaison Director of THE COMPANY's CONTRACTING ORGANIZATION for resolution within thirty (30) DAYS.*

*Upon expiration of the latter period and in the event that the dispute or difference has not been resolved by application of the above procedure, either PARTY may submit it to arbitration, in accordance with the following rules:*

1. *The Arbitration shall be conducted in accordance with the Arbitration Rules of the International Chamber of Commerce (ICC).*
2. *The place for arbitration will be Paris, France.*
3. *The languages of the arbitration proceedings shall be Spanish and English.*
4. *The arbitration shall be an arbitration of law.*
5. *The arbitral tribunal shall consist of three (3) arbitrators. The arbitrators shall be appointed as follows: each PARTY shall appoint an arbitrator. The appointment by the party that initiated the arbitration shall be made on the request for arbitration or otherwise, at the time the arbitration is initiated. Within ten (10) DAYS after the confirmation by the last arbitrator appointed by the PARTIES, the arbitrators appointed by both PARTIES shall appoint a third party, who shall act as president of the arbitral tribunal. If the arbitrators appointed by both PARTIES fail to designate the president of the arbitral tribunal within the period set forth herein, the president shall be appointed by the ICC International Court of Arbitration, in accordance with the ICC Rules. None of the arbitrators may have been employed or a consultant to either PARTY, or its affiliates, or engaged by the PARTIES or their subsidiaries as an attorney, public accountant, or similar, or have been a member, officer, director or employee of any entity related to one of the PARTIES or any of its subsidiaries or having a financial interest in the dispute. The arbitrators shall be lawyers, of any nationality other than that of all PARTIES, and shall speak fluently the English language and the Spanish language.*
6. *The costs of the process shall be covered by both PARTIES, in identical parts, unless the arbitral tribunal decides otherwise in its award.*
7. *The PARTIES will do their best to continue to perform their obligations under the CONTRACT despite any dispute between them, so that the performance of the CONTRACT is not suspended.*
8. *Any arbitral award shall be final and binding on the PARTIES.*

   ***29.2.*** *Likewise, the PARTIES agree that the information resulting or generated in the procedure described in the preceding paragraph shall be confidential and shall be treated in accordance with the provisions of Clause 24 (CONFIDENTIALITY) of this CONTRACT."*

9. Clause 29 of the Carito-Pirital Contract has the same wording.

## II. PROCEDURAL HISTORY

10. On May 24, 2022, the Tribunal issued the Partial Award deciding a number of issues relating to its jurisdiction and the admissibility of the claim.

11. On May 25, 2022, the International Court of Arbitration of the International Chamber of Commerce extended the deadline for rendering the final award to June 30, 2022.

12. On June 8, 2022, the Secretariat sent the Parties a courtesy copy of the Partial Award by e-mail.

13. On June 9, 2022, the Parties acknowledged receipt of the courtesy copy of the Partial Award.

14. On June 20, 2022, the Secretariat informed the arbitral tribunal that the Claimant had received the Partial Award on June 13, 2022.

15.     On June 23, 2022, the International Court of Arbitration of the International Chamber of Commerce extended the deadline for rendering the final award to July 29, 2022.

16.     On June 29, 2022, the Tribunal sent a communication to the Parties indicating that the deadline for the commencement of the second phase of this Arbitration would commence upon receipt by all Parties of a physical copy of the Partial Award. In the same communication, the Tribunal also referred to the provision for fees and expenses, in the following terms: "due to the situation prevailing during the first phase, the provision for fees and expenses was not deposited (which is absolutely abnormal in international arbitration) but was paid directly to the arbitrators at the end of the first phase, after the Hearing on Jurisdiction. We are awaiting a response from the ICC to see if we can normalize this issue for the second phase of this arbitration. That is, the provision is paid before the actual work of the Tribunal begins. The Tribunal has also asked whether the initial cost estimate (EUR 580,000) is still effective or whether it should be updated taking into account what has been done so far in this arbitration".

17.     On July 13, 2022, the Secretariat informed that the Court had reconsidered the provision for expenses on the same day and decided to increase it from EUR 580,000 to EUR 615,000. In its notification, the Secretariat informed that it was awaiting "certain verifications" from its Legal Services Department and its banking institution with the purpose of providing updated information on how to proceed with the financial aspect of this arbitration.

18.     On July 20, 2022, the Court received a communication from the ICC department in charge of *compliance* issues notifying that one of the banks with which ICC works was willing to receive payments in arbitrations involving a sanctioned Venezuelan entity provided that such payments are made by the non-sanctioned entity and that certain requirements are met.

19.     On July 21, 2022, the International Court of Arbitration of the International Chamber of Commerce extended the deadline for rendering the final award to February 28, 2023.

20.     On July 25, 2022, the Secretariat informed the Parties of what was indicated in the preceding paragraph, sent them the updated Financial Chart and requested a new provision of funds from the Claimant.

21.     On the same day, the Claimant acknowledged receipt of the above communication and undertook to duly arrange for payment.

22.     On July 28, 2022, the Secretariat informed that the Respondents were notified of the Partial Award on July 14, 2022.

23.     On the same day, upon inquiry by the Claimant, the arbitral tribunal announced the imminent dispatch of a draft timetable following the deadlines set forth in Procedural Order No. 2 (the "**PO2**").

24.     On July 29, 2022, the Tribunal sent the draft Procedural Order No. 5 (the **"PO5"**), containing such timetable and requested the Parties to make their comments on it as soon as possible.

25.     On August 1 and 2, 2022, respectively, Claimant and Respondents responded to the arbitral tribunal's call.

26.     On August 2, 2022, the arbitral tribunal issued PO5, which established the procedural schedule for the second phase of the proceedings.

27.     On August 17, 2022, Claimant filed its Claim memorial (the **"Claim"**), accompanied by the indexes of exhibits of documentary evidence and legal authorities, the witness statements with the indexes of exhibits, and the expert report with its index of exhibits. On the occasion, the Claimant informed that, pursuant to paragraph 8 of Procedural Order No. 1 (the **"PO1"**), the Claimant would send within the next three business days (Monday, August 22) a hyperlink to a Data Transfer Portal with the indexes of exhibits of documentary evidence and legal authorities, witness statements with their indexes of exhibits, relevant expert reports or opinions with the indexes of exhibits, exhibits of documentary evidence and legal authorities.

28.     On August 18, 2022, the arbitral tribunal acknowledged receipt of the Request and its exhibits.

29.     On August 22, 2022, Claimant submitted the hyperlink to a Data Transfer Portal containing the indexes of exhibits of documentary evidence and legal authorities; witness statements with their indexes of exhibits; relevant expert reports or opinions with the indexes of exhibits; and exhibits of documentary evidence and legal authorities. On the same occasion, the Claimant communicated that, in accordance with paragraph 8 of PO1, the Claimant would submit translations to documents not drafted in Spanish or English language within 7 working days from the filing of the brief (i.e., August 26, 2022).

30.     On August 23, 2022, the arbitral tribunal acknowledged receipt of the message from the Claimant, confirming that it had been able to access the documents through the Data Transfer Portal.

31.     On August 26, 2022, the Claimant submitted the hyperlink to the Data Transfer Portal where the translations of the documents not drafted in Spanish or English language had been uploaded.

32.     On August 27, 2022, the arbitral tribunal acknowledged receipt of the translations. However, the arbitral tribunal requested the Claimant to send a list of translated documents so that it could confirm that it had access to all translations.

33.     On August 28, 2022, the Claimant communicated the list of translated documents.

34.     On the same day, the arbitral tribunal acknowledged receipt of the list of translated documents, confirming that it had been able to access all the translations sent.

35.     On September 5, 2022, the Respondents informed that "[d]ue to the sanctions imposed on its clients, to date, it has been impossible to hire an expert witness", requesting the arbitral tribunal to grant "an extension of 15 additional days to the deadline to file our counter-memorial".

36.     On September 6, 2022, the arbitral tribunal requested the Claimant to comment on the Respondents' request no later than Thursday, September 8, 2022.

37.     On the same day, the Claimant submitted its comments, proposing that "[o]n September 20, 2022 (the date set in PO5) the Respondents will submit their Counter-Memorial, testimonies and documentary and legal evidence and expert reports (not affected by the sanctions), that "[o]n September 30, 2022 (+10 calendar days), if so deemed convenient, the Respondents have the possibility of submitting the expert report delayed by the sanctions, accompanied, if the Respondents so wish, by a short brief summarizing the conclusions of the report", and that "[t]he Claimant shall submit its Counter-memorial on October 15 and the Respondents their Rejoinder on October 30".

38.     On the same day, the arbitral tribunal acknowledged receipt of the Claimant's comments and proposals, informing that it would rule on them as soon as possible.

39.     On the same day, the arbitral tribunal decided to grant the Respondents' request to delay by 15 days the deadline set in the timetable for the filing of the Counter-Memorial(s), but only with respect to the expert report whose preparation would be affected by the sanctions. Thus, the deadline for the submission of said Memorial (except for the aforementioned expert report) remained September 20, 2022. On the same occasion, the arbitral tribunal indicated that the rest of the deadlines should be modified accordingly, which is why on September 6 it issued the amended PO5 updating the procedural deadlines.

40.     On September 17, 2022, the Respondents submitted a communication informing that they continued to have difficulties in making the payment of their experts, requesting a new extension of 15 additional days to file their Counter-Memorial.

41.     On September 18, 2022, the arbitral tribunal acknowledged receipt of the Respondents' communication and invited the Claimant to submit its comments by September 19, 2022.

42.     On September 19, 2022, Claimant submitted its comments, noting that "if the hiring of experts was impossible by the sanctions this party does not object to extending by 15 days the deadline for the submission of both expert opinions and the brief writing which will limited to the points of the expert opinion".

43.     On the same day, the arbitral tribunal authorized the Respondents to submit the aforementioned legal and accounting reports within the 15-day additional period granted above, on the understanding that in both cases the Respondents have had difficulties in hiring the experts due to the sanctions.

44. On September 20, 2022, the Respondents wrote to the arbitral tribunal informing that one of their witnesses had had connectivity problems "to the point that since yesterday we have not been able to contact him to complete his testimony". Thus, the Respondents requested the arbitral tribunal to "grant us two (2) more days to submit the statement of that witness, and if we are willing, a supplementary brief to the Counter-Memorial", noting that "[i]f that period elapses without our being able to contact the witness, we will waive the submission of said witness statement".

45. On the same day, given the peremptoriness of the request, which did not provide time to request comments from the Claimant, the Tribunal exceptionally granted a two-day extension (i.e., until September 22, 2022) to submit the written statement of the aforementioned witness, indicating that the witness should be clearly identified in the Counter-Memorial or in the letter accompanying such memorial. Furthermore, the arbitral tribunal noted that such exceptional extension referred only to the said witness statement, but to no other document to be submitted by the Respondents, emphasizing that the Respondents could not submit any supplementary brief to the Counter-Memorial after the expiration of the deadline that expired on that day.

46. On the same day, Respondents filed their Counter-Memorial (the **"Counter-memorial"**), accompanied by a list of legal and factual exhibits.

47. In a series of emails on the same day, the Respondents sent the exhibits to the counter-memorial and informed that the name of the witness who had connectivity problems was Luis Vielma.

48. On the same day, the arbitral tribunal acknowledged receipt of the documents sent and took note of the name of the witness whose testimony could be presented until September 22, 2022.

49. On September 22, 2022, the Respondents sent the Witness Statement of Luis Vielma, as well as the list of its exhibits.

50. On the same day, the arbitral tribunal acknowledged receipt of the witness statement of Mr. Luis Vielma with its exhibits.

51. On October 4, 2022, the Respondents filed their Supplemental Brief to the Counter-Memorial (the **"Supplemental Brief to the Counter-Memorial"**), accompanied by the Legal and Accounting Opinion.

52. On the same day, the arbitral tribunal acknowledged receipt of the Respondents' statement.

53. On October 5, 2022, the Respondents submitted exhibits to the Accounting Opinion.

54. On October 7, 2022, Respondents submitted exhibits to the Legal Opinion.

55. On October 8, 2022, the arbitral tribunal acknowledged receipt of the exhibits to the Legal Opinion. However, the arbitral tribunal requested information as to whether the

Respondents had placed or would place all documentation on a Data Transfer Portal as stated in §7 of PO1.

56.     On October 9, 2022, the Respondents communicated by email that a previous version of the Legal Opinion had been involuntarily sent, which contained material errors. Thus, the Respondents requested that a new version of the Legal Opinion be taken as valid. Likewise, the Respondents informed that they had prepared a *redline* version that would show the differences between the version originally submitted and the new version. Finally, the Respondents informed the arbitral tribunal that due to technical failures they had been unable to upload the documentation to a Data Transfer Portal,  but assured that the situation would be remedied as soon as possible.

57.     On the same day, the Respondents sent new exhibits to the Legal Opinion.

58.     On October 10, 2022, the arbitral tribunal acknowledged receipt of Respondents' mail dated October 9, 2022, which included 6 legal authorities (Exhibits DaE-41 to DaE-46), previously sent with different nomenclature. However, the arbitral tribunal noted that in their message the Respondents mentioned a new version of the Opinion and 18 exhibits. The arbitral tribunal stressed that this would mean that the message received by the arbitral tribunal did not contain all the documentation attached. Furthermore, in order to preserve the principle of procedural equality, the arbitral tribunal asked the Claimant if it had any considerations to make regarding the Respondents' latest representations.

59.     On the same day, the Claimant submitted a series of comments to the Respondents' statement. Furthermore, the Claimant requested the Arbitral Tribunal "to determine that the valid Mouriño's Report is the one submitted on the date established in the PO5 (i.e., the one submitted on October 4) or to suspend the Claimant's deadline for the submission of the Counter-memorial until it decides whether or not to admit the corrected report and/or any additional exhibits".

60.     On October 10, 2022, the arbitral tribunal acknowledged receipt of the Claimant's communication and requested the Respondents to clarify the situation raised with respect to the Legal Opinion, its versions and exhibits.

61.     On October 11, 2022, Respondents submitted the requested clarifications. Furthermore, in order to safeguard the Claimant's right of defense, the Respondents informed that they would agree to grant an additional 5 days so that the Claimant could prepare its reply taking into consideration the correct version of the Legal Opinion and its corresponding exhibits.

62.     On October 13, 2022, the arbitral tribunal issued Procedural Order No. 6 ("**PO6**") in which it ordered Respondents to promptly resubmit the different versions of the Legal Opinion and all accompanying Exhibits, reiterating that Respondents should share such documentation through a Data Transfer Portal as soon as possible; granted Claimant an additional five days (i.e., until October 25, 2022) to file its Counter-Memorial; provided that the Rejoinder Memorial should be filed by November 9, 2022, that the Notice to Witnesses should be made no later than November 23, 2022, that it would timely assess the admissibility and relevance of the evidence submitted by the Respondents, and, finally,

postponed its decision regarding the costs caused by these procedural proceedings to a later time.

63.     On October 14, 2022, the Respondents sent the hyperlink to download the last submitted files.

64.     On October 15, 2022, the arbitral tribunal acknowledged receipt of the "correct" and "comparative" versions of Prof. Mouriño's Legal Report, together with Exhibits DaE-9 to DaE-46, as well as the list describing them, via *dropbox*. On the same occasion, the Tribunal requested the Claimant to confirm whether it had had access to the documentation referred to.

65.     On the same day, Claimant confirmed that it had had access "to the 'correct' and 'comparative' versions of Prof. Mouriño's Legal Report, together with Exhibits DaE-9 to DaE46, as well as to Prof. Mouriño's 'correct' list of exhibits, through the shared link".

66.     On October 17, 2022, the arbitral tribunal acknowledged receipt of the Claimant's confirmation.

67.     On October 25, 2022, Claimant filed its Reply Memorial (the **"Reply"**), accompanied by the indexes of exhibits of documentary evidence and legal authorities, the witness statements with the indexes of exhibits, and the expert report with its index of exhibits. On the same occasion, the Claimant informed the arbitral tribunal and the Secretariat that it had changed its name to Álya Construtora S.A.

68.     On October 26, 2022, the arbitral tribunal acknowledged receipt of Claimant's Reply, together with three witness statements and an expert report, all accompanied by four lists of exhibits.

69.     On October 28, 2022, Claimant sent the hyperlink to a Data Transfer Portal containing the Rejoinder documentation. On the same occasion, Claimant reported that "[i]n the gathering of supporting documents for Dr. Badell's Second Report, an annex was identified that was quoted in that report but was not mentioned in the list of exhibits submitted to the Tribunal on October 25, 2022" and that "[t]herefore, an updated version of Dr. Badell's list of exhibits has been uploaded to the FTP which includes this document and identifies it as 'Exhibit 57'."

70.     On October 29, 2022, the arbitral tribunal informed that it had taken note of the updated version of Dr. Badell's list of exhibits, confirming that it has been able to download all the Rejoinder documentation sent on the Data Transfer Portal.

71.     On November 9, 2022, the Respondents submitted the Rejoinder Memorial (the **"Rejoinder"**), accompanied by the lists of legal and factual exhibits, as well as the exhibits of the corresponding Opinions. On the same occasion, the Respondents pointed out that "the Claimant submitted four (4) exhibits to which it makes no reference in its Reply Memorial, nor is it possible to relate them to any of its arguments", requesting "this Tribunal to deny the incorporation of such exhibits to the file" or, alternatively, "to ask the

Claimant to express the relationship of these exhibits with its arguments and allow us to make the respective response".

72.     On November 10, 2022, the arbitral tribunal acknowledged receipt of the Respondents' Rejoinder, accompanied by the lists of legal and factual exhibits, as well as the exhibits of the corresponding Opinions, and took note of the Respondents' request. On the same occasion, the arbitral tribunal invited the Claimant to submit any comments it deemed relevant no later than November 15, 2022.

73.     On November 13, 2022, the Respondents sent the hyperlink to download the exhibits to the Rejoinder.

74.     On the same day, the arbitral tribunal acknowledged receipt of the link to access the data platform where the Exhibits to the Rejoinder could be downloaded. However, the arbitral tribunal noted that the *dropbox* platform indicated that the data is protected and, therefore, the tribunal was unable to access the sent documents, inviting the Respondents to solve the technical problem as soon as possible.

75.     On the same day, the Respondents sent a new hyperlink to download the exhibits to the Rejoinder.

76.     On November 14, 2022, the arbitral tribunal confirmed that it had been able to download the exhibits to the Rejoinder.

77.     On November 15, 2022, the Claimant submitted a series of comments regarding the Respondents' request to deny the incorporation of Exhibits De-71 to De-74 into the record. In particular, the Claimant asserted that the request was groundless and that "[f]rom a simple reading of paragraphs 13 and 14 of Mr. Nielsen's Second Testimony and a review of the same with the name of the quoted documents it is evident that these exhibits refer to what is indicated in said paragraphs".

78.     On the same day, the Claimant advised that Respondents had not uploaded Exhibit Da-29 to the data transfer platform.

79.     On the same day, the arbitral tribunal took note of the Claimant's explanations regarding Exhibits De-71 to De-74. However, the arbitral tribunal invited the Respondents to make the necessary comments in this regard by November 18, 2022. Likewise, in relation to Exhibit Da-29, the Tribunal ordered its submission to the Respondents within the same period indicated, assuming that it was an uploading error.

80.     On November 18, 2022, the Respondents submitted their comments to Exhibits De-071, De-072, De-073, De-074 filed by the Claimant, and attached Exhibit Da-29 regarding its Rejoinder Memorial.

81.     On the same day, the arbitral tribunal acknowledged receipt of the Respondents' communication.

82.     On November 23, 2022, the Claimant informed that it would cross-examine the witness Mr. Luis Vielma, and the experts Mr. Diego de Freitas and Prof. Carlos Enrique Mouriño Vaquero during the Hearing.

83.     On the same day, the Respondents informed that they would cross-examine witnesses Messrs. Ariel Nielsen, Bruno Saber Alvim, Gediel Deleo, and the expert Prof. Rafael Badell.

84.     On November 24, 2022, the arbitral tribunal acknowledged receipt of messages from the Parties containing the lists of witnesses and experts that each Party wishes to examine at the Hearing.

85.     On November 25, 2022, the Secretariat sent correspondence with the updated Financial Chart of the case. The Tribunal made some remarks to the Secretariat about the established calculations, noting that the quantification of the claims had evolved in the second phase of the procedure.

86.     On November 28, 2022, the Claimant sent a letter to the arbitral tribunal formulating a series of comments regarding the Rejoinder submitted by the Respondents.

87.     On the same day, the Respondents sent an email taking note of the Claimant's arguments and requesting a deadline for their response.

88.     On November 29, 2022, the arbitral tribunal acknowledged receipt of the Claimant's letter dated November 28, 2022, inviting the Respondents to submit any comments they deemed relevant by December 2, 2022.

89.     On December 1, 2022, the Secretariat informed the Parties that the amount in dispute had increased, transmitting the new Financial Chart of the case.

90.     On December 2, 2022, the Respondents filed their response to Claimant's letter dated November 28, 2022.

91.     On the same day, December 2, 2022, the arbitral tribunal sent the Parties a letter inviting them to initiate discussions regarding the organization of the Hearing, setting December 16, 2022 as the deadline for communicating to the arbitral tribunal the outcome of their negotiations.

92.     On December 5, 2022, the arbitral tribunal sent a message to the Parties acknowledging receipt of the Respondents' response and noting that the Parties would have the opportunity to develop their arguments with respect to the issues raised by the Claimant at the Hearing. Furthermore, the arbitral tribunal noted that, at the appropriate time, it would give due consideration to the admissibility and relevance of the evidence submitted by the Parties.

93.     On December 14, 2022, the Claimant sent an e-mail informing the arbitral tribunal that the Parties had held discussions regarding the organization of the Hearing and had reached a series of agreements, which were communicated in the same message.

94.    On December 16, 2022, the Respondents sent an email confirming "in each and every one of its parts the agreements stated by the Claimant".

95.    On the same day, the arbitral tribunal acknowledged receipt of the Claimant's message, confirmed by the Respondents, informing of the Parties' agreements for the organization of the Hearing. The arbitral tribunal informed that it would prepare a procedural order taking into account such agreements, and that it would send the corresponding draft for comments by the Parties.

96.    On December 29, 2022, the arbitral tribunal circulated draft Procedural Order No. 7 (the "**PO7**"), inviting the Parties to submit comments on it by January 5, 2023.

97.    On January 5, 2023, the Respondents submitted their comments to the draft PO7.

98.    On the same day, the Claimant submitted its comments to PO7 draft, suggesting certain amendments to the order of the experts' statements.

99.    On January 6, 2023, the Respondents sent a message informing their disagreement with the Claimant's suggestions.

100.    On the same day, the arbitral tribunal issued PO7, ruling regarding the Hearing on the Merits.

101.    Again, on January 6, 2023, the Claimant acknowledged receipt of PO7.

102.    On January 7, 2023, the Respondents acknowledged receipt of PO7 and reported on logistical details regarding the organization of the Hearing.

103.    On the same day, the arbitral tribunal took note of the information provided by the Respondents, requesting additional information regarding the logistics of the Hearing.

104.    On February 16, 2023, the International Court of Arbitration of the International Chamber of Commerce extended the deadline for rendering the final award to July 31, 2023.

105.    On November 16, 2023, the Claimant submitted its list of attendees to the Hearing.

106.    On January 17, 2023, the Respondents submitted their list of attendees to the Hearing.

107.    On the same day, the arbitral tribunal acknowledged receipt of the communicated lists of attendees.

108.    On January 20, 2023, the Respondents requested the arbitral tribunal to issue "one letter per participant, mentioned below, from which their participation in the proceedings and the justification for their entry to France-Paris can be deduced".

109.    On the same day, the arbitral tribunal took note of the Respondents' request.

110.    On November 23, 2023, the arbitral tribunal sent the requested letters to the Respondents.

111. On the same day, the Respondents made a series of requests regarding the presentation of certain documents and the use of *Power Point* by witness Luis Vielma.

112. Pursuant to the arbitral tribunal's invitation, on January 24, 2023, the Claimant commented on the issues raised by the Respondents.

113. On the same day, the Respondents acknowledged receipt of the letters requested in their communication dated January 20, 2023.

114. On January 25, 2023, the arbitral tribunal issued Procedural Order No. 8 (the **"PO8"**), authorizing the submission of certain documents until January 26, 2023 and rejecting the use of "*Power Point*" by witness Luis Vielma.

115. On January 26, 2023, the Respondents sent a communication in response to PO8.

116. On the same day, the arbitral tribunal acknowledged receipt of the Respondents' communication.

117. On January 27, 2023, the arbitral tribunal wrote to the Parties to communicate the list of attendees for the Hearing and other logistical details.

118. From January 30 to February 1, 2023, the Merit Hearing (the **"Hearing"**) was held at the office of Dentons-Paris, located at 5 Boulevard Malesherbes, 75008 Paris, France. Initially scheduled to be held in a hybrid format, the Parties agreed on the first day of the Hearing that it could be held entirely in an in person format. The hearing was attended by the following persons:

> For the Tribunal, the following persons attended:
> Diego P. Fernández Arroyo, president of the Arbitral tribunal
> Cristián Conejero Roos, Co-arbitrator
> Franco Ferrari, Co-arbitrator
> Bruno Sousa Rodrigues, Secretariat to the arbitral tribunal
>
> On behalf of Claimant the following persons attended:
> Rafael Badell, Expert
> Ariel Nielsen, Witness
> Bruno Alvim, Witness
> Gediel Deleo, Witness
> José Ignacio García Cueto, Attorney-at-Law
> Ignacio Díaz, Attorney-at-Law
> Florencia Bohl, Attorney-at-Law
> Hernán A. Chiriboga Novillo, Attorney-at-Law
> Nicolás De La Flor Puccinelli, Attorney at Law
>
> On behalf of the Respondents, the following persons attended:
> Luis Alberto Vielma Peña, Witness
> Carlos Enrique Mouriño Vaquero, Expert

Diego Antonio De Freitas Assalona, Expert
Fidel Alberto Castillo Gómez, Attorney-at-Law
Jorge Isaac González Carvajal, Attorney-at-Law
Carmen Teresa Oliveros Durán, Attorney-at-Law
Roberto Antonio Tadeo Leyba Morales, Attorney-at-Law

119.   At the end of the Hearing, the arbitral tribunal invited the Parties to submit Post-Hearing Briefs ("**PHB**") on the basis of the questions posed by the arbitral tribunal. The deadline established for the submission of PHBs was February 21, 2023.

120.   On February 16, 2023, the Respondents filed a communication requesting the incorporation of certain documents to the file.

121.   On the same day, the arbitral tribunal acknowledged receipt and invited the Claimant to submit comments by February 20, 2023.

122.   On the same day, the Claimant submitted its comments.

123.   On February 18, the arbitral tribunal issued Procedural Order No. 9 ("**PO9**"), rejecting the Respondents' request for new documents to be added to the file.

124.   On February 21, 2023, the Claimant and the Respondents submitted their PHBs with their respective exhibits.

125.   On February 22, 2023, the arbitral tribunal acknowledged receipt of the Claimant's and Respondents' PHBs. The arbitral tribunal also invited the Parties to submit their statement of costs no later than March 15, 2023.

126.   On February 23, 2023, the Secretariat reported that the Court had reconsidered the provision for expenses, setting it at EUR 680,000. On the same occasion, the Secretariat attached the Financial Chart of the case and a request for payment for the Claimant.

127.   On the same day, the Claimant acknowledged receipt of the communication from the Secretariat.

128.   On March 15, 2023, the Parties sent their certifications of costs.

129.   On March 16, 2023, the arbitral tribunal acknowledged receipt of the Parties' certifications of costs.

130.   On March 27, 2023, in accordance with Article 27 of the Rules, arbitral tribunal closed the investigation.

131.   On June 13, 2023, the Court established the arbitration costs in EUR 670,000.

## III. THE CONTROVERSY

132. The following events constitute a summary of the factual background of the dispute as reported by the Parties. They have the sole purpose of contextualizing the Final Award. They do not constitute findings of fact by the Tribunal on the facts in dispute.

### 1. Origin of the Controversy

133. The present arbitration has its origin in the following contracts:

> (i)    Contract No. 4600057362 / 1B-121-015-A-14-N-5406, IPC PIGAP II EXTENSION ("**PIGAP Contract**");

> (ii)   Contract No. 4600057362 / 1B-121-015-A-14-N-5406, ADDENDUM No. 1, ENGINEERING, PROCESSING AND CONSTRUCTION CONTRACT "IPC PIGAP II EXTENSION" (**Addendum 1 - PIGAP**);

> (iii)  Contract No. 4600057362 / 1B-121-015-A-14-N-5406, ADDENDUM No. 2, ENGINEERING, PROCESSING AND CONSTRUCTION CONTRACT "IPC PIGAP II Extension" (**Addendum 2 - PIGAP**);

> (iv)   Contract No. 4600071245/1B-121-015-F-16-N-0151, IPC INCREASE IN LOW (60 PSIG) AND MEDIUM PRESSURE (450 PSIG) GAS COMPRESSION CAPACITY CARITO-PIRITAL ("**Carito-Pirital Contract**");

> (v)    Contract No. 4600071245/1B-121-015-F-16-N-0151, IPC INCREASE IN LOW (60 PSIG) AND MEDIUM PRESSURE (450 PSIG) GAS COMPRESSION CAPACITY CARITO-PIRITAL ("**Addendum 1 - Carito-Pirital**").

### 2. The Relevant Facts Regarding the Dispute

134. The PIGAP II project consisted of a project to carry out a secondary process for the recovery of oil deposits in the Santa Barbara field, Monagas State, Venezuela. The acronym PIGAP stands for "High Pressure Gas Injection Project"[1].

135. Between 2013 and 2014, PDVSA conducted a bidding process for the extension of the PIGAP II plant. In June 2014, PDVSA awarded the Claimant the referred extension project, and the PIGAP Contract for the design, procurement and construction of the extension of the high pressure gas compressor plant PIGAP II by PDVSA Petróleo and QG on November 27, 2014[2].

136. In the meantime, PDVSA and QG made joint efforts to obtain financing for the PIGAP Contract. However, in view of the difficulties in obtaining this financing and due to

---

[1] Request, § 21.
[2] Request, §§ 22-26; Response to Request, § 34.

requests for complementary works, QG and PDVSA Petróleo signed an addendum to the PIGAP Contract (Addendum No. 1 - PIGAP)[3].

137.     In 2016, PDVSA conducted a bidding process for the construction of two high pressure gas compressor plants in Carito and Pirital, Ezequiel Zamora Municipality, Monagas State in Venezuela. In July 2016, PDVSA was notified of the award of the contract for this project (Carito-Pirital Contract)[4], which was signed on January 24, 2017[5].

138.     On April 6, 2017, PDVSA and Banco San Juan International Inc. (**"BSJI"**) entered into a financing contract for the Carito-Pirital Contract and the PIGAP Contract. On the same day, QG, PDVSA and BSJI entered into a trust agreement for the management of the total amount of the two projects. The difference between the amount financed by BSJI (USD 519 million) and the total amount estimated for the projects (USD 561 million) would be contributed by PDVSA. In addition, the trust agreement established the procedure for approving QG's invoices and sending the payment orders to BSJI, which acted as the trust's paying agent[6].

139.     On July 14, 2017, the PIGAP Contract and the Carito-Pirital Contract were amended to adapt them to the payment modality established in the trust agreement, generating Addendum No. 2 - PIGAP and Addendum No. 1 - Carito-Pirital respectively[7].

140.     However, in the same year, differences began to arise regarding the lack of financing and its effects on the rights and obligations of the Parties with respect to the Contracts.

141.     Such differences persisted and on October 9, 2018 PDVSA issued Administrative Rulings 001-2018 and 002-2018, whereby it unilaterally terminated the Contracts[8].

## IV. SUMMARY OF PARTIES' POSITIONS AND PRETENSIONS

### 1. Claimant's Positions and Claims

142.     Claimant asserts that, under Venezuelan law, the legal regime established by the Public Procurement Law (**"LCP"**) and the Regulations to the Public Procurement Law (**"RLCP"**) applies to the Contracts.

143.     Claimant acknowledges that, under the applicable law, its counterparty enjoys extraordinary and exorbitant powers, including the possibility of unilaterally terminating an administrative contract. However, it is the Claimant's position that "this power is limited in that it cannot be exercised in an unreasonable or arbitrary manner, but requires that it

---

[3] Request, §§ 27-29; Response to the Request, § 36.
[4] Request, §§ 30-31.
[5] Response to the Request, § 40.
[6] Request, §§ 34-35.
[7] Request, § 36; Response to the Request, §§ 39, 41 and 44.
[8] Exhibits C-16 and C-17.

be exercised by means of a 'motivated act' justifying the reasons for the termination" and that "the administration is bound by the reasons alleged in the 'motivated act'"[9].

144.    Claimant asserts that the only ground identified by Respondents contemporaneously to the termination of the Contracts was the failure to meet their execution deadlines[10], so the other grounds are untimely and therefore inadmissible.

145.    Furthermore, Claimant rejects all of Respondents' arguments that the termination was due to causes attributable to CONTRACTOR.

146.    The Claimant understands that the Contracts were unilaterally terminated for causes not attributable to CONTRACTOR, so the rules of Article 153 of the LCP and Article 191 of the RLCP must be applied. According to the Claimant, and under the aforementioned articles, "when the entity terminates a contract for causes not attributable to CONTRACTOR, the contracting body or entity shall pay to CONTRACTOR: (i) the price of the work actually executed, calculated in accordance with the current budget of the contract; (ii) the price of the materials and equipment acquired by CONTRACTOR to be incorporated to the work; and (iii) a compensation of ten percent (10%) of the value of the not executed works, if the termination occurs when the works have not been started or those that have been executed have a value of less than thirty percent (30%) of the original amount of the contract."[11]

147.    Furthermore, Claimant asserts that "[t]he contemporaneous cause alleged by the party terminating the contract is the one that must be analyzed when assessing the legality or illegality of the termination since, after, a party cannot try to justify the termination based on other reasons or grounds since, in that case, the right of defense of the party defending the inaccuracy of the termination of a contract would be breached"[12].

148.    Claimant contends that PDVSA Petróleo and PDVSA are jointly and severally liable for the acts of termination of the Contracts.

149.    Finally, the Claimant submits that the Respondents should pay interest on the amounts due.

150.    The Claimant requests the arbitral tribunal to[13]:

> (i)    Declare that the Respondents have breached the PIGAP Contract and that the termination was contrary to Venezuelan law and/or the PIGAP Contract;
>
> (ii)    Declare that the Respondents have breached the Carito-Pirital Contract and that the termination was contrary to Venezuelan law and/or the Carito-Pirital Contract;

---

[9] Complaint, § 164, a.
[10] Complaint, §§ 112 and 165.
[11] Complaint, § 105.
[12] Complaint, § 164, c.
[13] Complaint, § 210 and Reply, § 189.

(iii)  Declare that the Respondents are jointly and severally liable for breaches of the Contracts;

(iv)  Declare that the Respondents are to compensate QG for the amounts claimed in the Claim Memorial and Counter-Memorial and order the Respondents to pay QG such amounts;

(v)  Order the Respondents to pay interest on the sums due, pre- and post-award, from the dates and at the corresponding rates until their actual payment;

(vi)  Order the Respondents to pay all costs associated with this arbitration proceeding and the dispute generally, including, without limitation, the costs and fees of ICC and the members of the arbitral tribunal, and the costs and fees of QG's legal and expert representation; and,

(vii)  Grant QG such other relief as the Court deems proper and fair under the circumstances.

### 2. Respondents' Positions and Claims

151.  The Respondents reject all of the Claimant's allegations.

152.  The Respondents state that "making use of the contractually agreed termination mechanisms, it unilaterally terminated the Contracts, without having to indemnify QG for any reason"[14].

153.  Likewise, the Respondents understand that "[t]he termination is not conditioned to any breach by any of the parties, therefore, it is irrelevant for its correct application - as in fact occurred - whether or not the contractual obligations of the parties have been fulfilled"[15].

154.  Subsidiarily, the Respondents assert that QG breached its contractual obligations and that, pursuant to the LCP and the RCLP, nothing should be indemnified to the Claimant.

155.  In particular, the Respondents argue that "QG failed to comply with the term of performance of the Contracts, failed to keep the performance bond and the labor bond in force during the term of the Contracts and failed to deliver the receipt for the advance payment and the advance payment bond within the agreed term"[16].

156.  Furthermore, and in a subsidiary manner in the event that QG is deemed to have complied with all its contractual obligations, the Respondents argue that the arbitral tribunal will never be able to award the compensation requested by the Claimant, since the amount established in the RLCP "represents a maximum limit to the compensation awarded under (sic) that assumption" and that "QG could only be compensated for the amount of the

---

[14] Counter-memorial, § 4.
[15] Counter-memorial, § 4.
[16] Counter-memorial, § 6.

damage effectively demonstrated, and not for an ungrounded amount, under penalty of undue payment or in the event of unjust enrichment "[17].

157.  In the event that the Respondents are convicted, the Respondents understand that "this arbitral tribunal must convict each of the co-respondents only to the extent that they have participated in the execution, performance and termination of the Contracts, and not jointly and severally for the entire amount established as compensation as erroneously requested by QG"[18].

158.  Finally, and in a subsidiary manner in the event of a conviction, the Respondents assert that "this arbitral tribunal must declare the claim made by QG regarding the payment of pre-award interest inadmissible because the amount agreed upon as compensation is illiquid (undetermined) and unenforceable (no expired term) until the award, an amount that, according to Venezuelan law, cannot generate interest until it is liquid and enforceable"[19].

159.  The Respondents request the arbitral tribunal to[20]:

> (i)   Declare the present action inadmissible due to the fact that it did not comply with the previous preliminary proceedings established in the Venezuelan legislation;
>
> (ii)  Declare that PDVSA has validly exercised its right to unilaterally terminate the PIGAP Contract, as provided in clause 5.8.3. of Addendum 1 of the PIGAG Contract, without having to indemnify QG;
>
> (iii) Declare that PDVSA has validly exercised its right to unilaterally terminate the Carito-Pirital Contract, as provided in clause 5.8.4. of that contract, without any compensation to QG;
>
> (iv)  Subsidiarily, declare that PDVSA has validly terminated the PIGAG Contract due to QG's breaches;
>
> (v)   Subsidiarily, declare that PDVSA has validly terminated the Carito-Pirital Contract due to QG's breaches;
>
> (vi)  Subsidiarily, declare that the costs and expenses claimed by QG are not compensable under Venezuelan law;

---

[17] Counter-memorial, § 7.
[18] Counter-memorial, § 8.
[19] Counter-memorial, § 9.
[20] Counter-memorial, § 217.

(vii)  Subsidiarily, declare the compensation requested by QG to be inadmissible since it did not prove the alleged damage or the causal relationship;

(viii) Subsidiarily, and in the event of any compensation, state that PDVSA and PDVSA Petróleo shall be individually liable to the extent that they participated in the execution of the Contracts;

(ix)  Declare inadmissible the request for payment of interest on arrears prior to the award on the amounts that may be condemned;

(x)  Order QG to pay all costs associated with these proceedings, including, without limitation, the costs and fees of the ICC and the members of the arbitral tribunal, and the costs and fees of the legal representation and experts of PDVSA and PDVSA Petróleo.

160.  In their Rejoinder, the Respondents enlarged their request to the arbitral tribunal as follows[21]:

(i)  Declare the present action inadmissible due to the fact that it did not comply with the preliminary proceedings established in Venezuelan law;

(ii)  Declare that the PIGAP Contract and the Carito-Pirital Contract are invalid and, therefore, cannot produce any effect for lack of authorization from the National Assembly;

(iii)  Subsidiarily, declare that QG waived any compensation provided for in the PIGAP Contract and the Carito-Pirital Contract and, consequently, is not entitled to any compensation;

(iv) Subsidiarily, declare that PDVSA has validly exercised its right to unilaterally terminate the PIGAP Contract, as provided in clause 5.8.3. of Addendum 1 of the PIGAG Contract, without having to indemnify QG;

(v)  Subsidiarily, declare that PDVSA has validly exercised its right to unilaterally terminate the Carito-Pirital Contract, as provided in clause 5.8.4. of that contract, without having to indemnify QG;

(vi)  Subsidiarily, declare that PDVSA has validly exercised its right to terminate the PIGAP Contract, as provided in clause 18.1.1. of the PIGAP Contract, and shall only indemnify QG for the causes established in clause 18.1.2. of that contract;

(vii) Subsidiarily, declare that PDVSA has validly exercised its right to unilaterally terminate the Carito-Pirital Contract, as provided in clause 18.1.1. of

---

[21] Rejoinder, § 478.

the PIGAP Contract, and should only indemnify QG for the concepts established in clause 18.1.2. of that contract;

(viii) Subsidiarily, declare that PDVSA has validly terminated the PIGAG Contract due to QG's breaches;

(ix) Subsidiarily, declare that PDVSA has validly terminated the Carito-Pirital Contract due to QG's breaches;

(x) Subsidiarily, declare that the costs and expenses claimed by QG are not indemnifiable under Venezuelan Law and the Contracts;

(xi) Subsidiarily, declare the compensation requested by QG to be inadmissible, since it did not prove the alleged damage or the causal relationship;

(xii) Subsidiarily, in the event of any compensation, state that PDVSA and PDVSA Petróleo shall be individually liable to the extent that they participated in the execution of the Contracts;

(xiii) Subsidiarily, and in the event that there is any type of compensation, declare that the victim's damage provided for in Article 1.189 of the CCV has occurred and, consequently, declare a compensation of faults of at least fifty percent (50%) of the amount that may eventually be agreed upon in the award;

(xiv) Declare inadmissible the request for payment of interest on arrears prior to the award on the amounts that may be condemned;

(xv) Order QG to pay all costs associated with these proceedings, including, without limitation, the costs and fees of the ICC and the members of the arbitral tribunal, and the costs and fees of the legal representation and experts of PDVSA and PDVSA Petróleo.

## V. ANALYSIS

### 1. Introduction

161.    The arbitral tribunal will now proceed to analyze the arguments and positions of the Parties. It should be noted that its analysis is not necessarily organized according to the structure adopted by the Parties, as the arbitral tribunal in its reasoning is not bound by the qualifications proposed by the Claimant and the Respondents.

162.    This could not be otherwise, since Claimant and Respondents qualify certain facts and claims differently. For example, the Claimant understands that the Respondents have introduced three new allegations concerning the admissibility of their claim, whereas the Claimant formally raises only one allegation concerning the admissibility of the claim.

163. The nature of the Claimant's request is clear and consistent, arguing from the outset of the proceedings that the Contracts were improperly terminated. The Respondents' claims and allegations are less linear, having evolved gradually over the course of this arbitration. In essence, the Respondents' claim, set forth in the Terms of Reference and reiterated throughout the proceedings, is that the arbitral tribunal recognize that their right to unilateral termination has been exercised in accordance with the terms of the Contracts.

164. Even so, the legal nature of the Respondents' claim was not to create a new legal situation, but to formally qualify a pre-existing legal situation. In other words, the arbitral tribunal was asked to analyze whether the termination of the Contract constitutes, transversally, the regular exercise of the right to unilateral termination provided for in clauses 5.8.3 of Addendum 1 - PIGAP and 5.8.4 of the Carito-Pirital Contract.

165. It should be noted from the outset that the jurisdictional activity undertaken by this arbitral tribunal in no way resembles a process of review of administrative acts issued by the Venezuelan administration. The nullity of the administrative acts of termination of the Contracts is not at issue here, but rather the liability and the right to compensation derived from the termination of the Contracts. The administrative acts underlying the litigation remain intact, subsisting in their existence, validity and effectiveness until the local administrative instances do not invalidate them. Despite its obviousness, it is worth emphasizing that this arbitral tribunal is not part of the Venezuelan contentious-administrative jurisdiction. Therefore, the remedies granted in this award are primarily contractual in nature, obviously informed by the law applicable to the Contracts.

166. In addition, the arbitral tribunal considers it appropriate to comment in this introduction on two requests made at the end of the proceedings by the Respondents. Specifically, in their Rejoinder, the Respondents requested the arbitral tribunal to declare the Contracts null and void for not having been approved by the National Assembly, as well as to declare that the contractual relations were terminated on the basis of clauses 18.1.1 and 18.1.2 of the Contracts[22].

167. The Claimant objected to the inclusion of these new requests, stating that they "are not included in the objections to jurisdiction incorporated in the Terms of Reference of the Mission Statement and the Respondents never requested the authorization of the Arbitral tribunal to raise the New Objections in terms of Article 23(4) of the ICC Rules"[23].

168. The arbitral tribunal considers that these new requests are flagrantly outside the terms of the Rules. Article 23(4) of the Rules provides that "no party shall make new claims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the arbitral tribunal, which shall consider the nature of the new claim, the stage of the arbitral proceedings and other relevant circumstances". The Respondents' requests for nullity and termination of the Contracts are not merely defensive allegations, but two new

---

[22] Rejoinder, § 478 (ii)(vi)(vii); Respondent PHB, § 134 (ii)(vi)(vii).
[23] PHB Claimant, § 36 ff.

counterclaims, within the meaning of Article 23(4) of the Rules, formulated outside the scope of the Terms of Reference and without the authorization of the arbitral tribunal being sought. Therefore, these two new claims and their grounds must be rejected and cannot be considered by the arbitral tribunal without violating the very Rules to which the Parties have voluntarily submitted.

169. This award will follow the following structure. Initially, the admissibility of the claim will be addressed before the issue of administrative pretrial. Next, the arbitral tribunal will address the grounds for the termination of the PIGAP and Carito-Pirital Contracts. Once the question of the termination of the Contracts has been addressed, the arbitral tribunal will proceed to the analysis of the legal consequences of the terminations, especially in terms of reimbursement and compensation. Finally, issues relating to the quantification of the compensation due will be addressed.

170. Under the terms of the Arbitration Contracts and the Terms of Reference, the languages of the arbitration are Spanish and English[24]. However, the arbitral tribunal notes that all written and oral submissions of the Parties were made in Spanish. The hearings were conducted in Spanish, the documents in the file are mostly in Spanish, and it was in Spanish that the witnesses and experts were presented and examined. Also, the communication between the arbitral tribunal and the Parties, as well as the documents issued by the arbitral tribunal, including the Partial Award, were in Spanish. There has been a real tacit contract between the Parties to conduct the proceedings in Spanish, which is why the arbitral tribunal has drafted the present award only in Spanish.

171. With the aforementioned structure, the grounds that support this award are presented below.

### 2. The admissibility of the Claim and the Administrative Pre-Trial

A) The Respondents' position "

172. The Respondents argue that QG failed to exhaust the prior administrative procedure established in the Organic Law of the Attorney General's Office of the Republic (the **"LOPGR"**), according to which "those who intend to file patrimonial claims against the Republic must express such will to the body to which the matter corresponds and follow the procedure set forth in those rules "[25].

173. The Respondents argue that the arbitral tribunal has only ruled on the admissibility objection based on the Contracts, but believe that the arbitral tribunal has yet to rule on the admissibility of the Claim in the absence of exhaustion of prior administrative remedies under Venezuelan law.

174. Respondents deny that they have expressly or tacitly waived this objection, since, Respondents argue, the LOPGR rules are not available. In fact, it is Respondents' position

---

[24] Mission Statement§ 99.
[25] Counter-memorial, § 26.

that the "administrative pre-trial" provided for in the LOPGR is of public order and that Venezuelan law does not establish exceptions in this regard in favor of arbitral tribunals[26].

175.   Thus, the Respondents assert that "in accordance with Venezuelan law, the present action should be declared inadmissible because the appellant has not exhausted the aforementioned prior administrative procedure"[27].

B) Claimant's position

176.   Claimant understands that the jurisdiction and admissibility phase has been exhausted and is now in the merits and quantification phase. Furthermore, the Claimant asserts that, pursuant to the Award on Jurisdiction, the arbitral tribunal confirmed the admissibility of the Claim[28].

177.   Furthermore, the Claimant notes that Articles 56 to 62 of the LOPGR, originally quoted by the Respondents, deal with "Personnel of the Office of the Attorney General of the Republic" and not with prior administrative proceedings[29]. On the other hand, the Claimant understands that, if the Respondents were referring to the process provided for in Articles 68 to 74 of the LOPGR in force, the alleged "administrative pre-trial" would only apply to claims of patrimonial content processed before the contentious-administrative jurisdiction and not in an arbitration proceeding[30].

178.   Since arbitral tribunals are not part of the Venezuelan contentious-administrative system, the Claimant asserts that arbitral jurisdiction is not subject to the requirement of exhaustion of the prior administrative procedure established in Venezuelan law[31].

C) The Tribunal's analysis

179.   Arbitration is certainly more flexible than judicial proceedings and is not subject to a rigid and formalistic preclusive regime. However, this does not mean that the arbitral tribunal can dispense with its use, especially if it is taken into account that the Partial Award is vested with obvious preclusive effects.

180.   It should be borne in mind that the principle of the proper administration of justice imposes on the arbitral tribunal and the Parties the duty to conduct the proceedings in an "expeditious and cost-effective" manner, as provided for in the Rules[32], in full accordance

---

[26] Rejoinder, § 10, 13 and 19.
[27] Counter-memorial, § 30.
[28] Reply, § 9.
[29] Reply, § 13 and note 14.
[30] Reply, § 14.
[31] Reply, §§ 15-16.
[32] Cf. Article 22(1) of the Rules.

with modern arbitration law[33]. Preclusion, an instrument widely used by different legal systems around the world, serves to give effect to this principle. In fact, the preclusive effect guarantees the overcoming of matters already analyzed and decided, allowing the procedure to advance towards the final resolution on the merits. Not only this. Consistently, the Rules presume "that a party who proceeds with the arbitration without objecting to a failure to comply with any of the provisions of the Rules, any other rules applicable to the proceedings, any direction of the arbitral tribunal or any provision contained in the arbitration contract relating to the constitution of the arbitral tribunal or the conduct of the proceedings, has waived its right to object"[34]. Certainly, this provision of the Rules does not constitute a special feature. On the contrary, it is part of the usual trend in arbitration law. Thus, the right of place of this arbitration expressly provides that "a party which knowingly and without legitimate reason fails to object to an irregularity before the arbitral tribunal in a timely manner shall be deemed to have waived the right to avail itself to such irregularity"[35].

181.    The preliminary phase, which resulted in the Partial Award of May 24, 2022, was devoted to addressing both jurisdictional and admissibility issues. As expressly stated in the Partial Award, this arbitral tribunal "decided that the arbitration proceedings would be divided into two phases: one to discuss exclusively the jurisdiction of the arbitral tribunal and the admissibility of the arbitration claim, and another - depending on the outcome of the first phase - related to the merits and the quantification of damages"[36].

182.    In this context, and in view of the efficient conduct of the proceedings, nothing could be more reasonable than to expect that all issues relating to jurisdiction and admissibility would be fully addressed at the preliminary stage. With this understanding, the Claimant is correct in asserting that "the Respondents have had ample opportunity to present and substantiate their admissibility defenses" and that "[s]uch is the case that - upon the Respondents' request - the arbitral tribunal instituted the divison of the proceeding in order to deal with questions of jurisdiction and admissibility at a separate and exclusive state for that purpose"[37].

183.    In fact, in the preliminary phase, even the Jurisdiction and Admissibility Hearing was held, with two days devoted to discussing the jurisdiction of the arbitral tribunal and the admissibility of the claim in depth. On that occasion, the Respondents did not even make use of all the time allotted to them by the arbitral tribunal at that Hearing, which shows that they had exhausted their arguments regarding jurisdiction and admissibility in this proceeding. It is surprising that, after the phase devoted to discussions on jurisdiction and admissibility, the Respondents raise a new objection regarding the admissibility of the

---

[33] Cf., for example, Article 1464, 3rd paragraph, of the French Code of Civil Procedure.
[34] Cf. Article 40 of the Rules.
[35] Cf. Article 1466 of the French Code of Civil Procedure [free translation].
[36] Partial Award, § 19.
[37] PHB Claimant, § 37.

claim. Evidently, the issue has already been decided and overcome, i.e., it is a precluded matter.

184.   Of course, considering the broad powers of the arbitral tribunal in the conduct of the proceedings[38], the preclusion operated by the Partial Award could be modulated or attenuated in exceptional and justifiable circumstances. This would be the case if new facts relating to jurisdiction and admissibility were to come to the attention of the Parties in a supervening manner. However, the objection raised by the Respondents regarding the administrative pre-trial does not fall within this hypothesis. The Respondents could have raised such an objection at the preliminary stage of these proceedings, as they were well aware of the alleged fact at the time this arbitration was initiated. Indeed, it cannot even be thought that, in the first phase, the Respondents preferred to focus on jurisdictional objections without paying specific attention to the admissibility of the claim. On the contrary, the Respondents raised from the outset an admissibility objection relating to the alleged breach of a condition precedent that would be provided for in the arbitration contract[39]. The question of admissibility now invoked was neither expressly suggested nor reserved in general terms in the first phase of these proceedings.

185.   Moreover, Respondents offer no argument to explain the untimely filing of this objection, merely resorting to Venezuelan public policy as a means to avoid issue preclusion. Specifically, the Respondents assert that "[t]he requirement of admissibility of the administrative preliminary hearing is of public policy, therefore, it is unavailable and not waivable by the parties and by the Tribunal"[40]. However, it is not clear why public administrative procedural provisions of Venezuelan law would apply to the analysis of the admissibility of the claim in a Paris-based international arbitration.

186.   On the one hand, it should be recalled that the arbitral tribunal determined in its Partial Award that French law is the law applicable to the Arbitration Contracts[41]. In fact, the arbitral tribunal considered that "the common will of the Parties in establishing the arbitration clause invokes as a basis for the jurisdiction of the arbitral tribunal was to provide reliability, eliminating any kind of uncertainty related to the resolution of eventual disputes that might arise in the execution of the Contracts" and that "[e]verything indicates that the Parties decided that for this purpose France, which is unanimously considered as a State openly in favor of arbitration should be the country of arbitration and that the arbitration should be conducted under universally recognized Rules such as those of the ICC"[42].

187.   On the other hand, it is important to note that, in the absence of any stipulation to the contrary by the Parties, the law applicable to procedural matters not expressly governed by the Rules and other procedural provisions agreed by the Parties is that of the place, again

---

[38] Cf. Article 22(2) of the Regulations; Article 1509 of the French Code of Civil Procedure
[39] Memorial on Jurisdiction, §§ 24-34.

[41] Partial Award, §§ 144-161.
[42] Partial Award §§ 159

French law. Thus, it is observed that French law is apt to govern all dimensions relating to the admissibility requirements of the arbitration claim, whether these requirements concern the arbitration procedure or the consent of the Parties. In other words, neither the LOPGR nor Venezuelan substantive law is applicable with respect to the admissibility of this arbitration.

188.   Note once again that the Venezuelan administrative jurisdiction and the international arbitral jurisdiction are two distinct and independent instances, so it is not necessary to address issues of Venezuelan administrative law in the admissibility of an arbitration claim filed in an international arbitration with place in Paris. It is worth noting that French law has no rule, either ordinary or public policy, which imposes as a requirement for the admissibility of an arbitration claim the exhaustion of any administrative instance, local or foreign.

189.   In view of the foregoing, the arbitral tribunal rejects the claim that the arbitration claim is inadmissible for not having been the subject of an administrative preliminary proceeding provided for in the LOPGR.

### 3. Termination of the Contracts

A) The position of the Claimant

190.   The Claimant argues that the Respondents terminated the Contracts based on a non-existent ground, such as the breach of the term. From Claimant's perspective, the contractual breaches were not attributable to QG but to PDVSA, emphasizing that Respondents, in violation of the Contracts, failed to disburse the advances due. As a consequence of this, the Initiation Contracts were never signed and the execution terms of the Contracts never started to run[43].

191.   For the Claimant, the advance payment of the Contract was indeed due, since it is provided for in the Addendum 1 – PIGAP. This was valid once it was agreed in accordance with Article 128 of the LCP[44]. The Claimant also points out that such contractual modification benefited the Respondents, since it allowed them to gain time to seek means of financing for the PIGAP Contract and protected them from the payment of compensations eventually due[45].

192.   The Claimant also argues for the validity of the advance payment obligation, stating that "aware of the validity of the clause and its adjustment to Venezuelan law, the Respondents try to argue that the same clause of the Carito-Pirital Contract is valid since this condition was agreed from the beginning and therefore does not imply 'an impairment or waiver to the detriment of the Administration in a same contracting'[46]. This is in contrast to the same clause in the PIGAP Contract which would not have been in place from the beginning,

---

[43] Complaint, §§ 116 and 122.
[44] Reply § 46.
[45] Reply, § 50.
[46] Reply, § 51

but only since the aforementioned contractual modification reported in Addendum 1 - PIGAP.

193.  Likewise, the Claimant rejects the argument that the commencement of the works could not be conditioned to the payment of the advance payment because the exception of non-performance of the contract would not apply to administrative contracts. The Claimant understands that the unfulfilled contract exception has nothing to do with the present dispute[47]. In any event, Claimant asserts that Respondents' allegation of breach that QG was required to perform the Contracts with its own funds is contrary to the terms of the Contracts[48].

194.  As to the PIGAP Contract bonds, the Claimant alleges that it had submitted them on December 12, 2017, as well as it had submitted the advance payment receipt on December 7, 2017 and then on February 9, 2018[49].

195.  Regarding the bond and receipt of the advance payment of the Carito-Pirital Contract Claimant alleges that it had submitted them on July 20, 2017[50]. On the other hand, the labor liability and performance bonds had been filed by the Claimant since January 2017[51].

196.  In addition, Claimant notes that the Contracts provided for a specific exception regarding the non-presentation of performance or labor liability bonds, i.e., that these documents could be substituted for withholdings in the payments made to Claimant[52].

197.  The Claimant points out that "even if *arguendo* were taken as *dies a quo* the date of signature of the Contract (January 24, 2017) the contractual term would end on February 23, 2019", i.e. "170 days after the date (September 6, 2018) on which the Respondents notified the Letter of Termination of the Carito-Pirital Contract"[53].

198.  The Claimant asserts that it is not possible *a posteriori* to justify a contractual termination with reasons that were not raised at the time of termination, under penalty of nullity of the termination[54]. In support of its position, the Claimant refers to the principle of ample defense, Article 156 of the LCP and the case law of the Political-Constitutional Chamber of the Supreme Court of Justice[55].

199.  Claimant rejects the argument that Respondents made use of clauses 5.8.3 and 5.8.4 respectively of Addendum 1 - PIGAP and Carito-Pirital Contracts, considering that this is an *ex post facto* theory.

---

[47] Reply, §§ 48,54
[48] Reply, § 56.
[49] Reply, § 59.
[50] Complaint, § 46.
[51] Reply §69
[52] Reply, §§ 58 and 71.
[53] Complaint, § 126.
[54] Complaint, § 108
[55] Badell Report, §§62 et seq.

200. In fact, Claimant understands that this explanation "even appears to be contradictory to what is defended by its own witness Mr. Luis Vielma, who suggests that his understanding is that the termination of the Contracts was due to the delay in the delivery of the necessary documents to manage the payment of the advance"[56].

201. Claimant notes that neither Administrative Ruling No. 001[57] dated October 9, 2018, regarding the PIGAP Contract, nor Administrative Ruling No. 002[58] dated October 9, 2018, regarding the Carito-Pirital Contract, which gave effect to the termination of the Contracts, made reference to clauses 5.8.3 of the PIGAP Contract or 5.8.4 of the Carito-Pirital Contract. The two letters sent on August 31, 2018[59], notifying of the initiation of the termination process of the Contract based on Articles 155 of the LCP and 193 of the RLCP, also made no reference to such clauses.

202. Claimant also argues that Respondents failed to comply cumulatively with the conditions set forth in clauses 5.8.3 and 5.8.4, in addition to failing to observe their duty to give prior written notice of the exercise of the right of unilateral termination under such clauses.

203. According to Claimant, "[t]he notice obviously had to refer to the clause and the factual assumption"[60], noting that the communications sent were intended to terminate the Contracts on other grounds and expressly supported by different legal provisions.

204. Furthermore, Claimant contends that clauses 5.8.3 and 5.8.4 established as a condition for the exercise of the prerogative of unilateral termination that the terms set forth were not extended by mutual contract of the contracting parties. From the perspective of the Claimant, the mutually agreed extension of the term and waiver of the exercise of this termination right was materialized with the signing of addenda adjusting the Contracts to the financing obtained from BSJI[61].

205. Furthermore, Claimant argues that such clauses could not be invoked in the event that the conditions foreseen were attributable to the party invoking them[62]. Furthermore, the Claimant argues that even in the case of termination under clauses 5.8.3 and 5.8.4 there would also be a scenario of termination for causes not attributable to QG[63].

---

[56] Reply, §28
[57] From-16
[58] From-17.
[59] From-14 and D-49
[60] Reply, § 36.
[61] Reply, § 37.
[62] Reply, § 38.
[63] Reply, § 39.

B) The Respondents' position

206.  The Respondents' position is that the Claimant failed to execute the Contracts in due time, to maintain in force the bonds stipulated in the Contracts, and to deliver the necessary documents for the payment of the advances[64].

207.  Furthermore, the Respondents argue that no advance payment[65] was agreed in the PIGAP Contract, since the first clause of Addendum 1 - PIGAP was invalid. The invalidity of such clause would be the result of the Respondents' inability to waive their exorbitant prerogatives under Venezuelan administrative law[66]. Thus, the execution of the PIGAP Contract was under the same regime established in the initial contract[67].

208.  Respondents point out that Claimant began executing the Contracts despite not receiving any advance payment, which would entail certain legal consequences: (i) an acknowledgment that its failure to execute the non-execution of the Contract may not be opposed or waive its prerogative, (ii) QG waives the conditions precedent established in its favor, and (iii) it gives rise to its obligation to perform the Contract with its own funds[68].

209.  With respect to the PIGAP Contract, Respondents assert that its clause 6.1 established that the term for the execution of the works would be four hundred and forty-five days from the "effective date". That initial term, according to the Respondents, would be understood as the date of the day on which the contract was signed, i.e., November 27, 2014[69].

210.  In fact, Respondents' understanding is that "QG had the obligation to perform its contractual obligations even if PDVSA Petróleo had not made any payment[70], given the "prerogative of the State and its Enterprises - in this case PDVSA Petróleo - that the exception of non-performance of the contract or non adimpleti contractus is not enforceable against it"[71]

211.  Respondents acknowledge that they received on December 12, 2017 the bond and the receipt of the advance payment in respect of the PIGAP Contract, but note that this occurred more than three years after the signing of the contract and 9 months after the effective date of the BSJI financing contract[72].

---

[64] Counter-memorial, § 70.
[65] Counter-memorial, §§ 81-83.
[66] Counter-memorial, § 98.
[67] Counter-memorial, § 101.
[68] Counter-memorial, §§ 107-110 and 130-133.
[69] Counter-memorial, §§ 78 to 80.
[70] Counter-memorial, §§ 85
[71] Counter-memorial, §§ 85
[72] Counter-memorial § 117.

212.    Respondents also acknowledge that on July 20, 2017 they received the bond and receipt of the advance payment related to the Carito-Pirital Contract, but note that this occurred more than three months after the signing of the BSJI financing contract[73].

213.    The Respondents argue that "since the Minute of Commencement was never signed, the Performance Bonds and the Labor Bond posted by QG never became effective, contrary to the provisions of the Carito-Pirital Contract regarding the effectiveness of the Bonds, and in violation of the prohibition to make the effectiveness of the bonds dependent on any condition"[74].

214.    According to the Respondents, the Claimant was negligent in failing to maintain in force the labor liability and performance bonds, which could cause the termination of the Contracts under clauses 18.2.3 of the PIGAP Contract and 18.4.2 of the Carito-Pirital Contract[75].

215.    The Respondents reject that the legality of the termination of the Contracts should be analyzed based on the grounds alleged contemporaneously to the termination, since that rule would only apply to proceedings for the nullity of administrative acts and not to disputes of a contractual nature. According to the Respondents, the arbitral tribunal may analyze all circumstances relating to the termination of the Contracts, especially issues relating to their performance or non-performance[76].

216.    Respondents understand that QG assumed the risks of contracting with PDVSA Petroleum, since the Claimant "was aware of the potential political, economic and access to international financing sources problems" affecting PDVSA Petroleum[77]. In particular, it is Respondents' position that clauses 5.8.3 of the PIGAP Contract and 5.8.4 of the Carito-Pirital Contract were established as a way to prevent the risks of breach of the Contracts[78].

217.    According to Respondents, clauses 5.8.3 of Addendum 1 - PIGAP and 5.8.4 of the Carito-Pirital Contract provided that either party could unilaterally terminate the Contracts if one of two conditions alternatively occurred, i.e., failure to make the financing or to disburse the advance payment within twelve months after the effective date[79].

218.    With respect to the PIGAP Contract, the Respondents assert that the "effective date" for the computation of the term set forth in clause 5.8.3 of Addendum 1 - PIGAP "occurred on July 28, 2015 - date of the signature of the Addendum to the PIGAP Contract" and that "as of July 28, 2016 the contract could be terminated, by either party - not only by the

---

[73] Counter-memorial, § 137.
[74] Counter-memorial, § 142.
[75] Counter-memorial, §§ 119 y 121.
[76] Counter-memorial, § 71-74.
[77] Counter-memorial, §§ 34 y 41.
[78] Counter-memorial, §§ 36 y 43.
[79] Counter-memorial, § 38 y 45.

Respondents - by virtue of the fulfillment of the condition referring to the lack of the first disbursement and payment of the advance payment"[80].

219.   The Respondents allege that the "effective date" for the computation of the term set forth in clause 5.8.4 of the Carito-Pirital Contract" was January 24, 2017 - the date of its execution - and the fulfillment of the term set forth in clause 5.8.4 occurred on January 24, 2018."

220.   Likewise, the Respondents understand that, in administrative contracts, such as the PIGAP Contract and the Carito-Pirital Contract, the legal and exorbitant prerogatives are established for the benefit of the State and its companies, not for the benefit of individuals[81]. Moreover, individuals have the power to dispose of their economic rights and establish a "special advantage" in favor of the State; it is under this understanding that the Respondents consider that clauses 5.8.3 and 5.8.4 constitute a "special advantage"[82].

221.   As to the exercise of their alleged unilateral right of termination, the Respondents argue that the written notice of intent to terminate the Contracts did not need to state the grounds for termination[83]. Furthermore, the Respondents point out that the need for a procedure, or to allege and prove the breach in order for the termination to be valid, was never agreed upon. In Respondents' view, even if it were not mandatory, the administrative process for the termination of the Contracts demonstrates "an excess of PDVSA's guaranteeing"[84].

222.   Therefore, the disbursement of the advance payment not having occurred, the Respondents claim that they regularly exercised their right of unilateral termination, since they sent the email dated September 6, 2018 expressing their will to terminate the Contracts in accordance with clauses 5.8.3 and 5.8.4[85], the grounds for termination being irrelevant[86].

C) The analysis of the Tribunal

223.   The present arbitration concerns two contracts entered into between the Parties, namely the PIGAP Contract and the Carito-Pirital Contract, signed respectively in 2014 and 2017. The first one contemplated the construction of "all the surface facilities of a high pressure gas compressor plant" [87] and the second one the execution of the "engineering,

---

[80] Counter-memorial, § 39.
[81] Counter-memorial, § 48.
[82] Counter-memorial, §§ 54-55.
[83] Counter-memorial, § 58.
[84] Counter-memorial, § 64-65.
[85] See De-50
[86] Counter-memorial, §§ 60 y 62.
[87] Cf. Clause 3 of the PIGAP Contract, De-1, p. 12.

procurement, supply and construction of two (02) compressor plants in the areas of Carito and Pirital"[88].

224.   It is an undisputed fact that the Contracts were unilaterally terminated by the Respondents. The dispute before the arbitral tribunal is whether the unilateral termination was properly effected and to whom the facts giving rise to the unilateral termination should be attributed.

225.   Claimant and Respondents present diametrically opposed positions regarding the grounds for termination of the PIGAP and Carito-Pirital Contracts. On the one hand, the Claimant contends that the Contracts were unilaterally terminated for causes not attributable to QG, arguing that any late submission of documents and delays in the execution of the Contracts are attributable to the Respondents. On the other hand, the Respondents allege that they only used the means of termination provided for in the Contracts, all in accordance with the applicable law.

226.   There are some factors that complicate the analysis to be performed by the arbitral tribunal. In particular, the Parties build their arguments on different bases. For the Claimant, the termination of the contract must be analyzed on the basis of the causes alleged at the time of their termination. On the other hand, the Respondents do not limit themselves to the causes alleged at the time of the termination of the contract, but have raised new hypotheses in the Arbitration that would validate the unilateral termination as it was carried out. Thus, the Respondents request, on the one hand, a declaration that the Contracts have been terminated in exercise of their right of unilateral termination provided for in clauses 5.8.3[89] of Addendum 1 - PIGAP and 5.8. 4[90] of the Carito-Pirital Contract[91] and, on the other hand, declare that the Contracts were terminated due to contractual breaches attributable to the Claimant[92].

227.   The Contracts were terminated by Administrative Rulings No. 001 and 002 dated October 9, 2018, issued by PDVSA[93]. There is no controversy in this regard. In these documents reference was made to the untimely presentation of the advance payment bond, the failure

---

[88] Cf. Clause 3 of the Carito-Pirital Contract, From-2, p. 10.
[89] Clause 5.8.3 of Addendum 1 - PIGAP states the following: "In the event tha the COMMERCIAL FINANCING does not materialize In the event that the COMMERCIAL FINANCING does not materialize and/or the first disbursement under the COMMERCIAL FINANCING and payment of the ADVANCE PAYMENT does not occur within twelve (12) months after the EFFECTIVE DATE, either PARTY may terminate this CONTRACT by giving prior written notice to the other PARTY, unless this term is extended by mutual agreement between them, without the PARTY deciding for the termination having any liability to the other PARTY for damages, indemnities, penalties and/or lost profits; likewise no amount being due to the other PARTY by reason of the termination provided for in this clause". Cf. From-6, p. 8.
[90] Clause 5.8.4 of the Carito-Pirital Contract has the same wording as Clause 5.8.3 of Addendum 1 - PIGAP. Cf. From-2, p. 16.
[91] Mission Statement, § 89(a)(b); Counter-memorial, § 217 (ii)(iii); Rejoinder, §478 (iv)(v); Respondent PHB, §134 (iv)(v).
[92] Mission Statement, § 89,(d); Counter-memorial, §§ 217 (iv)(v); Pleading, §478 (viii)(ix); PHB Respondents, §134 (viii)(ix).
[93] See From-16 and From-17

to comply with the contract execution terms and the failure to maintain the validity of the performance and labor bonds as grounds for the termination of the contracts. In this regard, the two administrative orders were based on clause 18.2.3 of the Contracts[94], on Articles 145[95] and 155[96] of the LCP and on Article 193[97] of the RLCP, that is, on the hypothesis of unilateral termination attributable to CONTRACTOR[98].

228.  Although the Parties have spent a lot of energy on the discussion of the binding force of the grounds conveyed in the administrative rulings, this arbitral tribunal does not understand its mandate in those terms. The arbitration jurisdiction was not instituted to define whether the grounds of an administrative act are binding; nor is its mandate to review administrative acts. The mission of the arbitral tribunal is to analyze a the time-limited contractual situation, i.e., the termination of the contract. Therefore, it must look at all relevant facts relating to the Parties' claims.

---

[94] Clause 18.2.3 of the Contracts establishes an exemplary list of causes for termination attributable to the Contractor. Due to a numbering error, in the Carito-Pirital Contract the list in question is stipulated from clause 18.3 to clause 18.5. The termination of the Contracts was based on two hypotheses. On the one hand, paragraph "b" of clause 18.2.3 of the PIGAP Contract and clause 18. 4 of the Carito-Pirital Contract provided that these could be terminated "[w]hen CONTRACTOR executes or has executed the WORK without complying with the stipulations of this CONTRACT, or when it executes the WORK without complying with the EXECUTION SCHEDULE, in such a way as to prevent the completion of the WORK or the conclusion of the PROJECT, within the term stipulated in Clause 6 (TIME FOR EXECUTION AND TERM) of this CONTRACT". On the other hand, letter "d" of clause 18.2.3 of the PIGAP Contract and clause 18.4.2. of the Carito-Pirital Contract provided that these could be terminated "[w]hen [the Contractor] does not present or maintain in force the insurance policies contemplated in Clause 19 (INSURANCE POLICIES) and Clause 20 (LABOR AND FIDEL PERFORMANCE BONDS) of this CONTRACT, with the exception of the provisions of Clause 20.2.5. See respectively From-1, p. 40 and From-2, pp. 45-46.

[95] Article 145 of the LCP provides as follows: "Contracting party shall ensure compliance with the obligations of contractor, in particular the date of delivery of the execution of the works, which must be recorded in order to support the administrative closing of the contract. This provision is also applicable in cases of supply of goods and provision of services. The contract may be terminated for: 1. Compliance with the purpose of the contract. 2. Unilateral termination due to causes not attributable to the contractor. 3. Termination by mutual agreement. Termination for cause attributable to the contractor". Cf. DeL-29, p. 44.

[96] Article 155 of the LCP provides as follows: "The contracting party, after substantiation of the corresponding administrative procedure, respecting due process and guaranteeing the right to defense, may unilaterally terminate the contract at any time, when the contractor: 1. Executes the works in disagreement with the contract, or performs them in such a manner that it is not possible for him to comply with their execution within the term indicated. 2. Agrees to the dissolution or liquidation of his company, or requests that be declared judicially in arrears or bankrupt, or when any of these circumstances has been judicially declared. 3. Assigns or transfers the contract without the prior written authorization of the contracting party. 4. Failure to begin the execution of the work in accordance with the term established in the contract or in its extension, if any. 5. Substantial errors or omissions during the execution of the contract. 6. Non-compliance of Contractor with its labor obligations during the execution of the contract. 7. Obtaining of contract through influence peddling, bribery, provision of false information or documents, extortion, commissions or gifts, or use of such means to obtain benefits under the contract, provided that this is proven through the administrative or judicial investigation carried out for such purpose. 8. Incur in any other fault or breach of the obligations established in the contract, in the judgment of the contractor. 9. Failure to keep a resident engineer in charge of the work in accordance with the provisions of this Decree with Rank, Value and Force of Law. The provisions of paragraphs 1 to 8 of this article are also applicable in cases of supply of goods and provision of services". Cf. DeL-29, p. 45.

[97] Article 193 of the RLCP establishes the following: "When the contracting body or entity decides to unilaterally terminate the contract because  Contractor has incurred in any or some of the causes indicated in the Public Contracting Law, the provisions of these Regulations and those established in the contract, it shall notify the Contractor, the guarantors and assignees, if any, in writing". Cf. DeL-28, p. 43.

[98] See From-16,pp. 5-8; From-17,pp 5-8

229.    In other words, it is up to this arbitral tribunal to assess to what extent the facts that gave rise to the termination of the Contracts fall within the contractual and legal hypotheses articulated by the Parties, as well as to assess whether the acts of termination were carried out in accordance with the provisions of the Contracts and the law or in violation of them or of the law.

230.    This is what will be done in the following points.

   *a)   The disbursement of the advance payment and the unilateral right of termination provided for in clauses 5.8.3 of Addendum 1 - PIGAP and 5.8.4 of the Carito-Pirital Contract.*

231.    The execution of the Contracts, including their payment terms, has always been linked to obtaining commercial financing[99]. This was obtained from BSJI in 2017; the financing contract itself was signed specifically on April 6, 2017[100]. The PIGAP Contract was subject to two amendments to adjust it to the conditions of the bank loan, namely Addendum 1 - PIGAP and Addendum 2 - PIGAP. The Carito-Pirital Contract was amended once in order to adjust it to the financing agreed by BSJI, as can be seen in Addendum 1 - Carito-Pirital.

232.    It is not controversial that, from its inception, the Carito-Pirital Contract provided for the disbursement of an advance payment of 10% of the dollar value stipulated for the acquisition of materials and equipment[101]. In fact, clause 5.8.7 established that the disbursement of the advance payment was to be paid with commercial financing funds, in dollars, which would be amortized by deducting 10% of the value of each invoice presented in dollars[102]. Finally, the same clause established that, "immediately after the closing of the commercial financing", CONTRACTOR should present the receipt of the advance payment[103].
 Addendum 1 - Carito-Pirital kept the wording of the clause 5.8.7 essentially with no amendments.

233.    Such a provision did not originally exist in the PIGAP Contract, but was subsequently included in clause 2 of Addendum 1 - PIGAP. The amendment in question deleted clause 5.7.4 of the original contract and added, among others, clause 5.8.6[104]. The new contractual provision had been drafted in similar terms to clause 5.8.7 of the Carito-Pirital Contract, with only two points of difference. First, clause 5.8.6 of Addendum 1 - PIGAP provided for a nominal value of seventy million dollars for the disbursement of the advance. Second,

---

[99] See clause 5.7.4 of the PIGAP Contract, From-1, p. 16; and clause 5.8 of the Carito-Pirital Contract, De-2, p. 10.
[100] De-3.
[101] De-2, p. 17.
[102] De-2, p. 17.
[103] De-2, p. 17.
[104] De-6, p. 10.

the reimbursement was to be made on the basis of a deduction of 2-% of the value of each invoice payable in US dollars[105].

234.   Addendum 2 - PIGAP, which detailed the relation between the main contract and the commercial financing contract with BSJI, reiterated the essence of clause 5.8.6 introduced by Addendum 1 - PIGAP. However, certain modifications were introduced, especially with respect to the amount of the advance payment. Thus, instead of a nominal value, Addendum 2 - PIGAP stipulated that the amount of the advance payment should total 15% of the dollar amount related to the acquisition of materials and equipment.

235.   That said, it should be noted that the Respondents argue that the PIGAP Contract does not establish any obligation with respect to the disbursement of the advance payment. The argument is based on a superficial interpretation of the original terms of the PIGAP Contract[106]. The Respondents allege that the first clause of Addendum 1 - PIGAP is invalid because it violates the State's exorbitant prerogatives[107].

236.   This thesis will be the subject of a detailed analysis below[108], but it is appropriate to emphasize at this point that the aforementioned allegation was the only challenge presented as to the validity of the amendments to the PIGAP Contract. Therefore, it must be assumed that all other clauses of Addendum 1 - PIGAP and Addendum 2 - PIGAP are recognized as valid by the Respondents. In fact, the Respondents themselves state in their Counter-memorial that their claims regarding the nullity of Addendum 1 - PIGAP are limited to its first clause[109].

237.   It should be recalled once again that the obligation to pay the advance payment was introduced in the PIGAP Contract by the second clause of Addendum 1 - PIGAP, reiterated with modifications, as seen above, by the third clause of Addendum 2 - PIGAP. The first clause of Addendum 1 - PIGAP, on the other hand, only made terminological modifications with respect to certain definitions of the PIGAP Contract. Through this clause, the Parties modified the definition of "effective date" and "commencement date", in addition to including definitions for the terms "bank", "joint account", "loan contract", "commercial financing", "lender" and "contract price"[110]. In summary, the first clause of Addendum 1 - PIGAP has nothing to do with the advance payment obligation. Consequently, considering the text of the amendments analyzed above, the argument that the PIGAP Contract did not provide for the obligation to disburse the advance payment cannot be sustained from a logical point of view.

238.   However, the obligation to disburse the advance payment did exist, since it was validly and voluntarily agreed to by the Parties under the second clause of Addendum 1-PIGAP and

---

[105] De-6, p. 10.
[106] Counter-memorial, § 81.
[107] Counter-memorial, §§ 94 et seq.
[108] Cf. §§ 262 et seq.
[109] Rejoinder, §101
[110] Cf. From-6.

third of Addendum 2 - PIGAP. What did not exist, as it does not exist, is a prohibition under the LCP with respect to the validity of these clauses. On the contrary, Article 128 of the LCP expressly allows administrative contracts to stipulate the payment of an advance. In fact, this article provides that "in the executed contracts, an advance payment may be granted, the payment of which shall not be an indispensable condition to begin the supply of the good or service, or the execution of the work, unless the contract establishes the prior payment thereof"[111].

239.    In other words, the arbitral tribunal is not convinced that it is possible to speak of a violation of the State's exorbitant prerogatives, since the law itself authorizes the administration to enter into contracts by granting an advance payment to CONTRACTOR. Thus, in light of the foregoing considerations, the arbitral tribunal understands that the Respondents had the obligation to pay the advance payment both in the Carito Pirital Contract and in the PIGAP Contract.

240.    Having overcome this issue, the conditions for the disbursement of the advance payment provided for in the Contracts must be analyzed. It is an undisputed fact that the delivery of the receipt of the advance payment was a necessary condition for its disbursement. This is acknowledged by the Claimant itself when it states that "[a]t the beginning of July 2017, there were meetings between the Parties to define how the invoice for the advance payment had to be, a document necessary for the disbursement to be made by PDVSA"[112].

241.    The disbursement of the advance payment was also conditioned to the presentation of a bond covering the total amount advanced. Reflecting the legal provision set forth in paragraph 3 of Article 128 of the LCP, the Contracts also stipulated this condition. In fact, clause 20.1.3 of the PIGAP Contract, in its original terms, already stipulated that CONTRACTOR had to submit an advance payment bond covering 100% of the anticipated value in dollars, which should remain in force until the advance payment was repaid in accordance with the terms of the Contract[113]. This provision was reiterated in the fourth clause of Addendum 2 - PIGAP, modifying only the form of repayment of the advance. An essentially identical provision had also been included in clause 20.1.3 of the Carito-Pirital Contract.

242.    The Parties devoted considerable attention in their written submissions to the issue of the submission of documents relating to the disbursement of the advance payment. The subject was also extensively discussed during the Hearing, and was the object of the Messrs. Nielsen[114], Alvim[115] and Vielma questioning[116].

---

[111] DeL-29, p. 41

[112] Complaint, §45.

[113] De-2, p. 54.

[114] Cf. Hearing, Day 1, 2023-01-30-CCI 24306-Audio-Part 5.mp3, 12min20s to 57min03s.

[115] Cf. Hearing, Day 2, 2023-01-31-CCI 24306-Audio-Part 1.mp3, 37min25s to 51min20s.

[116] Cf. Hearing, Day 2, 2023-01-31-CCI 24306-Audio-Part 4.mp3, 41min20s to 2h24min25s.

243.  The positions of the Parties are, once again, opposing and contradictory. The Respondents cling to the arguments relating to the form and timing of the submission of the documents as they do not dispute that such documents were actually submitted.

244.  In summary, the Respondents' position is that the disbursement of the advances could not take place since the documents required for the payment of the advance, namely the advance payment receipt and the advance payment bond, were submitted out of time and in breach of certain formalities. In fact, the Respondents point out that the advance payment receipts of the PIGAP Contract were issued in the amount of 5% of the value of the work and not 15% as agreed. In addition, Respondents also allege that the advance payment bonds were not properly filed.

245.  Mr. Nielsen, who had been the project manager in charge of the Contracts on behalf of QG[117], was asked during the Hearing how he would explain the lower amount recorded in the receipt of the advance payment of the PIGAP Contract. In his response, the witness stated that this modification had been requested by the Respondents and that it would result in a reduction of the amount to be received as an advance payment[118]. According to his testimony, such conduct was consensual between the Parties to allow the execution of the PIGAP Contract. However, at the Court's urging, the witness pointed out that such modifications had been made informally, claiming that it was normal practice to "go in and out of the contract" to execute the work, and that this has to do with a technical dialogue between the engineers[119].

246.  Mr. Nielsen himself, in his first witness statement, informed that the Parties had agreed that the guarantees provided for in the Contracts should be in force only at the time of signing the Minute of Commencement[120]. Corroborating this statement, a minute of the meeting held between the Parties on December 8, 2017 was provided to the file in which this contract was recorded, reading in said document among other things that "PDVSA informs that all bonds and insurances must be in force at the time of signing the project commencement act"[121].

247.  The record contains abundant evidence that the Parties maintained a constant flow of communication and coordination, with numerous messages exchanged on the subject of the documentation required for the disbursement of the advance. On this point, the email of December 8, 2017 sent by Ms. Eimara Pérez, at that time PDVSA's Corporate Legal Affairs Manager, is quite enlightening. Indeed, following a series of communications exchanged between Claimant and Respondents regarding the amount of the advance payment, Ms. Pérez stated that the documents sent by QG had been reviewed and did not comment on any irregularities regarding the advance payment receipts submitted[122].

---

[117] DeT-1, Testimony of Ariel Nielsen, § 15.
[118] Cf. Hearing, Day 1, 2023-01-30-CCI 24306-Audio-Part 5.mp3, 38min29s to 39min45s.
[119] Cf. Hearing, Day 1, 2023-01-30-CCI 24306-Audio-Part 5.mp3, 1h08min55s to 1h14min25s.
[120] DeT-1, Ariel Nielsen Testimony, §44.
[121] See De-42, item 3, p. 3.
[122] De-43.

248.    The Respondents allege that Ms. Eimara Pérez, despite her high hierarchical position, was not empowered to give any approval regarding the amendments to the Contracts. It is true that the Contracts could not be modified orally, which is expressly stipulated in clause 38.3. of both Contracts[123]. Thus, it is clear that Mrs. Perez, through her e-mail message, did not introduce any formal modification to the terms of the contract. However, the arbitral tribunal is not convinced that the contractual relationship between the Parties was based on a rigid contractual formalism, there being numerous moments when the Parties did, in fact, "move in and out" [124] of the Contracts[125]. Ignoring this factual reality by the Parties would constitute a breach of good faith, which in the Tribunal's opinion must always preside over any contractual relationship. Indeed, Article 2 of the LCP enshrines honesty, equality and transparency as guiding principles of administrative contracting, constituting the legal protection of the protection of good faith in contracts entered into between the administration and private parties under Venezuelan law[126]. These principles are true general clauses implicit in any administrative contract entered into under the LCP.

249.    In this regard, and in line with what had been accepted by PDVSA's corporate management, the mails dated February 9, 2018, signed and accepted by Messrs. Luis Becerra and Jesús Mago, respectively project managers of the PIGAP Contract and the Carito-Pirital Contract, provide an important recapitulation of the milestones for the disbursement of the advance payment of the Contracts and indicate that the issue of the advance payment amounts was never questioned[127].

250.    From the analysis of these emails, it can be seen that the Claimant recorded the procedures for the disbursement of the advance payment in the following terms: "As you are aware, since that time, teams from both parties have been processing and negotiating the terms and conditions of the Advance Payment Bond. In this regard: (i) In the above-mentioned response from you dated December 8, 2017, we were advised that your Corporate Legal Affairs Management would review the proposed bond. (ii) On January 12, 2018 we received your communication dated January 9, 2018 requesting certain modifications to the proposed bond. (iii) On January 19, 2018 we sent to you the modified bond following your instructions. (iv) On January 25, 2018 we received a response from you requesting additional modifications to the bond. (v) On January 30, 2018 we sent you a new modified bond following your instructions. (vi) On February 2, 2018 we received your response requesting additional modifications to the bond. (vii) On February 5, 2018 the project managers of both parties met in order to approve in final form the text of the bond

---

[123] De-1, p. 65; De-2, p. 75.
[124] Cf. Hearing, Day 1, 2023-01-30-CCI 24306-Audio-Part 5.mp3, 1h09min00s to 1h15min25s.
[125] See De-42, De-43, De-44, De-45 and From-46.
[126] Article 2 wording is as follows: "The provisions of this Decree with Rank, Value and Force of Law shall be developed respecting the principles of economy, planning, transparency, honesty, efficiency, equality, competition, publicity and simplification of procedures; and shall promote popular participation through any associative form of production". See DeL-29, p. 20.
[127] De-45 and De-46.

including the modifications requested by you. (viii) On February 6, 2018 the final bond was issued under the terms and conditions agreed upon by both parties."[128].

251.  The same emails indicate that the Claimant and the Respondents had had lengthy discussions regarding the filing of the advance payment bond. These messages show that a series of modifications to the bonds submitted by QG had been requested by PDVSA at different times, namely on January 12, 2018, January 19, 2018 and February 2, 2018. In addition, the emails in question also prove that the project managers of each of the Contracts received the final version of the advance payment receipts and advance payment bonds in the terms that had been requested by PDVSA itself.

252.  The Claimant has been able to prove that there was, albeit informally, a well-founded trust regarding the documentation to be submitted for the disbursement of the advance. Furthermore, it has been demonstrated that, acting in good faith and in accordance with such contract, the Parties decided not to strictly comply with the terms of the Contracts. It is true that, by virtue of clauses 38.2[129] and 38.3[130] of the Contracts, such conduct cannot be construed as a waiver of rights on the part of the Respondents or as a formal modification of the contractual relationship. However, it is not a waiver that is at issue here, nor is it a modification of the contractual relationship. The central problem with the above facts is that Respondents' claim is based on a clear example of *venire contra factum proprium*. The proven facts demonstrate that the Respondents acted in clear violation of the guiding principles of the administrative contract, as set forth in Article 2 of the LCP, in particular the principles of honesty and transparency.

253.  It should be emphasized that the Respondents have recognized the normativity of the doctrine of own acts, having referred to it in the following terms: "doctrine and case law have developed the theory of own acts (*venire contra factum proprium no valet*), which assumes that when a person within a legal relationship has created in another person, by his conduct, a trust based on good faith, in a certain future conduct, he must not defraud that trust and any action incompatible with it is inadmissible"[131]. The arbitral tribunal agrees with the Respondents' position on the doctrine of own acts, when they advocate "the prohibition of contradictions and inconsistencies because contradictory conduct is then a contravention of breach good faith duty"[132].

---

[128] De-45 and De-46.

[129] Clause 38.2. of the Contracts stipulates the following: "If on one or more occasions, THE COMPANY shall fail to require strict performance of any of the provisions of this CONTRACT or shall fail to avail itself of any options or rights provided for in this CONTRACT or by law, this shall not be construed as a waiver on its part of such provisions, options or rights, or of the other provisions of this CONTRACT." See De-1, p. 65; De-2, p. 75.

[130] Clause 38.3 of the Contracts provides as follows: "This CONTRACT may not be modified by any verbal commitment or otherwise, except in writing, signed by the legal representatives of the PARTIES duly accredited for such purpose in Venezuela, and in accordance with the laws of Venezuela." See, De-1, pp. 65-66; De-2, p. 75.

[131] Respondents' Supplemental Brief, §57.

[132] Respondents' Supplemental Brief, §57.

254.    The Respondents' behavior with respect to the termination of the Contracts must be considered as such. After lengthy negotiations, the Respondents induced the Claimant to accept a smaller advance payment, forcing it repeatedly to adjust the documents relating to its disbursement. They then decided to terminate the Contracts on the grounds, inter alia, that Claimant had failed to timely deposit, in accordance with the terms of the Contracts, the receipts and bonds for the advance payment[133]. This action is undeniably contradictory and violates outright the situation of well-founded trust in which the Claimant found itself.

255.    Even more contradictory is the claim that, more than four years after the order terminating the Contracts was issued, the arbitral tribunal ignores the reasons set forth in those documents. The Respondents' thesis is that, despite the reasons stated in the administrative orders, the real reasons for the termination of the Contracts would be the exercise of the right of unilateral termination provided for in clauses 5.8.3 of Addendum 1 - PIGAP and 5.8.4 of the Carito-Pirital Contract. If these allegations reflect what actually happened, we would be in the presence of an express admission that the motivation of the administrative rulings was false and that the reasons for the termination of the Contracts were deliberately concealed. In other words, if the Respondents' arguments are accepted, this conduct would represent an even more evident violation of the principles of honesty and transparency stipulated in Article 2 of the LCP.

256.    Consequently, the arbitral tribunal considers that the claim that the Contracts were terminated based on the right of unilateral termination provided for in clauses 5.8.3 of Addendum 1 - PIGAP and 5.8.4 of the Carito-Pirital Contract is inadmissible.

257.    The situation is even clearer when it is verified that, under the terms of the analyzed clauses, the termination must be preceded by a "prior written notice to the other party"[134]. It is logical to assume that the notification in question should reflect the handling of the right of rescission contained in the referred clauses, especially when it is considered that the Venezuelan State and its companies are obliged to issue motivated acts. However, in none of the acts of termination of the Contracts[135], nor in the letters of notification of the initiation of the unilateral termination procedure of the Contracts[136], nor in any of the documents submitted to the file, was it mentioned that the Contracts were being terminated based on clauses 5.8.3 of Addendum 1 - PIGAP and 5.8.4 of the Carito-Pirital Contract.

258.    It should be noted that Professor Mouriño, Respondents' own expert, emphasized that the unilateral termination of administrative contracts must be subject to a sufficient motivation of the act and to a notification to CONTRACTOR so as to guarantee its right of defense[137]. This duty to state reasons, Professor Mouriño also explains, is supported by the case law

---

[133] De 16, p. 5; De 17, p. 6.
[134] Cf. Clause 5.8.3 of Addendum 1 - PIGAP, De-6, p. 8; and clause 5.8.4 of the Carito-Pirital Contract, De-2, p.16
[135] De-16 and De-17.
[136] De-14 and De-39.
[137] Mouriño's Report, § 79.

of the Political-Administrative Chamber of the Supreme Court of Justice[138]. It is evident that the act of termination that does not refer to the causes that motivate it, or that refers to causes other than the real ones, lacks sufficient motivation[139]. In both cases, the person administered is unable to exercise his right of defense.

259. Once again, these considerations of the arbitral tribunal do not question the existence, validity or effectiveness of Administrative Rulings Nos. 001 and 002 of October 9, 2018, a matter that remains subject to Venezuelan contentious-administrative jurisdiction. What this arbitral tribunal rejects in the Respondents' conduct is the violation of the principles of honesty and transparency that must preside over any contractual relationship under the LC.

260. Indeed, the LCP, which both Parties invoke as the legal text governing the Contracts, clearly establishes the principles of good faith, honesty and transparency as the guiding principles of administrative contracting[140]. Based on the strong evidence in the record, the arbitral tribunal is convinced that the termination of the Contracts was in violation of the principles of honesty and transparency, a violation attributable to the Respondents.

261. It is unreasonable to assume that the Respondents were authorized to induce the Claimant not to observe the contractual terms and that they were then also authorized to terminate the Contracts on the basis of such situations of non-observance of the strict terms of the Contracts that they themselves caused. Nor can it be accepted that the true reasons for a contractual termination be concealed. The parties to a contractual relationship under the aegis of good faith must behave in a cooperative, honest, transparent and loyal manner. This was not the case with respect to the Respondents' conduct in relation to the disbursement of the advance payment or the grounds for termination of the Contracts, and this arbitral tribunal cannot accept such a course of action.

262. Consequently, and in view of the facts described above, the arbitral tribunal accepts the Claimant's argument that the non-disbursement of the advance payment is attributable to the Respondents, and rejects the Respondents' argument that the Contracts were terminated on the basis of the right of unilateral termination provided for in Clauses 5.8.3 of Addendum 1 - PIGAP and 5.8.4 of the Carito-Pirital Contract.

    b)  *Term of execution of the Contracts*

263. The Respondents make separate allegations regarding the non-performance of the PIGAP and Carito-Pirital Contracts. In the case of the PIGAP Contract, the Respondents allege that the Claimant has missed its performance deadline[141]. The Respondents' argument with respect to the Carito-Pirital Contract is of a different nature. According to the Respondents, once the execution of the works began, the Claimant was obliged to carry

---

[138] Judgements No. 01811 of December 10, 2009 and No. 00422 of May 19, 2010, DaE-29.
[139] On the content of Administrative Rulings Nos. 001 and 002 of October 9, 2018, see paragraph 227 above.
[140] Cf. Article 2 LCP, From-29, p. 20.
[141] Respondents' Supplemental Brief, § 94 et seq.

them out in their entirety and with its own funds[142]. In both cases, the Respondents base their allegations on certain exorbitant prerogatives attributed to the State and its companies.

264. The allegations relating to the PIGAP Contract and the Carito-Pirital Contract should be analyzed separately.

265. Clause 6 of the PIGAP Contract provided for a term of 445 days for its execution, originally counted from the "effective date" to the date of provisional reception of the work[143]. In its original terms, clause 1.11 of the PIGAP Contract defined the "effective date" as the date of execution of the Contract[144].

266. However, Addendum 1 - PIGAP introduced some changes in the way the PIGAP Contract execution period is accounted for. The first clause of Addendum 1 - PIGAP promoted the distinction between "effective date" and "commencement date". On the one hand, the "effective date" would be the date of signature of the Contract, the date of its respective entry into force. On the other hand, the "commencement date" would be a date subsequent to the "effective date", which would be specified in a notice issued by PDVSA determining the commencement of the works. The "commencement date" would also be the date on which the "Minute of Commencement" would be signed[145].

267. Consequently, the third clause of Addendum 1 - PIGAP amended clause 6.1 of the PIGAP Contract, stipulating that the computation of the 445-day period for the execution of the works under the contract should be counted from the "start date" to the "temporary reception" date[146].

268. However, the Respondents argue that the first clause of Addendum 1 - PIGAP is invalid, which would lead to the computation of the term for the execution of the works in the terms originally agreed in the PIGAP Contract. The argument of the invalidity of the first clause of Addendum 1 - PIGAP is based on the thesis that the mentioned amendment altered conditions that would be mandatory under the terms of Articles 1, 119 and 128 of the LCP[147]. The Claimant fully rejects the Respondents' argument[148].

269. Article 1 of the LCP does not provide any specific guidance to this arbitral tribunal on the invalidity of the challenged clause. In effect, the provision in question barely delimits the object of the LCP, providing generically that "[t]he processes referred to in this Decree

---

[142] Counter-memorial, §§ 128 et seq.
[143] De-1, p.16.
[144] De-1, p. 8.
[145] De-6, p. 4.
[146] De-6, p. 11.
[147] Rejoinder, §101 et seq.
[148] Reply, §45 et seq.

with Rank, Value and Force of Law are of mandatory compliance, except for the exceptions provided herein"[149].

270. Similarly, Article 119 of the LCP does not specifically address the validity of contractual modifications, stipulating only a general duty to maintain "what was contemplated in the bidding documents or conditions of the contract and in the bid that was awarded"[150].

271. Finally, the arbitral tribunal does agree with Respondents' proposed reading of Article 128 of the LCP. The provision does not contemplate the invalidity of clauses in which an advance payment is agreed upon after the conclusion of the contracts, as claimed by the Respondents. Strictly speaking, the rule in question has a different nature, establishing that the payment of the advance payment may be an indispensable condition to start the supply of the good or service, as long as it is so agreed in the contract[151]. In any case, it should not be overlooked that the first clause of Addendum 1 - PIGAP did not provide for the payment of the advance payment, but rather for definitions of terms of the Contracts.

272. For the arbitral tribunal, the argument attacking the validity of the first clause of Addendum 1 - PIGAP is delineated in an abstract, almost ethereal manner, lacking legal and evidentiary support[152]. The Respondents have not proven the existence of the alleged deterioration in their contractual position as a result of the modifications made by the first clause of Addendum 1 - PIGAP, nor have they proven the occurrence of violations to the referred "exorbitant prerogatives of the State". Moreover, if Respondents' argument were accepted, any modification - adopted by the Parties by mutual contract - involving an extension of deadlines or a price adjustment, even if *de minimis*, would necessarily be null and void.

273. It should be noted that Article 130 of the LCP establishes that "[t]he contractor may, before or after the supply of goods, the rendering of services or the execution of the work, introduce such modifications as it deems necessary"[153]. Likewise, and giving greater specificity to the contractual modification hypotheses, the LCP also provides that variations in the original budget, prices, as well as extensions, suspensions and stoppages of work may be regulated by means of contractual modifications under the terms of Articles 131, 132, 133 and 135 of the LCP[154]. In other words, the alterations conveyed by the first clause of Addendum 1 - PIGAP were made voluntarily, in accordance with clause 38.3 of the PIGAP Contract and without violation of any provision of the LCP. The purpose of PIGAP Addendum 1, including its first clause, was to adjust the PIGAP Contract to the commercial financing under negotiation at the time with Credit Suisse – a fact that in no way diminishes CONTRACTOR's situation or violates Venezuelan public policy.

274. The arbitral tribunal considers that the Respondents have failed to prove that Addendum 1 - PIGAP is invalid, and therefore all the modifications introduced by this Addendum

---

[149] DeL-29, p. 20.
[150] DeL-29, p. 40.
[151] DeL-29, p. 41. *Supra*, § 238.
[152] See Response, §§ 94-100; Rejoinder, §§ 104-107.
[153] DeL-29, p. 130.
[154] DeL-29, p. 41-42.

must be taken into account for the correct interpretation of the PIGAP Contract. Recall that under the first clause of Addendum 1 - PIGAP the "effective date" was defined as "the date of signature of the CONTRACT by all PARTIES, at which time the CONTRACT shall become effective, even though the works contemplated therein shall commence on the START DATE as such term is defined below"[155]; and that the "commencement date" was defined as the "date after the EFFECTIVE DATE specified in the notice to commence the WORKS, which notice shall be issued by THE COMPANY once the following conditions have been met, it being understood that such date must also be after the notice to be given: (i) receipt by THE COMPANY of the Advance Payment Bond and the Performance Bond; and, (ii) receipt of the ADVANCE PAYMENT amount by CONTRACTOR with the COMMERCIAL FINANCING on the terms and conditions provided in Section 5.8.6. of Addendum No. 1"[156]. The first clause of Addendum 1- PIGAP also provided that "[o]n the STARTING DATE the PARTIES shall sign a Minute of Commencement of the WORK evidencing compliance with the aforementioned conditions"[157].

275.    Indeed, the Claimant has proven that none of the Contracts began to run the deadlines for their execution, since PDVSA never indicated the "commencement date" nor have the respective "Minutes of Commencement" been signed. This information is corroborated by Mr. Luis Vielma, Respondents' witness, during the merits hearing[158]. Therefore, under the terms of Addendum 1 - PIGAP, there was no breach of the deadline for the execution of the PIGAP Contract.

276.    Now, it is appropriate to move on to the analysis of the Carito-Pirital Contract.

277.    It is an uncontroverted fact that the term for the execution of the Carito-Pirital Contract has always been subject to the signature of a "Minute of Commencement"[159], which was never signed as demonstrated above. Surprisingly, Administrative Ruling No. 002 presented the non-compliance with the execution term of the work as the basis for the termination of the Carito-Pirital Contract[160]. Even more surprisingly, the administrative ruling used language absolutely identical to that of the Administration Ruling 001, which terminated the PIGAP Contract[161]. Furthermore, Administrative Ruling No. 002 erroneously referred to the execution term of the Carito-Pirital Contract as 445 days, which was the term agreed for the PIGAP Contract, and not to the correct term of 760 days[162].

---

[155] Cf. Addendum 1 - PIGAP, clause one, 1.11, p. 4.

[156] Cf. Addendum 1 - PIGAP, clause one, 1.38, pp. 4-5.

[157] Cf. Addendum 1 - PIGAP, clause one, 1.38, p. 5.

[158] Cf. Hearing, Day 2, 2023-01-31 - ICC 24306 - Audio - Part 4.mp3, 12m25s to 16m25s.

[159] PHB Respondents, §80.

[160] The fundamentals are as follows: "With respect to the aforementioned regulations, it is observed that CONTRACTOR executed works in disagreement with the contract, failing to comply with the execution thereof according to the schedule established by the same at the request of PDVSA; not honoring the contractual commitments in the execution term of 445 days established in the contract". De-17, p. 7.

[161] The text of Administrative Ruling No. 001 in relevant part is as follows: "With respect to the aforementioned regulations, it is observed that CONTRACTOR executed works in disagreement with the contract, failing to comply with the execution thereof according to the schedule established by the same at the request of PDVSA; not honoring the contractual commitments in the execution term of 445 days established in the contract". De-16, p. 6-7.

[162] De-17, p. 7.

278.    It is evident, in any form of computation of performance periods, that the Carito-Pirital Contract was terminated well before the expiration of its performance period. In fact, the Contract was signed on January 24, 2017[163], so even if the term was counted from its signature, the same would not have expired until February 2019. However, the termination of the contract, operated through Administrative Ruling No. 002, was effected in October 2018. It is clear, therefore, that there could not have been a breach of the execution deadline.

279.    The Respondents also allege that, by initiating the execution of the work on its own initiative, the Claimant waived the condition precedent set forth in the Carito-Pirital Contract- *i.e.*, the signature of the "Minute of Commencement"[164]. Consequently, the Respondents consider that the Claimant should have completed the entire contracted work on its own[165]. This allegation is beyond the arbitral tribunal's understanding, given its disproportionate and arbitrary nature.

280.    It would be unreasonable to penalize a contracting party who, in good faith and free of charge, makes its best efforts to set in motion the performance of a contract. To assume that the Claimant waived the condition precedent of the Contract merely because it was diligent and cooperative would be punishing contractual good faith. Therefore, Respondents' argument does not merit acceptance.

281.    In conclusion, the arbitral tribunal considers that there was no breach by the Claimant with respect to the term of performance of the Contracts.

   c)   *The validity of performance bonds and labor bonds*

282.    The arbitral tribunal now turns to a final allegation of the Respondents regarding an alleged breach of contract attributable to the Claimant, which concerns the performance and labor bonds. In connection with the PIGAP Contract, the Respondents allege that the Claimant failed to keep such bonds in force. Regarding the Carito-Piritial

Contract, the Respondents accuse the Claimant of not having presented them properly.

283.    Both contracts deal with performance and labor bonds in clauses 20[166].
From the reading of these clauses, it is clear that these documents were to be delivered at the time of signing the Contracts. On the one hand, by virtue of clause 20.1.1 of the Contracts, the performance bond was to remain in force until the date of issuance of the "Provisional Acceptance Certificate". On the other hand, by virtue of clause 20.1.2 of the Contracts, the labor bond was to remain in force until six months after the issuance of the "Minute of Temporary Acceptance".

284.    According to the Contracts, the labor bond was to be equivalent to 10% of the estimated cost of the labor to be employed in the execution of each Contract[167]. Regarding the performance bond, the amounts covered were not exactly the same in each of the

---

[163] De-17, p. 1.
[164] Counter-memorial, §109.
[165] Counter-memorial, §133.
[166] De-1, p. 47; De-2, p.53
[167] Cf. Clause 20.1.2. of the Contracts. See De-1, p. 48 and De-2, p. 54.

Contracts. In the PIGAP Contract, the agreed amount of the performance bond covered 15% of the total value of the Contract, while in the Carito Pirital Contract, this amount was to be equivalent to 20% of the total value of the Contract.

285. It should be noted that Administrative Rulings Nos. 001 and 002 of October 2018 already referred to irregularities related to performance and labor bonds. Thus, when terminating the PIGAP Contracts, Administrative Ruling No. 001 stated that "the Performance and Labor Bonds submitted by [the Claimant], which were valid for a period of one year from the signing of the contract, had expired due to the expiration of that period"[168]. On the other hand, Administrative Ruling No. 002, which terminated the Carito-Pirital Contract, stated that the performance and labor bonds "had expired due to non-payment of the annual premium"[169].

286. The Respondents, in their allegations, partially reiterated the reasons stated in Administrative Rulings Nos. 001 and 002. In fact, with respect to the PIGAP Contract, the grounds of Administrative Ruling No. 001 are reproduced. In other words, even if it is acknowledged that the bonds had been presented at the time the Contract was signed, the Respondents allege that the Claimant did not keep them in force as required by the PIGAP Contract[170]. Regarding the Carito-Pirital Contract, the Respondents' position has evolved. In fact, Respondents' allegation is that Claimant did not deliver either the performance bond or the labor bond on the contractually agreed terms, since the bonds in question had a condition precedent that had not been contractually agreed upon[171].

287. Claimant rejects Respondents' allegations. In particular, the Claimant contends that the bonds were reviewed and approved by Respondents[172] and that "if they had any objection to such bonds, they could have communicated it, which they never did". Likewise, the Claimant also alleges that during the course of the Contracts, the Parties agreed that the performance and labor bonds should only be in force as of the signature of the "Minute of Commencement"[173]. In addition, the Claimant alleges that the Contracts established "a specific *carve-out* for the performance and labor bonds, establishing that their non-presentation would generate their replacement by retentions in the payment to CONTRACTOR"[174].

288. It should be noted that clause 20.2.2 of the Contracts establishes that "[t]he bond document shall not contain any clause or condition that makes its duration or validity dependent on the expiration of the term, the payment of its premium, the performance of any act, whether by CONTRACTOR or the banking institution or the insurance company or third parties, or on any circumstance or condition"[175].

---

[168] De-16, p. 7.
[169] De-17, p. 8.
[170] Counter-memorial, §122; Rejoinder, §§ 142-147; Respondents PHB, §55.
[171] Counter-memorial, §§ 140; Rejoinder, §209; Respondents PHB, §§85-89.
[172] Reply, §§57 and 69.
[173] Reply, §69.
[174] Reply, §§58 and 71.
[175] De-1, p. 49; De-2, p. 55.

289.     It should also be noted that Clause 20.2.5 of the Contracts stipulates that "[i]n the event that [...] CONTRACTOR does not submit the bonds referred to in this Clause, to the satisfaction of the Company, the Faithful Performance or Labor Liability bonds shall be substituted by withholdings of its payments"[176].

290.     After reviewing the documents of the performance bond and the labor bond related to the PIGAP Contract, this arbitral tribunal was not convinced that their term was restricted to one year.

291.     There is a lot of contradictory information contained in the provided documents regarding the PIGAP Contract bonds. On the first page of these documents, there is a notarized statement indicating that the bonds were issued "in accordance with the General Conditions of the Surety Agreement with State Agencies" and that their "identical text is attached hereto as an integral part of this document"[177]. Upon analyzing said General Conditions of the Surety Agreement with State Agencies, Clause 2 expressly states that "[t]he bonds issued by the Insurance Companies to guarantee the performance of public contracts in any of their modalities shall be in force until the Contracting Agency or Entity issues the administrative act for the release of the bonds, once the final reception of the object of contracting is made, the accounting settlement is granted, the performance evaluation is completed, the compliance with the social responsibility commitment is certified, when applicable, or any other obligation imposed on CONTRACTOR by the legislation regulating public contracting or the contract"[178]. However, on the first page of the documents regarding the PIGAP Contract bonds there is also a notarized statement referring to a term of one year[179].

292.     The situation described above raises many doubts, which were not dispelled by the Respondents. On the one hand, if their term was for one year, the PIGAP Contract bonds would clearly not be in accordance with the General Conditions of the Surety Agreement with Government Agencies. On the other hand, it is possible that the mention of a one-year term may have been a material error, since the bonds should have been subject to the General Conditions of the Surety Bond Contract with Government agencies. In other words, either the bond was valid for one year and the notarial statement that the bonds were granted in compliance with the General Conditions of the Surety Agreement with Government Agencies is false; or the notarial statement regarding the validity of one year was false (or mistaken) and the bonds were in accordance with the General Conditions of the Surety Agreement with Government Agencies in the terms of its Clause 2.

293.     The arbitral tribunal notes that the Respondents have selectively pointed to a portion of the PIGAP Contract bond document that contains information useful to their thesis. However, they omitted in their analysis the existence of an important clause to the contrary, *i.e.*, Clause 2 of the General Conditions of the Surety Agreement with Government Agencies - which, it must be emphasized, was an integral part of the bonds of the PIGAP

---

[176] De-1, p. 48; De-2, p. 56.
[177] De-34, pp. 5 and 13.
[178] De 34,pp. 7-15
[179] De-34,pp. 6 and 14

Contract. The omission is very relevant, since it is clear from the aforementioned clause that the bonds could be in force under the terms of the General Conditions of the Surety Agreement with Government Agencies. Despite the contradiction, the Respondents said nothing to clarify the situation. Moreover, the Respondents themselves acknowledge having received the bonds at the time of signing the PIGAP Contract[180], but did not file any objection in this regard until the termination of the contractual relationship, a fact that militates in favor of the regularity of the bonds in question.

294. It is well known that the burden of proof rests on the alleging Party, so it is up to the Respondents to prove that the performance and labor bonds of the PIGAP Contract had expired during the course of the contractual relationship. In the view of the arbitral tribunal, the assertion that the PIGAP Contract bonds were not in force is purely speculative, based on an isolated and strategic reading of only a small excerpt of the PIGAP Contract bond documents, and the Respondents have therefore failed to prove their allegations.

295. On the other hand, the allegations related to the Carito-Pirital Contract constitute a different situation. In fact, both the performance bond and the labor bond of the Carito-Pirital Contract are conditioned to the signature of the "Minute of Commencement". On this point, the arbitral tribunal recognizes that the inclusion of such condition precedent would violate in the abstract the terms of Clause 20.2.2 of the Carito-Pirital Contract.

296. However, as noted above in the discussion of the disbursement of the advance payment, this arbitral tribunal is convinced that the Respondents were aware of this fact and, by their conduct, created certain legitimate expectations in the Claimant as to the continuity of the contractual relationship. In other words, the doctrine of own acts prohibits inconsistent or contradictory behavior, since the *venire contra factum proprium* constitutes a true violation of good faith - which is protected under the principles of honesty and transparency embodied in the LCP already discussed above[181].

297. As can be seen from the minutes of the meeting held between the Parties on December 8, 2017, the Respondents put on record that "the bonds and insurances must be in force at the time of the signature of the project minute of commencement.[182]". In other words, the Respondents' position in December 2017 was that the bonds would not have to be effective until the "Minute of Commencement" was signed.

298. The arbitral tribunal's recognition of that fact does not mean that the Contracts have been modified or that the Respondents have waived a right. This is a factual finding, relating to the conduct of the Parties and the expectations arising from such conduct. The information contained in the minutes of the meeting makes it clear that PDVSA generated a situation

---

[180] Counter-memorial, §122
[181] Cf. §§ 252-256 *supra.*
[182] De-42, paragraph 3, p.3

of trust in relation to the Claimant. In other words, there was no expectation of termination of the contractual relationship, but rather of continuity thereof.

299.  The Respondents did not realize there was a threat of termination, nor the slightest hint of protest regarding the condition precedent contained in the bonds, but rather a message of reassurance that until the signing of the "Minute of Commencement" there would be no reason for concern. In this context, the Respondents cannot, in open contradiction with the trust generated, adopt a diametrically opposed position. Furthermore, when it is taken into account that the Contracts themselves did not provide for their termination as a direct and immediate sanction for failure to present the bonds.

300.  It should be recalled that Clause 20.2.5 of the Contracts provided that the performance and labor bonds could be replaced by the withholding of a percentage of the payments due. Thus, the failure to deliver the bonds did not merit the termination of the Contracts, since they established a specific remedy for such contravention other than termination.

301.  In summary, the arbitral tribunal is not convinced that the Contracts were terminated due to irregularities relating to the submission and validity of the performance and labor bonds, and therefore rejects the Respondents' claims in this regard.

### 4. The right to compensation under the LCP and the RLCP "

A) The position of the Claimant

302.  The Claimant states that the RCLP "establishes that when the entity terminates a contract for causes not attributable to CONTRACTOR, the contracting body or entity shall pay CONTRACTOR: (i) the price of the work effectively executed, calculated in accordance with the current budget of the contract; (ii) the price of the materials and equipment acquired by CONTRACTOR to be incorporated into the work; and (iii) an compensation of ten percent (10%) of the value of the work not executed, if the termination occurs when the work has not been started or if the value of the executed work is less than thirty percent (30%) of the original amount of the contract[183].

303.  In particular, Claimant argues that Articles 153 and 191 of the RLCP apply to the situation under analysis, noting that the LCP does not establish an authority to pay but an obligation to pay under those rules[184]. In fact, the position defended by the Claimant is that the regulation in question is of public order, being therefore of mandatory compliance[185].

B) The Respondents' position

304.  The Respondents state that "the resolutory condition established in the Termination Clauses having been fulfilled, the consequence is that neither of the parties, neither the Co-respondents - PDVSA Petróleo and PDVSA - nor QG have anything to claim from the

---

[183] Complaint, § 105.
[184] Complaint, § 110.
[185] Complaint, § 106.

other for damages, compensations, penalties and/or lost profits, not owing any amount to the other by reason of the termination of the Contracts under the agreed terms"[186].

305.　Subsidiarily, the Respondents argue that, under the LCP and the RLCP, the arbitral tribunal should dismiss the Claimant's claims, since the Contracts were terminated for causes attributable to the Claimant itself[187]. In fact, the Respondents contend that, pursuant to Articles 155 of the LCP and 193 of the RLCP, the Claimant's contractual breaches authorized them to terminate the Contracts without having to pay any compensation[188].

306.　Furthermore, the Respondents argue that "QG cannot claim that for the same facts – (alleged unilateral termination of the Contracts for causes not attributable to CONTRACTOR) it should be indemnified under Article 191 of the RLCP, and, in turn, also be indemnified under the Contracts"[189].

307.　The Respondents understand that "since execution of the contract is the means of presenting the claim for the alleged costs and expenses - which, as already stated, seeks double compensation for the same facts and constitutes unjust enrichment - neither the request in the Complaint Memorial, nor the Reply Memorial, contains a complaint for performance of the contract"[190].

308.　Finally, Respondents also argue that the Contracts, by their nature of National Public Interest Contracts, are not capable of producing effects, including those related to compensations eventually established, since they did not have the approval of the National Assembly[191].

### C) The analysis of the Tribunal

309.　The Parties agree that the Contracts should be qualified as administrative contracts[192]; their legal experts also agree on the subject[193]. Therefore, both Parties invoke the LCP and the RLCP as the legal basis for analyzing the legal consequences of the termination of the Contracts.

310.　It is important to note that Article 152 of the LCP authorizes the contracting party to unilaterally terminate an administrative contract even when there is no breach of contract by CONTRACTOR[194].

---

[186] Complaint § 67.
[187] Counter-memorial, § 69.
[188] Counter-memorial, § 125.
[189] Rejoinder, § 32.
[190] Rejoinder, § 35.
[191] Rejoinder, § 171 and 213.
[192] Complaint, § 104; Reply, § 49.
[193] Badell Report, § 19; Mouriño Report, § 24.
[194] See DeL-29, p. 45.

311.   Likewise, Articles 152 and 153 of the LCP and Article 191 of the RLCP provide for the payment of compensation and other reimbursements in compensation for the unilateral termination of an administrative contract for causes not attributable to CONTRACTOR, devices used by the Claimant to support its claim for compensation.

312.   However, the Respondents allege that the Claimant has waived any right to contractual or statutory compensation under Clauses 18.2.5 of the PIGAP Contract and 18.5.1.7 of the Carito-Pirital Contract. This waiver would reflect the provisions of Articles 155 of the LCP and 193 of the RLCP[195].

313.   It should be recalled that Clause 18.2.5 of the PIGAP Contract establishes that "[t]he Contractor waives the right to claim for all damages arising from the early termination referred to in Section 18.2.3. of this Clause, but shall have as sole compensation the right to payment in accordance with Section 18.4. of this same Clause. It is noted that the aforementioned provision refers to the cases of termination of the contract for causes attributable to CONTRACTOR (i.e., Clause 18.2.3. of the PIGAP Contract). In addition, the provision now commented on also refers to Clause 18.4 of the PIGAP Contract, which establishes a series of amounts due in the event of early termination of the Contracts for causes attributable to CONTRACTOR[196]. Clause 18.5.1.7 of the Carito-Pirital Contract *mutatis mutandis* has identical wording.

314.   The Respondents devoted much energy to the discussion of the availability of the right to compensation provided for in the LCP and the RLCP[197]. However, it should be noted that, in view of the elements already set forth in this award, the arbitral tribunal is convinced that the Contracts were terminated for causes not attributable to CONTRACTOR. Thus, the aforementioned waiver clauses are irrelevant to the analysis of the specific case. Nor is it necessary to discuss whether or not the waiver would be valid or invalid, nor to analyze whether or not it would constitute "special advantages".

315.   Articles 155 of the LCP and 193 of the RLCP are also not relevant for the analysis of the arbitral tribunal, considering that these rules deal with unilateral termination for causes attributable to CONTRACTOR.

316.   This arbitral tribunal understands that the legal consequences of the present case are governed by Articles 152 and 153 of the LCP and Articles 190 and 191 of the RLCP, since these rules do provide for unilateral termination for causes not attributable to CONTRACTOR. In fact, while Articles 152 and 153 of the LCP and 190 of the RLCP establish against the contracting party a duty to indemnify, Article 191 of the RLCP establishes the terms under which such compensation must be paid. In this sense, Article 191 of the RLCP establishes that CONTRACTOR shall pay the price of the work actually executed, the price of the materials and equipment acquired for incorporation in the work, and an compensation calculated on the percentage of the value of the contracts[198].

---

[195] Respondents PHB, §§ 18-20.
[196] Cf. clauses 18.4, 18.4.1, 18.4.2 and 18.4.3 of the PIGAP Contract, De-1, p. 44.
[197] Counter-memorial, §§ 47 et seq; Mouriño Report, §§ 127 - 142.
[198] De-28, 43.

317.   In other words, the arbitral tribunal is convinced that, under Articles 152 and 153 of the LCP and Articles 190 and 191 of the RLCP, the Respondents have the duty to indemnify the Claimant for certain concepts, which will be analyzed in due course when discussing the *quantum* of the compensation.

318.   Finally, it is appropriate to turn to the question of joint and several liability. The Claimant alleges that the Respondents are jointly and severally liable for the payment of the compensations provided for in the LCP and the RLCP[199]. The Respondents' position is that each of them should be held liable to the extent of their participation in the conclusion, performance and termination of the Contracts[200].

319.   Section 1, Article 6 of the LCP defines the "Contracting Party" as the "[s]ubject contemplated in the scope of application of this Decree with Rank, Value and Force of Law, which executes the processes foreseen for the selection and administration of contracts related to the acquisition of goods, rendering of services or execution of works"[201]. To the extent that PDVSA and PDVSA Petróleo are distinct legal entities, it is necessary to analyze whether both Respondents can be understood as "Contracting Parties" in the terms of the LCP.

320.   On the one hand, there is no doubt that PDVSA Petróleo is a signatory to the Contracts, having been a central party in their negotiation and administration. Thus, it is clear that PDVSA Petroleo Respondents' must be qualified as a "Contracting Party" pursuant to Article 6 of the LCP[202].

321.   On the other hand, it was also abundantly demonstrated that PDVSA, although it was not formally a signatory of the Contracts, acted jointly and indistinctly with  PDVSA Petróleo in the selection, administration and termination of the Contracts. In fact, the evidence in the file shows that PDVSA actively participated in the negotiation and bidding process of the Contracts[203], that it was PDVSA who subscribed the financing linked to the Contracts[204] and, finally, that PDVSA was the one who terminated the Contracts[205]. Thus, it is noted that PDVSA must also be understood as a "Contracting Party" in the terms of Article 6 of the LCP. In fact, the findings of the arbitral tribunal in the Partial Award, when assessing PDVSA's participation in the Arbitration Contracts, are in general also valid with respect to the Contracts in general[206].

322.   In view of the foregoing, the arbitral tribunal is convinced that the Respondents, PDVSA Petróleo and PDVSA, acted jointly and severally throughout the life of the Contract, and

---

[199] Complaint, §§ 134-136; Reply, §§ 183-188.

[200] Reply, §§ 205-207; Rejoinder, §§ 420-423.

[201] De-29, p. 22.

[202] Article 6 of the LCP defines the term Contracting Party as follows: "Subject contemplated in the scope of application management of contracts referred to the procurement of goods, rendering of services or execution of works". Cf.

[203] De-4, From-5, De-9, De-26 and De-27.

[204] De-3.

[205] De-16 and De-17.

[206] Partial Award, §§ 72-82, esp. § 82: "the arbitral tribunal considers that PDVSA is clearly and unequivocally a Party to the Arbitration Contracts."

should therefore be ordered jointly and severally to pay the Claimant the compensation provided for under Articles 152 and 153 of the LCP and Article 191 of the RLCP.

### 5. The quantum of compensation under the LCP and the RLCP

#### A) The position of Claimant

323. The Claimant asserts that the suspensive conditions of the Contracts only suspended the computation of the term for the construction activities, not suspending the validity or effectiveness of the Contracts [207] . Furthermore, the Claimant points out that the Respondents have not explained how an eventual suspension of the Contracts would prevent the payment of compensation due[208].

324. The Claimant understands that the language in which the description of certain expenses is made does not change their amount, their quantification, or the appropriateness of the compensation[209]. The Claimant further states that the costs and expenses incurred relate to site work, the engineering required for the work, construction and assembly, and the movement of personnel, necessary for the performance of the contractual obligations[210].

325. According to the Claimant, these expenses are compensable under Article 191 of the RLCP[211]. Furthermore, the Claimant understands that "the Contracts were terminated unilaterally by the Respondents, and based on the principle of the State's pecuniary liability, Respondents must reimburse QG for these incurred amounts "[212].

326. Likewise, Claimant notes that Clauses 18.4 and 18.7, respectively, of the PIGAP Contract and the Carito-Pirital Contract, allow for the recovery of costs and expenses incurred in the execution of the Contracts[213].

327. The Claimant alleges that it submitted detailed evidentiary support for 70% of the costs and expenses for which reimbursement is sought[214]. The Claimant also states that it has submitted an extract of its internal system that would serve as evidentiary support for the remaining 30%[215].

328. Regarding the exchange rate used in its calculations, Claimant asserts that the rate used in its accounting "reflects the actual exchange rate to which QG was exposed and to which it

---

[207] Reply, § 80.
[208] Reply, § 82.
[209] Reply, § 95-99.
[210] Reply, § 106.
[211] Reply, § 104.
[212] Reply, § 105.
[213] Reply, § 103.
[214] Reply, § 110.
[215] Reply, § 111.

was subject at the time of payment" and that "[t]he accounting record of QG reflects this reality and is the one presented in the Claim memorial"[216].

329.   Furthermore, Claimant points out that the intention of the Parties in drafting the Contracts was to protect the amounts due from exchange rate fluctuation, so the Contracts did provide for the payment of sums in U.S. dollars[217].

330.   The Claimant also asserts that the compensation established in the RLCP is in the form of fixed and predetermined amounts, not a maximum limit. In fact, the Claimant understands that, by application of the RLCP, it is entitled to compensation of 10% of the value of the Contracts in addition to reimbursement for expenses incurred[218].

331.   The Claimant understands that "the RLCP establishes that: (i) the compensation is not a ceiling and (ii) it is not required to prove the damage, it is sufficient that the factual assumption of the rule (which is none other than the unilateral termination without breach by CONTRACTOR) is met"[219]. Being a legal and public policy sanction, the Claimant understands that it is not possible to speak of unjust enrichment[220].

332.   Finally, Claimant states that "the claimed debts are indeed liquid and due, the payment obligation having accrued at the time the claimed breach was generated: the termination of the Contracts" and that "[t]he Respondents are in default since they were requested to reverse the termination"[221].


        B) The Respondents' position

333.   The Respondents qualify the postulations regarding the reimbursement for costs and expenses incurred with the execution of the Contracts as "lacking of any logic"[222], particularly because, given the non-fulfillment of their suspensive conditions, the execution of the Contracts would be suspended[223].

334.   The Respondents also argue that the Claimant assumed all the risks of the execution of the Contracts, given that the public interest must prevail over the private interest[224].

---

[216] Reply, § 124.
[217] Reply, §§ 130-131.
[218] Reply, § 152.
[219] Reply, § 154.
[220] Reply, § 155.
[221] Reply, § 177-178.
[222] Counter-memorial, § 152.
[223] Counter-memorial, § 151.
[224] Counter-memorial, § 164.

335.   Respondents point out that the calculations submitted by Mr. Gediel Deleo lack evidentiary value, considering that they were submitted in a language different from the one agreed in this arbitration[225].

336.   Furthermore, according to the Respondents, the costs and expenses submitted by the Claimant are not compensable under Article 191 of the RCLP, since they would not be related to the performance of the Contract[226]. In fact, Respondents assert that "[n]o one of these alleged expenses refers to the price of materials and equipment that would have been purchased by CONTRACTOR to be effectively incorporated into the Works"[227].

337.   The Respondents point out that 4,201 items referring to expenses reflected in Exhibit De-63 have no evidentiary support[228], and that the Claimant has not proven the causal link between the alleged expenses and the execution of the Contracts[229].

338.   The Respondents also assert that the compensation of Article 191 of the RLCP must be understood as a maximum limit, and that it is up to the Claimant to prove the damage, its relation to the Contracts and its *quantum*[230]. In addition, Respondents assert that pre-award interest is not due, since the amounts eventually compensable are not yet liquid or enforceable[231].

339.   Furthermore, Respondents allege that Claimant overestimated its expenses by using an exchange rate that would not be applicable. According to the Respondents, the reimbursement of costs and expenses claimed by the Claimant would go from USD 20,906,717.81 to USD 160,424.25 if the correct exchange rate[232] were applied.

340.   Finally, the Respondents assert that the expenses allegedly incurred by the Claimant were incurred in Bolivares, so that, in case of an eventual compensation, it should also be calculated in Bolivares[233].

   C) The analysis of the Tribunal

341.   Article 191 of the RLCP, as mentioned above, imposes on CONTRACTOR the obligation to pay CONTRACTOR amounts of three different orders, namely: (i) the price of the work actually executed, calculated on the value of the Contract, (ii) the price of materials and equipment acquired by CONTRACTOR for incorporation into the work, and (iii) an compensation of 10% of the value of the work not executed, when the termination

---

[225] Counter-memorial, §§ 166-167.
[226] Counter-memorial, § 171.
[227] Counter-memorial, § 172.
[228] Counter-memorial, § 177-180.
[229] Counter-memorial § 181.
[230] Counter-memorial, § 197.
[231] Counter-memorial, § 208.
[232] Supplemental Brief, § 139.
[233] Supplemental Brief, §§ 159-160.

occurred at a time when the work had not yet begun or when it had a value of less than 30% of the original amount of the contract.

342.   In addition, Clause 18.4 of the PIGAP Contract and Clause 18.7 of the Carito-Pirital Contract stipulate the right to reimbursement of certain amounts in the event of early termination of the Contracts for causes attributable to the Contracting Party. In effect, the provisions in question grant CONTRACTOR the possibility of being reimbursed for all sums paid or payable relating to works executed in whole or in part, or to goods and services acquired for the execution of the works, provided that these have been received to the "entire satisfaction of the Company"[234].

343.   Based on these provisions, the Claimant estimates the amount of its claim to be as follows:

> *PIGAP  Contract*[235]   Costs
> and expenses:
> USD 15,811,121
> Compensation of 10% of the value of the work not executed:
> USD 20,999,984 and Bs. 88.198.725
>
> *Carito-Pirital  Contract*[236]   Costs
> and expenses:
> USD 14,116,186
> Compensation of 10% of the value of the work not executed:
> USD 30,869,234 and Bs. 2.608.428.129

344.   In addition, the Claimant also requests that the Respondents be ordered to pay interest on the sums due, before and after the judgment, calculated at the rate of 12%[237].

345.   The Respondents point out that the 10% amount for compensation set forth in Article 191 of the RLCP represents a maximum limit granted for this purpose, which is subject to the damages actually proven in accordance with the general principles of Venezuelan civil law. Furthermore, the Respondents deny that the costs and expenses claimed by the Claimant are compensable. As to interest, the Respondents assert that the debt is not liquid and overdue, and there is no reason to condemn of default interest.

346.   The arbitral tribunal will now examine each of these points.

   *a)  The compensation stipulated in Article 191, paragraph 1, letter c of the RLCP.*

347.   It has been established that the Contracts were unilaterally terminated by the Respondents due to causes not attributable to the Claimant. It has also been verified that the Contracts were completed even before the signing of the "Minute of Commencement", so that the

---

[234] Cf. Clauses 18.4.1 and 18.4.2 of the PIGAP Contract, From-1, p. 44; and Clauses 18.7.1 and 18.7.2 of the Carito-Pirital Contract, From-2, p. 49.
[235] Complaint, § 185.
[236] Complaint, § 138.
[237] Complaint, § 207.

execution of the contracted works had not yet begun[238]. The situation described above falls perfectly within the hypothesis provided for in Article 191(1)(c) of the RLCP. It should be recalled that the provision in question stipulates the payment of an compensation of "[u]ten percent (10%) of the value of the work not executed, if the termination occurs when the work has not been started or when the value of the work executed is less than thirty percent (30%) of the original amount of the contract"[239]. In other words, the arbitral tribunal is convinced that the unilateral termination for causes not attributable to the Claimant, operated by the Respondents, took place before the work on the construction site had begun.

348.    The Respondents raise a number of considerations regarding the method of calculation of the compensation provided for in Article 191(1)(c) of the RLCP. It is his understanding that the calculation parameters established therein do not constitute fixed amounts, but rather maximum limits to be assessed by the judge. In this regard, Respondents submit that any compensation awarded under Article 191 of the RLCP must comply with the general principles of Venezuelan civil law, being calculated on the basis of the principle of proven damage[240]. If the Respondents' position were true, the Claimant would have to prove the existence of the damage and the causal relationship between the damage caused and the administration's act.[241]

349.    The arguments of Claimant and Respondents on the calculation of compensation under Article 191 of the RLCP are based on a profound disagreement on the ultimate foundations of the administrative regime, which was clearly expressed in the reports prepared by Professors Badell and Mouriño. On the one hand, the Claimant presents a regulatory regime that seeks to reduce the space in which the administration can behave arbitrarily. On the other hand, the Respondents defend a vision of a regulatory regime based on the quasi-infallibility of the Administration, which is articulated on a multitude of - in the very terms used by the Respondents - exorbitant prerogatives and special advantages. These are irreconcilable points of view that reflect long-standing doctrinal controversies in the comparative administrative law literature.

350.    Notwithstanding its doctrinal interest, it is not for this arbitral tribunal to affiliate itself with one or another abstract approach to Venezuelan administrative law. It has already been said above, but it is worth insisting once again on the point, that this arbitral tribunal is not part of the Venezuelan contentious-administrative jurisdiction. It is not for him to assess the qualities of the current administrative regime, nor to take sides in doctrinal controversies. The role of this arbitral tribunal is to interpret and concretely apply the contractual and legal provisions in question.

---

[238] See *supra* §§ 265-266, 274 et seq.
[239] Article 191, letter c, paragraph 1, reads as follows: "In the case provided for in the preceding article [termination of the contract for causes not attributable to the contractor], the contracting body or entity shall pay Contractor: [...] c) a compensation estimated as follows: 1. Ten percent (10%) of the value of the work not performed, if the termination occurs when the work has not been started or the work performed it has a value of less than thirty percent (30%) of the original amount of the contract". Cf. DeL-28, p. 43.
[240] Counter-memorial §310
[241] Respondent §312

351.   In accordance with its mission, the arbitral tribunal has been convinced by the arguments presented by the Claimant on the correct interpretation of the parameters for the calculation of the compensation provided for in Article 191(c)(1) of the RLCP. In this regard, some observations should be made.

352.   Professor Mouriño understands that the parameters stipulated in Article 191 of the RLCP must be conceived "to limit the damage that can be compensated to the detriment of the contracting administration and thus protect the public patrimony, as required by Article 1 of the LCP"[242]. However, Professor Badell stated that the compensation provided for in the LCP "does not start from a damage alleged by CONTRACTOR, but arises from a presumption of the legislator according to which any early termination for a cause not attributable to CONTRACTOR produces an illegal damage that can be compensated"[243].

353.   It should be recalled that Article 191 of the RLCP uses terms such as "shall pay" and "shall estimate", expressing a high degree of imperativeness regarding the payment obligation. In this context, letter c of the same article provides that the amount of the compensation "shall be estimated" at "ten percent (10%) of the value of the work not executed, if the termination occurs when the work has not been started or if the work executed has a value of less than thirty percent (30%) of the original amount of the contract"[244].

354.   The arbitral tribunal is convinced that the text of the law does not open any semantic space for the free appreciation of the *quantum* of compensation, once there is a duty to compensate on the basis of the percentages predetermined by the legislator.

355.   As if the clarity of the legal text were not enough, the thesis of the application of the civil law principle of proven damage is not very convincing. The Mouriño Report, in support of the argument of proven damage, made use of a ruling of the Political-Administrative Chamber as evidence of the correctness of its thesis[245]. However, the quoted judgment was issued in 2002, while the LCP was enacted in 2014. In this regard, Professor Mouriño did not discuss to what extent the entry into force of the LCP in 2014 could have affected the regime based on proven harm. Nor did it clarify the compatibility of the 2002 decision with Articles 152 and 153 of the LCP.

356.   On the contrary, Professor Badell, in a very didactic way, demonstrated that "(i) the compensation does not start from a damage alleged by CONTRACTOR, but arises from a presumption of the legislator according to which any early termination for a cause not attributable to CONTRACTOR produces an illegal damage that can be compensated; (ii) the proof of damage does not respond to a particular quantification (e.g.: loss of profits, consequential damage, etc.), but is limited to the verification of the assumption in which the administration terminates (resolves) a contract early before the beginning of the execution of the contract, which seems to be uncontroversial in this case), but it is limited

---

[242] Second Mouriño Report, § 95.
[243] Second Badell Report, § 53.
[244] DeL-28, p. 43.
[245] Mouriño Report, § 156.

to the assumption that the case in which the administration terminates (terminate s) a contract in advance before the beginning of the execution, an aspect that seems to be uncontroversial in this case (what is controversial is whether the rescission for breach was appropriate); and (iii) the amount of the compensation does not respond to proven damages, but is directly determined by the legislator, which is why the arguments put forward by Professor [Mouriño] are not in line with the factual and legal situation of the case under analysis"[246].

357.   Consequently, the arbitral tribunal considers that, since the conditions set forth in Articles 152 and 153 of the LCP and 190 of the RLCP are met, the parameters for the calculation of the compensation provided for in Article 191, paragraph 1, letter c, of the LCP are of mandatory application, being not possible to modulate them and it being unnecessary to prove any damage.

358.   It should be noted that the Respondents requested that the eventual condemn to payment of compensation take into account the compensation of fault, materialized in the victim's act, in accordance with Article 1.189 of the Venezuelan Civil Code[247].

359.   It is not necessary to analyze this claim in detail, since this arbitral tribunal has found that the Contracts were unilaterally terminated by the Respondents for reasons not attributable to the Claimant. In other words, the arbitral tribunal has not found any breach of the Contract on the part of the Claimant, and therefore there is no need to compensate the victim's faults or acts.

360.   In view of the foregoing, the arbitral tribunal declares the Claimant's claim for compensation based on Article 191(1)(c) of the RLCP to be admissible, setting the amount of the compensation due by virtue of the termination of the PIGAP Contract at USD 20,999,984 and VEF 88,198,725[248], and by virtue of the termination of the Carito-Pirital Contract in USD 30,869,234 and VEF 2,608,428,129[249].

361.   Finally, it is a public and notorious fact, also alleged by Respondents[250], that Venezuela underwent two currency reconversion processes, one in 2018 and the other in 2021. The Contracts do not contain any clause relating to currency devaluation, nor do they contain any clause expressly distributing the risks of possible inflationary devaluation. This omission means that the risk derived from inflationary processes has been left on the shoulders of the Claimant.

362.   In addition, it should be noted that the Claimant has not made any request for monetary adjustment of the amounts owed in bolivars, so this arbitral tribunal is prevented from indexing such amounts to any price index that may be applicable. Considering that the

---

[246] Second Badell Report, § 53.
[247] Rejoinder, §§ 449 ff.
[248] Value denominated in Bolívar Fuertes (VEF), in accordance with the PIGAP Contract.
[249] Value denominated in Bolívar Fuertes (VEF), in accordance with the Carito-Pirital Contract.
[250] Counter-memorial, §322.

compensation payment will be made in current currency, the amounts owed in bolivares fuertes (VEF) were restated to reflect the aforementioned monetary reconversion processes.

363.   Under the 2018 monetary reconversion, as of August 20, 2018, amounts in bolivares fuertes (VEF) had to be converted to bolivares soberanos (VES), dividing them by one hundred thousand (100,000)[251]. Thus, the amounts owed in VES for compensation are VES 881.98725 in the PIGAP Contract and VES 26,084.28129 in the Carito-Pirital Contract.

364.   Likewise, in light of the monetary reconversion of 2021, as of October 1, 2021, the amounts in Sovereign Bolivars (VES) had to be converted to Digital Bolivars (VED), dividing them by one million (1,000,000)[252]. Therefore, the amounts due in EDV for compensation are EDV 00.0008 in the PIGAP Contract and EDV 00.0260 in the Carito-Pirital Contract.

*b)   The reimbursement of costs and expenses*

365.   The discussion on the reimbursement of costs and expenses claimed by the Claimant revolves around Clauses 18.4 of the PIGAP Contract and 18.7 of the Carito-Pirital Contract, and also relates to the provisions of Article 191(a) and (b) of the RLCP.

366.   In fact, the Contracts contain provisions that provide for the reimbursement of certain amounts in the event of early termination for causes attributable to CONTRACTOR, namely Clauses 18.4.1 and 18.4.2 of the PIGAP Contract and 18.7.1 and 18.7.2 of the Carito-Piritial Contract[253]. The Claimant relies on these provisions to support its claim of reimbursement for costs and expenses incurred with the execution of "preliminary activities" of the Contracts.

367.   However, the arbitral tribunal has detected problems with respect to the Claimant's claim for reimbursement under these clauses, since they establish that only work received by CONTRACTOR to its "entire satisfaction" generates a right of reimbursement. In fact, it has not been proven that the said "preliminary activities" were received by the Respondents, let alone that they were received to their "entire satisfaction". Thus, Clauses 18.4.1 and 18.4.2 of the PIGAP Contract[254] and 18.7.1 and 18.7.2 of the Carito-Pirital Contract[255] are of little use to support Claimant's claim for reimbursement.

368.   However, the arbitral tribunal notes that Article 191 of the RLCP authorizes the reimbursement of work actually performed, as well as the reimbursement of sums incurred for the purchase of materials and equipment incorporated into the work[256]. Logically, it is up to this arbitral tribunal to analyze specifically which costs and expenses have been

---

[251] Cf. Article 1 of Decree No. 3,548 of July 5, 2018, published in Official Gazette No. 41,446.

[252] Cf. Article 1 of Decree No. 4,553 of August 6, 2021, published in Official Gazette No. 42,185.   [253] From-1, p. 44; From-2, p. 49.

[253] De -1, p44;De-2, p.49

[254] De-1, p.44

[255] De-2, p. 49.

[256] De-28, p. 43.

proven and which of these could be reimbursed under the terms of Article 191 of the RLCP.

369.     Although the Claimant requests reimbursement for some 4351 accounting items classified as costs and expenses, its own Excel worksheet shows that for only 819 of these accounting items is there any reference to documents capable of supporting the request for reimbursement[257]. Among the items referencing supporting documents, Respondents were able to demonstrate that several of these documents either cancel each other out or are unrelated to the Contracts [258].

370.     It should be noted that the arbitral tribunal was surprised by Mr. Gediel Deleo's statement, made during the Hearing, that all expense vouchers exist in a Claimant's deposit in Venezuela, but that, for logistical reasons, only the vouchers of those expenses that were considered most significant were submitted[259]. It is worth remembering that the burden of proof is on the one who alleges. In other words, it is not sufficient to state that certain expenses were incurred in order to prove that they were actually incurred.

371.     It should be noted that the Claimant made a choice in its procedural strategy regarding the substantiation of the proof of the items claimed as costs and expenses. This option implies the necessary inappropriateness of the claim for reimbursement related to 3,720 accounting items for which not even evidence confirming their existence was presented. But that's not all. Even in the case of costs and expenses where there is some documentary support for them, the arbitral tribunal was not always convinced of their effective relationship with the Contracts.

372.     In fact, Respondents, as well as their accounting expert, raise issues with several of the invoices submitted by Claimant[260]. The Claimant, on the other hand, states that "[t]he fact that an invoice does not have the phrase 'Carito-Pirital Contract' or 'PIGAP Contract' does not mean that such invoice is not related to those contracts" and that "[t]hese invoices were uploaded to the system at the same time, classifying them by contract, so there is a link to the Contracts that the Respondents claim does not exist"[261]. For the arbitral tribunal, on the other hand, the Claimant's argument cannot be accepted.

373.     It is true that an invoice could be linked to the Contracts without expressly referring to the PIGAP Contract or the Carito-Pirital Contract. However, in such a hypothesis, it is necessary to present other means of proof that allow associating such invoice to the Contracts. For example, the presentation of an invoice in respect of the rental of vehicles, without any other support associating it to the Contracts, is not an adequate means to prove that such expense was effectively related to the Contracts. It should be noted that

---

[257] De-69.
[258] Second Freitas Report, paragraphs 12-27.
[259] Cf. Hearing, Day 2, 2023-01-31 - ICC 24306 - Audio - Part 2.mp3, from 25min13s to 26min21s.
[260] ACounter-memorial, §§ 135 et seq; Freitas Report, §§ 5.5 et seq.
[261] Reply, § 121.

the Claimant was not exclusively focused on the Contracts that are the subject of this arbitration, as will be seen below.

374.  However, the Claimant argues that the internal classification prepared by its own accounting system constitutes sufficient evidence that the claimed costs and expenses are related to the Contracts[262]. This argument is not convincing for the arbitral tribunal either. In other words, it is also not sufficient to submit an invoice and claim that the same Party submitting it, through its own accounting system, has classified that invoice as related to the Contracts. This premise could lead to all kinds of abuses.

375.  It is well known that a business accounting system can be manipulated and is subject to failures. Even Mr. Gediel Deleo, Claimant's witness, stated that the records presented were made by the system operators and not by himself[263]. It is not known who these operators are, where they are located, what are the parameters of their accounting activity and what is the degree of security of this internal system. Therefore, it is clear that the arbitral tribunal cannot take the information automatically generated by this internal accounting system as if it reflected an incontrovertible truth. Therefore, based on a concrete analysis of the documents submitted, the arbitral tribunal has the task of verifying the relationship between the documentary support and the expenses claimed.

376.  Another argument raised by the Claimant regarding the relationship of the invoices submitted with the Contracts also deserves comment. Claimant asserts that the PIGAP Contract and Carito-Pirital Contract were the only contracts that the Claimant had in Venezuelza and that, therefore, all expenses incurred in Venezuela would necessarily be related to the Contracts[264].

377.  The arbitral tribunal is not convinced by this argument. It is possible to imagine many circumstances in which employees of a company that does not operate in a given country incur various expenses in that country, even for the purpose of prospecting for new business.

378.  However, there is something more serious about this allegation. Mr. Gediel Deleo expressly stated during the Hearing that, contemporaneously to the Contracts, there was another QG project in Venezuela, referring to the Quibor Valley project[265]. Therefore, there is a contradiction in Claimant's own thesis, since its witness confirmed that QG carried out other activities in Venezuela in addition to the Contracts. In this scenario, how can the arbitral tribunal verify, for example, that unreferenced invoices do not correspond to the Quibor Valley project? Based on the evidence in the file, the arbitral tribunal does not have the necessary means to make such an assessment.

379.  Another problem related to the reimbursement of costs and expenses relates to their settlement in dollars. Claimant indiscriminately settles all claimed costs and expenses in dollars, even when the original disbursements were made in bolivars. The Respondents do

---

[262] Reply, § 121.

[263] Cf. Hearing, Day 2, 2023-01-31 - CCI 24306 - Audio - Part 2.mp3, from 18min30s to 18min50s.

[264] Reply, §122.

[265] Cf. Hearing, Day 2, 2023-01-31 - ICC 24306 - Audio - Part 2, 11min11s - 11min43s.

not agree with this procedure, asserting that the costs and expenses, if due, "should be reimbursed in the currency in which they were allegedly incurred and within the limits of the allocated item for each stage of the project"[266].

380.  The situation described above has given rise to a long discussion as to what exchange rate should be applied to convert expenses incurred in bolivars to dollars. The arbitral tribunal is convinced that this is a superfluous discussion, since the Contracts established that "[t]he Company shall pay CONTRACTOR, in Bolívares, the national component of the works" and "in foreign currency only the foreign component of the works"[267]. In other words, expenses incurred in dollars had to be paid in dollars, while expenses incurred in bolivars had to be paid in bolivares.

381.  For this reason, in both Contracts, the provision for payment in dollars only existed in connection with the acquisition of machinery and equipment, and all the rest of the prices of the Contracts[268] had to be paid in bolivars. It is observed, therefore, that there is no reason to support the reimbursement in dollars of expenses incurred in bolivars, nor is there any reason to support the conversion to dollars of bolivar-denominated expenses.

382.  After analyzing the documentary evidence submitted by the Claimant[269] and comparing it with the revision produced by the Respondents[270], the arbitral tribunal has found that there are 632 accounting items related to costs and expenses supported by some type of verifiable documentary evidence[271]. In this regard, the analysis made by Mr. Diego de Freitas during the Hearing of the documentary support submitted by the Claimant was quite enlightening[272]. The arbitral tribunal has verified that, of the 632 accounting items supported by documents, 615 are items related to expenses incurred in bolivars and 17 are items related to expenses incurred in dollars[273]. Of the 615 bolivar-denominated items, the arbitral tribunal is convinced that 43 of them are directly related to the[274]Contracts. As to the dollar-denominated items, the arbitral tribunal understands that all of them are directly related to the[275]Contracts.

383.  However, it remains to be clarified whether the costs and expenses contained in these remaining 60 accounting items are eligible for compensation under Article 191 of the RLCP. It is important to remember that the rule in question refers to the payment of the

---

[266] Respondents PHB, § 122.

[267] Cf. Clauses 5.4 and 5.5 of the PIGAP Contract, From-1, p. 14; and Clauses 5.4 and 5.5 of the Carito-Pirital Contract, From-2, p. 12.

[268] Cf. Clause 5.1 of the PIGAP Contract, De-1, p. 13-14; and Clause 5.1 of the Carito-Pirital Contract, De-2, p.11-12.

[269] De-65 and De-66.

[270] Special Review De-069.

[271] See De-066.

[272] Hearing, Day 3, 2023-02-01 - ICC 24306 - Audio - Part 3, 6min25s - 46min50s.

[273] Cf. Special Review From-069.

[274] See Special Revision De-069, lines 9, 10, 11, 12, 13, 14, 14, 15, 16, 17, 18, 19 20, 23, 24, 25, 27, 27, 28, 29, 30, 31, 32, 34, 36, 43, 72, 78, 104, 119, 174, 177, 180, 226, 235, 252, 284, 285, 301, 303, 342, 359, 419, 429, 453.

[275] See Special Revision De-069, lines 86, 89, 96, 103, 103, 107, 191, 217, 266, 333, 343, 367, 371, 402, 403, 411, 455, 624.

price of the work actually executed, as well as the payment of the price of the materials and equipment acquired for incorporation into the work[276].

384. Regarding the first hypothesis, it is uncontroversial that the execution of the work was never even started. As to the second hypothesis, the Claimant has not been able to prove that the claimed costs and expenses correspond to the acquisition of equipment and materials. And even if invoices were submitted in respect of the purchase of equipment and materials, the Claimant would have the burden of proving that these were incorporated into the work performed. However, there is a logical obstacle for this fact to be proven: since there is no work executed, it is not possible to incorporate any equipment and material to it.

385. In view of the foregoing, the arbitral tribunal rejects in its entirety the Claimant's request for reimbursement of costs and expenses.

   *c)  Interest*

386. The arbitral tribunal understands that the payment of the award under Articles 152 and 153 of the LCP and 191 of the RLCP is only due as of the date of this award. Indeed, as Claimant's expert points out, the compensation provided for in these articles "is not based on a damage alleged by CONTRACTOR, but arises from a presumption of the legislator"[277]. That is to say, the obligation to pay compensation under the Articles 152 and 153 of the LCP and 191 of the RLCP arise only at the time of the award, *i.e.,* at the time the award is rendered. Until the judge verifies the subsumption of the facts to these norms, there is no duty to indemnify under these provisions of the LCP and the RLCP. In the same sense, the arbitral tribunal considers that the delay can only take place once the payment obligation exists under Articles 152 and 153 of the LCP and 191 of the RLCP. For this reason, the arbitral tribunal has to reject the request for pre-award interest.

387. The situation is different with respect to post-award interest. It should be recalled that the Arbitration Contracts, the Contracts and the LCP are silent on the possibility of awarding post-arbitration interest. In the absence of contract of the Parties or express provision on this issue, the Rules[278] grant the arbitral tribunal broad discretion to determine the conduct of the proceeding, including with respect to enforcement of the award. Indeed, using this discretion, the arbitral tribunal considers that the widely accepted principle of completeness of compensation leads inexorably to the fixing of interest between the date of notification of the award and the date of actual payment.

388. Post-award interest has two functions. On the one hand, they serve to compensate the party that was deprived of the use and disposal of the capital it did not receive due to the failure of its counterparty to pay an arbitration award in due time. On the other hand, post-award interest serves as a deterrent, encouraging the party to comply with the award in due time and form.

---

[276] Cf. Article 191 of the RLCP, letters a and b, DeL-28, p. 43.
[277] Second Badell Report, §53.
[278] 278 Cf. Article 22(2) of the Rules.

389.  When setting the appropriate interest rate, the arbitral tribunal has to consider these two elements, i.e., the remuneration of the immobilized capital and the debtor's penalty for the delay. Note that it is customary to take as a reference for the remuneration of capital the rate practiced in relation to U.S. Treasury bills with a maturity of one year, which is currently set at around 5%.

390.  However, the arbitral tribunal considers the 12% interest rate claimed by Claimant to be excessive[279], a rate based on a judgment of the Venezuelan Supreme Court of Justice of June 1, 2017[280]. However, the judgment cited establishes the rate of 12% based on the provisions of Article 108 of the Venezuelan Commercial Code[281], which is not applicable in our case, both because it refers to interest on late payment in commercial relations (and the Contracts are of an administrative nature), and because this is an international arbitration based in Paris, France.

391.  Thus, considering the compensatory and penalizing dimension of post-award interest and its discretion on the matter, the arbitral tribunal understands that the appropriate annual interest rate, both for the amount in dollars and for the amount in bolivars, is 6%, i.e., 5% as compensation for the capital tied up on the basis of the rate applied relative to U.S. Treasury bills and 1% as a deterrent to default.

392.  Consequently, the arbitral tribunal rejects the Claimant's claim for the payment of pre-award interest and, instead, orders the payment of interest on the amount of compensation established in this award, which shall be calculated at an annual rate of 6%, applicable between the date of notification of this award and the date of actual payment.

## VI. COSTS

393.  Each Party requests that the arbitral tribunal order the other Party to bear the full fees and expenses of the arbitrators, as well as the ICC administrative expenses. Each Party also requests that the other Party be ordered to reimburse it for the expenses it has incurred in presenting its case in this arbitration.

394.  At its session of June 13, 2023, the Court established the arbitration costs in EUR 670,000 - USD 731,774.00[282]. The claims for reimbursement by each party for the expenses incurred in bringing their respective cases are USD 1,024,210.90 for Claimant [283] and USD 1,772,061.83 for Respondents[284]. Thus, the amount of total costs in this arbitration is set in USD 3,528,046.73.

---

[279] Complaint, §§ 208 and note 198.
[280] De-32.
[281] See De-32, p.28.
[282] Conversion made on the basis of the exchange rate of 1 EUR to USD 1.0922, effective June 19, 2023. Data of the European Central Bank. Accessible in: https://www.ecb.europa.eu/stats/policy_and_exchange_rates/euro_reference_exchange_rates/html/eurofxrefgraph-usd.en.html
[283] Cf. Certification of Claimant's Costs.
[284] Cf. Certification of Respondents' Costs.

395.  The Arbitration Contracts provide that "[t]he costs of the proceedings shall be borne by both PARTIES, in equal shares, unless the arbitral tribunal decides otherwise in its award"[285]. Article 38(5) of the ICC Rules provides that "[i]n making decisions on costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in a cost-effective and expeditious manner".

396.  The arbitral tribunal notes that the Respondents were defeated in the first phase of the proceedings, as their objections to the jurisdiction of the arbitral tribunal and to the admissibility of the claim were rejected in the Partial Award. On the merits, the arbitral tribunal finds that the Claimant's main claim has been recognized. Furthermore, the arbitral tribunal also acknowledges that it has found the Respondents' defense that the costs and expenses claimed by the Claimant are not compensable. Finally, the arbitral tribunal notes that, beyond some delays and complications that could have been avoided, both Parties conducted themselves correctly.

397.  In view of these considerations, the arbitral tribunal understands that the costs of this arbitration should be apportioned under a rule of proportionality, whereby the Respondents bear the percentage of the costs equivalent to the claims obtained by the Claimant. In particular, the arbitral tribunal notes that it has granted 63% of the amounts requested by the Claimant. Consequently, the Respondents shall bear 63% of the total costs of this arbitration, i.e., USD 2,222,669.43. The Claimant, for its part, shall bear 37% of the total costs of this arbitration, i.e., USD 1,305,377.29.

## VII.   RESOLUTION

1. In view of the foregoing, the arbitral tribunal decides the following:

   a)   reject as inadmissible the Respondents' claim that the PIGAP Contract and the Carito-Pirital Contract are invalid, and that, as such, they cannot produce any effect for lack of authorization from the National Assembly;

   b)   dismiss the Respondents' claim that Claimant had waived any compensation under the PIGAP Contract and the Carito-Pirital Contract;

   c)   dismiss the Respondents' claim that the claim would be inadmissible for failure to comply with the preliminary injunction established in Venezuelan law;

   d)   dismiss the Respondents' claim that PDVSA had validly exercised its right to unilaterally terminate the PIGAP Contract, as provided in Clause 5.8.3 of Addendum 1 to this Contract;

   e)   dismissing the Respondents' claim that PDVSA had validly exercised its right to unilaterally terminate the

---

[285] Cf. De-6, p. 14; De-2, p. 68.

Carito-Pirital Contract, provided in Clause 5.8.4 of this Contract; f) dismiss the Respondents' claims that PDVSA has validly exercised its right to terminate the PIGAP Contract, provided in Clause 18.1.1 of this Contract, and must only indemnify QG for the concepts set forth in Clause 18.1.2 of this Contract;

g) dismiss the Respondents' claims that PDVSA has validly exercised its right to unilaterally terminate the Carito-Pirital Contract, as provided in Clause 18.1.1 of this Contract, and must only indemnify QG for the items set forth in Clause 18.1.2 thereof;

h) declare that the Respondents have unilaterally terminated the PIGAP Contract and the Carito-Pirital Contract for causes not attributable to the Claimant;

i) order the Respondents jointly and severally to pay the compensation stipulated in Articles 152 and 153 of the LCP and 191 of the RLCP for the unilateral termination for causes not attributable to the Claimant of the PIGAP and Carito-Pirital Contracts, in accordance with the amounts set forth in paragraphs j), k) and l);

j) to established the compensation set forth in Articles 152 and 153 of the LCP and 191 of the RLCP with respect to the termination of the PIGAP Contract at USD 20,999,984 and VED 00.0008;

k) to establish the compensation set forth in Articles 152 and 153 of the LCP and 191 of the RLCP for the termination of the Carito-Pirital Contract in USD 30,869,234 and VED 00.0260;

l) determine that the sums in paragraphs j) and k) of this provision are due with an annual interest rate of 6%, calculated from the date of notification of this award until the date of actual payment of the compensation;

m) declare that the costs and expenses claimed by Claimant are not compensable under Venezuelan law and the Contracts;

n) declare the Respondents' claim regarding the fact of the victim provided for in Article 1.189 of the Venezuelan Civil Code to be inadmissible;

o) declare the Claimant's claim for payment of pre-award interest on the amounts of the condemnation inadmissible;

p) order the Respondents to bear 63% of the total costs of this arbitration, i.e., USD 2,222,669.43;

q)  order the Claimant to bear 37% of the total costs of this arbitration, i.e., USD 1,305,377.29;

r)  order the immediate payment of the compensations established in this award, as well as the amounts due as arbitrators' fees and administrative costs;

s)  dismiss all other claims of the Parties.

Paris (France), July 25, 2023

[Signature]                                  [Signature]
Cristian Conejero Roos                       Franco Ferrari
Co-arbitrator                                Co-arbitrator

[Signature]
Diego P. Fernandez Arroyo
President Arbitral tribunal

I María José Fernandez Marengo certify that I am fluent in both English and Spanish languages and that the document above is a complete translation of the attached document on this 26th day of the month of March of 2024. ------------------------------------------------------------------------------------------------------------------------